# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL G. VOGT, | ) | |
| Individually and on Behalf | ) | |
| of All Others Similarly | ) | No. 16-04170-CV-C-NKL |
| Situated, | ) | June 4, 2018 |
| | ) | Jefferson City, Missouri |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| V. | ) | VOLUME II |
| | ) | (Pages 38-218) |
| STATE FARM LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |


TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE NANETTE K. LAUGHREY

SENIOR UNITED STATES DISTRICT JUDGE


Proceedings recorded by electronic stenography

Transcript produced by computer

Page  39

```
 1                        APPEARANCES
 2
       For Plaintiffs:      MR. NORMAN ELI SIEGEL
 3                          MR. ETHAN M. LANGE
                            Stueve Siegel Hanson, LLP
 4                          460 Nichols Road, Suite 200
                            Kansas City, MO 64112
 5
                            MR. JOHN J. SCHIRGER
 6                          MR. MATTHEW W. LYTLE
                            MR. JOSEPH M. FEIERABEND
 7                          Miller Schirger, LLC
                            4520 Main St., Suite 1570
 8                          Kansas City, MO 64111
 9     For Defendant:       MR. TODD A. NOTEBOOM
                            Stinson Leonard Street LLP
10                          150 South Fifth Street, Suite 2300
                            Minneapolis, MN 55402
11
                            MR. JEREMY A. ROOT
12                          Stinson Leonard Street LLP
                            230 W. McCarty Street
13                          Jefferson City, MO 65101
14                          MR. BRADLEY J. ANDREOZZI
                            Drinker Biddle & Reath LLP
15                          191 N. Wacker Drive, Suite 3700
                            Chicago, IL 60606
16
                            MR. WAYNE B. MASON
17                          Drinker Biddle & Reath LLP
                            1717 Main Street, Suite 5400
18                          Dallas, TX 75201
19
20
21
22
23
24
25
```

Page 40

```
 1                    I N D E X
 2                    VOLUME I
                    (Pages 1-37)
 3
    JUNE 1, 2018
 4
    Pretrial discussions                              7
 5
                      - - -
 6
                    VOLUME II
 7                  (Pages 38-218)
 8  JUNE 4, 2018
 9  Plaintiffs' opening statement                    52
    Defendant's opening statement                    61
10
    PLAINTIFFS' WITNESSES:
11
      MICHAEL VOGT
12        Direct Examination by Mr. Schirger         74
          Cross-examination by Mr. Andreozzi         81
13
      SCOTT WITT
14        Direct Examination by Mr. Lytle            82
          Resumed Direct Examination by Mr. Lytle    99
15        Resumed Direct Examination by Mr. Lytle   138
          Cross-examination by Mr. Root             149
16        Redirect Examination by Mr. Lytle         198
          Recross-examination by Mr. Root           208
17
                      - - -
18
                    VOLUME III
19                  (Pages 219-370)
20  JUNE 5, 2018
21  PLAINTIFFS' WITNESSES (continued):
22    Plaintiffs' Exhibit 246, video deposition
          testimony of Carl Streily, was played    247
23        for the jury
24    Plaintiffs' Exhibit 247, video deposition
          testimony of Jeffrey Holzbauer, was       247
25        played for the jury
```

1

DEFENDANT'S WITNESSES:

2

ALAN "RUSTY" HENDREN
3      Direct Examination by Mr. Mason      254
      Cross-examination by Mr. Feierabend      271
4      Redirect Examination by Mr. Mason      284
      Recross-examination by Mr. Feierabend      285

5

ANNE GRON
6      Direct Examination by Mr. Noteboom      286
      Resumed Direct Examination by Mr. Noteboom      302
7      Cross-examination by Mr. Lytle      319
      Redirect Examination by Mr. Noteboom      334

8

DAVID WEINSIER
9      Direct Examination by Mr. Noteboom      335
      Cross-examination by Mr. Lange      250

10

- - -

11

VOLUME IV
12               (Pages 371-432)

13  JUNE 6, 2018
14  Instructions conference      377
15  Plaintiffs' closing argument      389
      Defendant's closing argument      403
16  Plaintiffs' rebuttal argument      416
17  Verdict read      428

18               - - -

19         E X H I B I T S

| 20 | PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 21 | 25 - Vogt application amendment | 365 | 366 |
| 22 | 27A - Vogt policy | 104 | 105 |
| 23 | 28 - annual notice for Vogt policy | 365 | 366 |
| 24 | 51 - UL actuarial memorandum | 213 | 214 |
| 25 | 53 - actuarial memo | 213 | 214 |

```
 1    55 - underlying pricing mortality      213      214
 2    57 - 1994 COI history (Excel file)     213      214
 3    58 - 2001 COI history (Excel file)     213      214
 4    64 - Jent memo about COI reduction     246      246
 5    125 - Witt declaration with exhibits   117      118
 6    125A - Witt CV                         100      100
 7    128 - Witt supplemental declaration    117      118
 8    129 - Feb. 5th supplemental flashdrive 213      214
 9    135 - 1/1/94-6/30/94 UL guaranteed
            monthly deduction rates per $1,000 365     366
10
      137 - 94000 UL current monthly
11          deduction rates per $1,000       365      366
12    138 - 1/1/94-6/30/94 UL guaranteed
            monthly deduction rates per $1,000 365     366
13
      235A - spreadsheet of policies with
14           no lost account value           365      366
15    240 - flash drive with spreadsheets re:
            lost account value variation     365      366
16          calculations
17    241 - summary of lost account value    130      131
            (exclusions)
18
      242 - crossover, summary of lost       137      137
19          account value (exclusions)
20    243 - pooled, summary of lost account  140      140
            value (exclusions)
21
      244 - PC, summary of lost account value 143     143
22          (exclusions)
23    245 - demonstrative exhibit            145      --
24    246 - Carl Streily video depo testimony 246     246
25    247 - Jeffrey Holzbauer video depo     246      246
            testimony
```

Page  43

1

DEFENDANT'S EXHIBITS                          OFFERED   RECEIVED

2

1 - NJ actuarial memo                         113       113

3

6 - substandard COI table rates              365       366

4

29 - UL brochure                              213       214

5

48 - 11/1/2013 request for cash surrender     365       366

6

168 - 1994 COI rate file materials            365       366

7

177 - MO policyholder information            181/365   181/366

8

227A - Anne Gron CV                           292       292

9

228A - David Weinsier CV                      343       344

10

244 - Witt mortality rate/State Farm          301       302

11      COI rate comparison

12  245 - demonstrative exhibit                          --

13                          * * * * *
                            * * * *

14
15
16
17
18
19
20
21
22
23
24
25

1   can you describe for the jury what you mean?

2   A.      So in -- on, I believe, January 1st of 2002, State Farm

3   introduced a new cost of insurance scale that was applicable to

4   this policy form, and I believe for ages above 30, 30 or 31,

5   somewhere around in there, the rates were generally lower in

6   the 2002 scale than they were in the 1994 scale.

7   Q.      So there was a reduction in the cost of insurance rates

8   in 2002?

9   A.      Broadly speaking, yes.

10   Q.      Before we get to any more detail about that, can you

11   explain to the jury, what's a pricing mortality table?

12   A.      Probably the easiest way to understand that is it is an

13   expectation of what the life insurance company thinks is going

14   to happen in the future with respect to mortality.  And it's

15   important for them to use a mortality table that is a -- has

16   realistic expectations built into it because they use that

17   table in their pricing to see if they hit their profit targets

18   and if the policy has been priced appropriately.  So the intent

19   with the pricing mortality table is to make sure that it

20   appropriately represents your own experience and approximates

21   the mortality characteristics that you would expect to see from

22   the group going forward.

23   Q.      And you compared those pricing tables, then, to the

24   cost of insurance rate tables?

25   A.      I did.  There's one additional complicating factor I

1   should point out just for completeness.  To each of those

2   experience tables, State Farm then applied a factor to convert

3   the experience mortality table into a pricing mortality table.

4   And in general it's a percentage that reduces it.  Broadly

5   speaking, those percentages are somewhere between 85 and 100

6   percent, and they lower the experience mortality table a bit to

7   come up with the pricing mortality table.  So when we talk

8   about a pricing mortality table, it's actually a product of an

9   experience mortality table, multiplied by some kind of scaler

10  to adjust.  Oftentimes companies may do it for anticipated

11  future experience or improvements that have happened during

12  that lag period from when the study was done to when the

13  charges were going to be actually levied within the policy.

14  Q.    Did you document your work in this case, Mr. Witt?

15  A.    I did.

16  Q.    Did you prepare a report?

17  A.    I did.

18        MR. LYTLE:  Your Honor, may I approach?

19        THE COURT:  You may.

20        MR. LYTLE:  We'll move on.  I apologize, Your Honor.

21  BY MR. LYTLE:

22  Q.    So in reaching your first opinion that the cost of

23  insurance rates that State Farm used for the 94030 policy

24  contained factors in addition to pricing mortality, can you

25  just describe again for the jury the process you went through

Page 113

1    to reach that determination?

2    A.    Sure.  It wasn't a very complicated one.  As I said,

3    just by inspection, I could see that the cost of insurance

4    rates in many instances were higher than the pricing mortality.

5    I also noted in one or more of State Farm's own documents that

6    there was reference to the pricing mortality rates being loaded

7    for expenses and profit, so, again, it was self-evident that

8    the cost of insurance rates contained something other than

9    mortality because State Farm's documents said that they did.

10              MR. LYTLE:  Okay.  Your Honor, at this time I would

11   offer Defendant's 1, which its admissibility has already been

12   stipulated.

13              THE COURT:  It's admitted.

14              (Defendant's Exhibit 1 was admitted into evidence.)

15   BY MR. LYTLE:

16   Q.    Mr. Witt, on the screen there, you'll see the document

17   that's been marked as Defendant's Exhibit 1.  Do you recognize

18   that document, sir?

19   A.    I do.

20   Q.    And what is that document?

21   A.    This is an actuarial memorandum, and I can tell from

22   the markings that this is to the State of New Jersey.

23   Q.    Is this one of the documents you reviewed in reaching

24   your opinion that the cost of insurance rates contained factors

25   in addition to pricing mortality?

Page 114

1    A.    It is.

2    Q.    Where in that document, sir -- it might be a little

3    cumbersome, if you can -- is this one of the documents from

4    which you identified the pricing mortality that was used?

5    A.    It is.  Could you -- yeah, keep going.  Let me -- so

6    there's a section there where underneath the mortality where it

7    shows that --

8              THE COURT:  Let me interrupt for just a minute.  For

9    those of you in the jury box, you can pull your screens out and

10   up so you can see it more easily.  Because I know I can't read

11   this.

12             JUROR:  Oh, that looks a lot better.

13             THE COURT:  You can get it up and closer to you.

14   There you go.

15             MR. LYTLE:  Your Honor, just to clarify, does Your

16   Honor need hard copies of the exhibits, or are you also viewing

17   them on the screen?

18             THE COURT:  I'm viewing them, but I would like hard

19   copies also.

20             MR. LYTLE:  You would like hard copies.  All right.

21   We can do that for you.  We'll get that taken care of for you,

22   Your Honor, I apologize.

23             THE COURT:  I don't need it right now.  I'm able to

24   see it on the screen now, but I need a stack of them so I can

25   keep those by me.

Page 115

1          MR. LYTLE:  We will take care of that.

2    BY MR. LYTLE:

3    Q.    Mr. Witt, you were looking at this document and

4    describing what you were seeing there in terms of the mortality

5    assumption?

6    A.    Correct.  So this document would be in reference to the

7    1994 cost of insurance rates that were developed, and within

8    the section that is underlined mortality, you can see that

9    there's reference to X percent of the 88-91, and SFL I assume

10   is State Farm Life.  And the 88-91 State Farm Life, I interpret

11   that to be an experience mortality table.  And in order to get

12   the so-called pricing mortality assumption, a percentage is

13   multiplied times that table.

14         The document goes on to describe what that

15   percentage is.  It starts off at 85 percent up until age 61,

16   and then it starts to increase by 1 percent for each age, and

17   it is then capped at 100 percent.

18   Q.    So in doing your analysis, did you rely upon the

19   mortality assumption as described in this document in selecting

20   the pricing mortality rate that you used to compare to cost of

21   insurance rates?

22   A.    That was one of the things I relied on.

23   Q.    Mr. Witt, you stated earlier that you had documented

24   your work in this case, correct?

25   A.    Correct.

Page 120

1   benefit.  It is that amount, that net amount at risk which is

2   used as the basis for calculating cost of insurance charges.

3   So in any given period, you take that net amount at risk.  And

4   you multiply it times the applicable cost of insurance rate,

5   and that gives you the cost of insurance charges.

6            There's some other little technical aspects to make

7   things mathematically sound, but at a high level, it's as

8   simple as that.  To determine cost of insurance charges, you

9   take the stated cost of insurance rate and multiply it times

10  the net amount at risk.

11  Q.    Thank you, Mr. Witt.  You mentioned earlier that in

12  performing your analysis to determine that there were other

13  factors in addition to those allowed for by the policy and the

14  cost of insurance rates, you compared the cost of insurance

15  rates to the pricing mortality rates and that you relied on the

16  New Jersey actuarial memorandum to select the pricing mortality

17  rates used in your analysis.

18           What was it about the New Jersey actuarial

19  memorandum that caused you to rely on that?  Why did you rely

20  on that document, sir?

21  A.    Well, in my experience, an actuarial memorandum

22  provides a description for the underlying pricing, and it was

23  apparent to me that, not only in the New Jersey memorandum, but

24  in multiple other places within deposition testimony and

25  exhibits provided by State Farm, that the pricing mortality for

Page 121

1    the development of those 1994 cost of insurance rates and then

2    subsequently the 2002 cost of insurance rates did, indeed,

3    originate from the pricing mortality tables.

4    Q.    And did the New Jersey actuarial memorandum also

5    confirm the existence of factors other than mortality?

6    A.    It did.  I believe there was a sentence or two in there

7    that specifically said that the mortality factors were adjusted

8    upward for profit and expense loading.

9    Q.    And I've got on the screen there, Mr. Witt, Page 3 of

10   Exhibit D1, under the heading II, compliance with New Jersey's

11   statutes and regulations.  Is that what you're referring to?

12   A.    That's part of it.  There's a bullet point on the

13   middle of that page, the second bullet point underneath Roman

14   Numeral II says, "The current monthly cost of insurance rates

15   were developed based on our current pricing mortality."  So

16   that was another piece of evidence.

17         Later on near the bottom of that page, it says these

18   rates were loaded for expenses and profit margins.

19   Q.    Is that the language you're referring to there, sir?

20   A.    It is.

21   Q.    And did that give you some comfort that your conclusion

22   that the rates included loads for other than or in addition to

23   mortality was correct?

24   A.    Yeah.  I mean, really the rest of that investigation

25   was largely academic.  If you have an actuarial memorandum that

1   listing, so there's one row for every single policy.  I believe

2   these policies are listed in chronological order, which should

3   roughly correspond with when they were issued.  So these

4   policies at the top should be the oldest policies, generally

5   speaking.

6           And then Column B is the lost account value that I

7   described previously.  So, again, in order to come up with

8   that, I first replicated the stated account value using State

9   Farm's own data, and that serves as the base line.  And then a

10  second model was used to recalculate the account value where I

11  simply substituted in the pricing mortality for the cost of

12  insurance.  And by stripping out the portion of the cost of

13  insurance rates that are attributable to non-mortality

14  elements, I was able to then calculate a recalculated account

15  value.  By comparing the recalculated account value with the

16  original account value, I'm able to determine a lost account

17  value for each policy, and that value for each policy is what

18  you see here.  There are close to 24,000 rows here.

19  Q.    And if we scroll down this page, sir, you've done the

20  total, correct?

21  A.    Correct.  So the bottom row with numbers in it there,

22  you can see that the total lost account value is

23  $35,285,901.22.

24  Q.    Could you read that for me again, Mr. Witt?

25  A.    $35,285,901.22.

1   Q.      What is the -- can you describe for the jury what a

2   select and ultimate rate is?

3   A.      Yeah, when you hear reference to a select and ultimate

4   table, what it basically means is that a different rate is

5   being used -- a different mortality rate, or it could be a cost

6   of insurance rate in some situations, is being used based on

7   how long it has been since the policyholder has gone through

8   underwriting.  The theory is if you have just recently gone

9   through underwriting, the company knows more about your health

10  and future mortality than they would somebody who went through

11  underwriting ten or twenty or thirty years ago.

12          So if you take a look at a 35-year-old, for

13  instance, a newly issued -- a 35-year-old who was newly

14  underwritten and newly issued a policy, if the company

15  determined that they were a nonsmoker in good health, the

16  company would have more confidence that that person would

17  exhibit a relatively low mortality rate than, say, a

18  35-year-old who bought the policy when they were 20 years old

19  and it's now been 15 years since they were underwritten.

20          And so the select and ultimate table concept is a

21  way that enables the insurance company to reflect a more

22  accurate mortality or cost of insurance rate during that select

23  period.

24  Q.      And in a select and ultimate table, sir, is there a

25  unique rate for a policyholder of a given age, sex, and rate

1  class for each policy year?

2  A.    Yes.  There is a different -- there is a different rate

3  for each policy year based on those characteristics.

4  Q.    And would a pooled rate table differentiate -- your

5  understanding of a pooled rate table that's been talked about

6  in this case, does that differentiate by policy year, sir?

7  A.    It does not.

8  Q.    But the pricing mortality tables that you used in this

9  case were the select and ultimate?

10  A.    They are.  The first table had a five-year select

11  period.  That was the table that went into the 1994 cost of

12  insurance pricing.  The table that went into the 2002 pricing

13  had, I believe, a 25-year select period.

14  Q.    And also, were there any other issues that you're aware

15  of that have been raised by State Farm or its experts with your

16  analysis?

17  A.    I'm aware of an issue that I have referred to as a

18  crossover issue.

19  Q.    And can you describe for the jury the crossover issue,

20  please, sir?

21  A.    So the easiest way to understand this is that in my

22  analysis, my understanding of the theory of damages in my

23  model, I used the lesser of the cost of insurance rate or the

24  pricing mortality with the understanding that there were no

25  damages, there were no -- there was no lost account value in

1   situations where the cost of insurance rate was already below

2   the pricing mortality.

3         State Farm contends that it should have been a

4   straight substitution, that instead of using the cost of

5   insurance rates, the pricing mortality should have been used

6   across the board in every instance, even in situations where

7   the cost of insurance rate was lower than the pricing

8   mortality.

9   Q.    And do you know, sir, if State Farm's experts performed

10  an analysis or calculation to determine the effect that would

11  have on the damages or the lost account value figures that

12  you've put forward?

13  A.    I am not aware that they have.

14  Q.    Did you perform that analysis, sir?

15  A.    I did.

16  Q.    Did you document that analysis?

17  A.    I did.

18  Q.    Describe for me the documentation and process.

19  A.    So very similar to the exhibit that is on the screen

20  right now, I created additional exhibits that incorporated

21  State Farm's contentions.  So essentially a what-if scenario,

22  what if State Farm is right about these various points.  And I

23  prepared three additional exhibits.  One addressed the

24  crossover issue in isolation, one addressed the pooled --

25  Q.    Let's stay with just the crossover issue in isolation.

Page 137

1    Okay, Mr. Witt?

2    A.    Oh.

3    Q.    And did you prepare that in what we've put together as

4    Trial Exhibit P242?

5    A.    Yes.

6          MR. LYTLE:  Your Honor, at this time I would offer

7    Exhibit P242.

8          MR. ROOT:  Same objection to P242 as to 241.

9          THE COURT:  All right.  I'm going to overrule it on

10    those grounds.

11          (Plaintiffs' Exhibit 242 was admitted into evidence.)

12    BY MR. LYTLE:

13    Q.    Mr. Witt, on the screen there, you'll see Exhibit P242.

14    Can you describe for the jury what's reflected here?

15          THE COURT:  Let's go ahead and take a lunch break.

16    We're a minute from noon, and I know we're going to spend some

17    time with this, so now is a good time.

18          I want to remind the jury of the instructions I've

19    previously given you.  Don't talk amongst yourselves about the

20    case or anyone involved with it.  If anyone tries to talk to

21    you about the case, you must report it to me immediately.  You

22    must not do any independent research or talk to anybody outside

23    the jury pool about the case.  I may not repeat these every

24    time that I take a recess, but you are bound by these rules

25    throughout the trial.

Page 139

1    A.    I do.

2    Q.    And could you again state what your opinion is for the

3    total lost account value?

4    A.    My opinion for this class of policyholders is that the

5    aggregate lost account value, due to the inclusion of

6    non-mortality components in the cost of insurance rates and

7    charges, that lost account value is $35,285,901.22.

8    Q.    And the number of class members?

9    A.    That is 23,895.

10    Q.    And then immediately before lunch, sir, we were looking

11    at Exhibit No. 242?

12    A.    Yes.

13          MR. LYTLE:  And, Your Honor, if I may approach, I've

14    got Your Honor's copy of the CD for Exhibit 242.

15          THE COURT:  Okay.

16          MR. LYTLE:  And I also have a copy of D1, which was

17    admitted earlier.

18    BY MR. LYTLE:

19    Q.    And Exhibit 242, sir, that was your summary of lost

20    account value for the class, accounting for the crossover

21    effect that you testified about; is that right?

22    A.    Yes.

23    Q.    And if we scroll down to the bottom there, what is your

24    opinion with respect to the lost account value to the class,

25    accounting for the crossover effect?

Page 140

1    A.      If the lost account value is recalculated using State

2   Farm's contention with respect to the crossover issue, the

3   aggregate lost account value is $34,333,495.81.

4    Q.      And the class member number, sir?

5    A.      It's the same number of class members.

6    Q.      And we were also speaking before lunch, sir, about the

7   pooled rates issue.  Do you recall that?

8    A.      I do.

9    Q.      And did you -- are you aware, sir, whether plaintiffs'

10  expert calculated the lost account value using the so-called

11  pooled rates in place of the pricing mortality?

12   A.      I'm not aware of that.

13   Q.      But you did perform that calculation, didn't you?

14   A.      I did.

15   Q.      And did you document your calculation, sir?

16   A.      I did.

17   Q.      How did you document that calculation?

18   A.      Similar to the exhibit you see here, I had another

19  Exhibit D that addressed the pooled mortality issue.

20   Q.      And that was the Exhibit P243?

21   A.      Correct.

22          MR. LYTLE:  Your Honor, at this time I would offer

23  Exhibit P243.

24          MR. ROOT:  Same objection.

25          THE COURT:  That's overruled.  You may proceed.

Page 141

1              (Plaintiffs' Exhibit 243 was admitted into evidence.)

2              MR. LYTLE:  May I approach, Your Honor?

3              THE COURT:  You may.

4     BY MR. LYTLE:

5     Q.    Mr. Witt, on the screen in front of you is Exhibit

6     P243.  Can you please explain to the jury what is reflected in

7     Exhibit P243?

8     A.    This exhibit has the same format as the others we've

9     looked at, has one row for every policy number, and then a

10    recalculated lost account value which uses the pooled mortality

11    that State Farm contends should have been used in lieu of the

12    nonpooled mortality that I used in my calculation.

13    Q.    And if we scroll all the way down to the bottom there,

14    sir, what is the aggregate lost account value using the

15    so-called pooled rate?

16    A.    $24,385,346.34.

17    Q.    How many cents, sir?

18    A.    Thirty-four.

19    Q.    How many class members?

20    A.    The same number of class members, 23,895.

21    Q.    Sir, based on the documents that you've reviewed and

22    relied upon in reaching your opinion, does it make any sense to

23    use pooled rates in place of the -- or to compare to the cost

24    of insurance rates in this case?

25    A.    Not based on the documents I've reviewed.

Page 142

1    Q.      Why not?

2    A.      They didn't exist in the documents that I reviewed.   In

3    deposition transcripts, deposition exhibits, actuarial

4    memoranda, spreadsheets supplied by State Farm, one after the

5    other did not use pooled mortality.

6    Q.      And the mortality rates that they did use, is that the

7    85 percent of the State Farm pricing mortality tables that you

8    testified about?

9    A.      It was -- it started at 85 percent for one of the

10   experience tables.   With the later experience table, the

11   percentages were different, but those are the tables, yes.

12   Q.      And those were select and ultimate tables, correct?

13   A.      Yes.

14   Q.      Mr. Witt, are you aware -- one of the other

15   observations made by State Farm's experts is that you didn't

16   account for -- we talked about the crossover against your

17   model, and we've talked about running your model with pooled

18   rates in place of pricing mortality rates.   Are you aware, sir,

19   of whether State Farm's experts did a calculation of lost

20   account value using, A, pooled rates, and, B, accounting for

21   the crossover against those pooled rates?

22   A.      I saw evidence that they had performed such a

23   calculation for Mr. Vogt's policy, but I saw no evidence that

24   the calculation had been performed for the entire class.

25   Q.      And you did perform that calculation for the entire

Page 152

1    the State Farm 88-91 mortality assumption; is that right?

2    A.    Part of it.  Could you repeat the question?  I'm not

3    sure what you're asking me.

4          MR. ROOT:  I'm sorry.  Would you mind reading it

5    back?

6          (The requested portion of the record was read.)

7    A.    So one of the assumptions that I had to make was what

8    does pricing mortality mean with respect to the theory of

9    damages.

10   BY MR. ROOT:

11   Q.    When you use the term pricing mortality, is that a term

12   you're familiar with in your pricing work as an actuary at

13   Northwestern Mutual?

14   A.    It is.

15   Q.    And are you trying in your work to isolate the

16   component of the cost of insurance that was actually charged by

17   State Farm to customers that relates to their mortality?

18   A.    I am.

19   Q.    And what, if any, difference do you make on the basis

20   of tobacco use among policyholders in your model?

21   A.    Tobacco use is incorporated within the mortality on a

22   blended basis.

23   Q.    It's incorporated in the mortality on a blended basis.

24   Does that mean that smokers and nonsmokers are charged the same

25   in your model?

1    A.      The pricing -- when the substitution is done, I used

2    the pricing mortality that the evidence suggested, stronger

3    than suggested, the evidence made it clear was the pricing

4    mortality that was used, and so I substituted that pricing

5    mortality into the model.  That pricing mortality blended

6    smoker status.

7    Q.      You agree that tobacco use is material to mortality

8    expectations, right?

9    A.      I do.

10   Q.      And so a person who smokes or uses tobacco is -- has a

11   higher mortality risk than a person who doesn't smoke or use

12   tobacco, right?

13   A.      I agree.

14   Q.      And Mr. Vogt's policy, which has been, I believe,

15   introduced into evidence as Defendant's Exhibit 1 --

16          MR. ROOT:  Can you pull that up?  Defendant's

17   Exhibit 1 -- I'm sorry, P27A.  I apologize.  Can you go to Page

18   3?  Not Page 4, Page 3, under schedule of benefits.

19   BY MR. ROOT:

20   Q.      Do you see that, Mr. Witt?

21   A.      I do.

22   Q.      What does it say next to basic amount?

23   A.      In parentheses it says, Table 4 rate class, male

24   non-tobacco.

25   Q.      In your work reviewing State Farm's actual cost of

Page 155

1    Q.      Doesn't he have a lower mortality expectation than the

2    smoker?

3    A.      Yes.

4    Q.      And so if you're trying to isolate the mortality

5    component of his charge, why does it make sense to use the same

6    charge for a smoker and a nonsmoker?

7    A.      It makes sense because under the terms of the policy

8    and the interpretation as I understand it, I was compelled to

9    use the pricing mortality that State Farm used.  So regardless

10   of what my professional opinions are, it was unambiguous when I

11   looked through the evidence as to what the pricing mortality

12   was that State Farm used.  And if State Farm used a table that

13   blended smokers and nonsmokers together, I had no alternative

14   but to use a blended rate.

15   Q.      Could you have used your actuarial judgment?

16   A.      I could have.

17   Q.      You chose not to do that, right?

18   A.      I was not -- that was not the scope of my engagement.

19   Q.      Your engagement was not as an actuary?

20   A.      I don't view it that way.

21   Q.      Let's look at the New Jersey actuarial memoranda.  Do

22   you have that exhibit?  It's Defense Exhibit 1.  Are you --

23   you're familiar with actuarial memoranda like this, aren't you,

24   Mr. Witt?

25   A.      I am.

Page 158

1    insurance rates based on the 88-91 SFL table for male tobacco,

2    female tobacco, male non-tobacco, and female non-tobacco?

3    A.    No.

4    Q.    Would those rates be differentiated by the mortality

5    expectations of the expected policyholders?

6    A.    They would.

7    Q.    Would those rates be loaded for expenses and profit

8    margins?

9    A.    Eventually they would be.

10   Q.    And the way the narrative is described right here,

11   would they have been loaded yet?

12   A.    I don't believe so.

13   Q.    And you did not use separate rates for male tobacco and

14   male non-tobacco in your model.

15   A.    Those rates were not available.

16   Q.    But you didn't use them.

17   A.    I did not.

18   Q.    Do you agree with me, sir, that this memorandum

19   describes the creation of those rates?

20   A.    I agree that it describes the creation of them.

21   Q.    And did you do anything to understand what those rates

22   were in your work on this project?

23   A.    I searched in vain through all of the provided

24   documentation and deposition transcripts and exhibits and Excel

25   spreadsheets provided by State Farm and did not find adequate

Page 159

1    information to be able to reflect those tables in my work; and,

2    in fact, I found repeated references and tables that were

3    blended and described as pricing mortality.

4    Q.    Let me ask it a slightly different way.  What efforts,

5    if any, did you make to understand how the mortality assumption

6    worked in the spreadsheet pricing model that was produced to

7    you?

8    A.    I familiarized myself with it, and, like I said, looked

9    for -- looked to see if there were tobacco-distinct rates

10   available, and the preponderance of the evidence in my view was

11   that those, those -- the pricing mortality table was considered

12   to be a tobacco-blended table.

13   Q.    Do you remember when you gave a deposition in this case

14   on February 22, 2018?

15   A.    I do.

16   Q.    And you were under oath at that time?

17   A.    I was.

18        MR. ROOT:  Casey, can you play 309, 1 through 10?

19        MR. LYTLE:  Objection, Your Honor, improper

20   impeachment.

21        THE COURT:  Sustained.

22   BY MR. ROOT:

23   Q.    Did I ask you the same question I asked you today, and

24   did you give a different answer?

25   A.    I don't recall.

Page 162

1    Q.     You're aware that State Farm differentiated based on

2    tobacco.

3    A.     Based on?

4    Q.     Tobacco.

5    A.     In the development of the cost of insurance rates, yes.

6    I am aware of that.

7    Q.     Did anyone suggest that State Farm didn't differentiate

8    on the basis of tobacco in developing cost of insurance rates?

9         THE COURT:  You can answer that question, and we'll

10   go back to the other question.

11   A.     Okay.  I believe in Mr. Streily's deposition and

12   Mr. Holzbauer's deposition, there was no -- there was ample

13   opportunity to clarify that blended rates were used, and I

14   don't believe there was any indication that they were.

15         And to be clear, smoking status is taken into

16   account in a blended rate.  It's a blend between smoking and

17   nonsmoking.

18   BY MR. ROOT:

19   Q.     But Mr. Vogt was charged a lower rate because he's a

20   non-tobacco user, correct?

21   A.     Charged a lower rate in my model?

22   Q.     No, by State Farm.

23   A.     His actual COI rate was lower than for somebody

24   similarly situated who would have been a smoker.

25   Q.     All right.  So all the smokers in the class under your

Page 205

1    A.    In the January 30th report, I did not take into account

2    face amount increases, so I knew when that report was submitted

3    that that was an issue that still needed to be addressed.

4    Q.    And you subsequently addressed that issue?

5    A.    I did.  A handful of days later, I was able to complete

6    that portion of the analysis and supplement the report.

7    Q.    When you supplemented the report, it was the $36.3

8    million, right?

9    A.    That is correct.

10   Q.    And that's still been revised to reflect the removal of

11   folks who are not in the class as defined by the Court to

12   arrive at your opinion today?

13   A.    That is correct.  That is correct.

14   Q.    And that opinion today is what, again?

15   A.    My opinion is that when the non-mortality components

16   are removed from the cost of insurance rates that State Farm

17   actually used, the calculation of the lost account value for

18   the class is $35,285,901.22.

19   Q.    Mr. Witt, you were asked several questions about the

20   tobacco -- tobacco rates that are used or whether the rates

21   that you used in your analysis accounted for tobacco use.  Do

22   you remember those questions?

23   A.    I do.

24   Q.    And do the rates that were used, pricing mortality

25   rates that you used in your analysis consider tobacco?

Page 206

1    A.    Yes and no.  They consider tobacco on an aggregate

2    basis.

3    Q.    And that's a blended rate?

4    A.    Correct.

5    Q.    But regardless of the blending for tobacco, is it your

6    understanding, sir, that that's a weighted average of smokers

7    to nonsmokers?

8    A.    That's my understanding.

9    Q.    And regardless of the tobacco pooling issue, the

10   pricing mortality rate table still assigns a specific rate to

11   each policyholder of the same age and same policy year; is that

12   right?

13   A.    Could you clarify?

14   Q.    Sure.  In the select and ultimate rate table that you

15   used for the pricing mortality assumption in your analysis, a

16   policyholder with an issue age of 54 would have a rate for the

17   first year, a different rate for the second year, different

18   rate for the third year, but in the COI rate tables that State

19   Farm actually charged, every person of age 54 would have the

20   same COI rate, regardless of the policy year they were in; is

21   that fair?

22   A.    Yeah.  I mean, to clarify a little bit more, if you're

23   talking about a 54-year-old, let's say three different

24   54-year-olds, one that was issued today, one that was issued a

25   year ago, and one that was issued two years ago, with a select

Page 371

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL G. VOGT, | ) | |
| Individually and on Behalf | ) | |
| of All Others Similarly | ) | No. 16-4170-CV-C-NKL |
| Situated, | ) | June 6, 2018 |
| | ) | Jefferson City, Missouri |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| V. | ) | VOLUME IV |
| | ) | (Pages 371-432) |
| STATE FARM LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE NANETTE K. LAUGHREY

SENIOR UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography

Transcript produced by computer

Page  417

1   class members down here who get zero.  And if you look at

2   Exhibit 243, we've calculated -- just like I showed you on 241,

3   this one shows what every person would get in the state of

4   Missouri if you applied pooled rates.  And I submit that it's

5   not plaintiffs setting a high bar hoping you'll go lower, it's

6   defendants hoping that you'll ignore Mr. Witt's testimony,

7   you'll ignore his analysis, which was based exclusively on

8   State Farm's data, to discount.

9           That's the only reason we're here.  It's your --

10  it's their hope that you will not give full damages to the

11  class as some sort of compromise.  Don't do it.  Don't do it.

12  People will get zero.  It's only -- if you apply this

13  crossover, which I'll talk about in a minute, it's 29 people.

14  That's the number of people we're talking.  It's not a lot.

15  But if you look at the zeros -- this is 242.  If you look at

16  the zeros at 243, this goes up to several hundred or hits a

17  thousand.  And what they're doing there --

18          COURTROOM DEPUTY:  What are you wanting to use?

19          MR. SIEGEL:  This pad.  This iPad thing.  There we

20  go.  It's there.

21          So I showed you this in my portion of the closing.

22  What they're trying to do is say, you know what, even though we

23  were obligated to charge a mortality-only rate, we want the

24  jury to think that that rate was somehow pooled.  And remember

25  one other critical thing if you want to talk about house of