1

**The Honorable Barbara J. Rothstein**

2

3

4      **UNITED STATES DISTRICT COURT**
       **FOR THE WESTERN DISTRICT OF WASHINGTON**
5                    **AT TACOMA**

6   WILLIAM T. WHITMAN, individually and on    )   NO. 3:19-cv-06025-BJR
    behalf of all others similarly situated,        )
7                                                    )
              Plaintiff,                             )
8                                                    )   **DECLARATION AND REPORT OF**
          vs.                                        )
9                                                    )   **SCOTT J. WITT**
    STATE FARM LIFE INSURANCE                        )
10   COMPANY,                                        )
                                                     )
11            Defendant.                             )
                                                     )
12                                                   )
                                                     )
13  ─────────────────────────────────────           )

14

15

16

17

18

19

20

21

22

23

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 1

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

# DECLARATION AND REPORT OF SCOTT J. WITT

## Qualifications and Experience

1.     My name is Scott J. Witt. I am an actuary and president of Witt Actuarial Services, LLC, a fee-only insurance advisory and actuarial firm. I am an independent consultant who is compensated on a fixed fee or hourly basis by my clients. I have been engaged by Plaintiff William T. Whitman through counsel to provide testimony as an actuarial expert in this case. I am being compensated at a rate of $450 per hour. For sworn testimony I am compensated at a rate of $550 per hour. For travel time I am compensated at a rate of $225 per hour. A copy of my CV, including a list of all publications I have authored in the previous ten years and a list of all other cases in which I have testified as an expert in the previous four years, is attached hereto as Exhibit A.

2.     I am a 1993 graduate of Montana Tech with a B.S. in both mathematics and computer science. I graduated from Oregon State University in 1995 with a M.S. in statistics.

3.     Over the last 25 years I have worked extensively with life insurance products, both as an actuary for Northwestern Mutual Life and then as a fee-only insurance advisor. During my 25 years of experience as an actuary, I have obtained comprehensive experience, knowledge, and expertise in many aspects of actuarial science and life insurance, including but not limited to: universal life insurance products; pricing and valuation of life insurance products; pricing and analysis of underlying assumptions used in the development of life insurance products; and analysis of risks associated with life insurance products. As part of my experience, I have routinely analyzed mortality assumptions, experience, and tables, as well as the rates used to assess monthly charges on life insurance products.

4.     In the ten years I spent as an actuary at Northwestern Mutual, I was positioned in several areas directly responsible for development, analysis, and management of life insurance, including whole, universal, variable, and term life products. My time at Northwestern Mutual included work on experience studies, valuation, marketing (or competition), corporate modeling, and life insurance product pricing.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  Through my various roles I directly participated in: evaluation and analysis of mortality experience and

2  risk; development of mortality rate scales or tables; evaluation and analysis of policy interest rates;

3  evaluation and setting of reserves, and ensuring compliance with statutory regulations regarding reserves;

4  modeling performance of life insurance under changing policy scenarios, assumptions, and features;

5  illustration testing, including lapse-support and self-support testing; and pricing and repricing of life

6  insurance and other products, including the review and analysis of pricing and repricing efforts.

7       5.     I have significant additional experience with life insurance policies as a fee-only (non-

8  commission) insurance advisor, where I am routinely required to offer unbiased objective advice to

9  clientele as they plan to purchase, or attempt to re-evaluate, permanent life insurance policies. In order

10  to offer such advice, it is often necessary that I deconstruct or reverse-engineer life insurance policies, in

11  particular the cash value components of permanent policies and their underlying rates and charges.

12  Therefore, I have analyzed thousands of different life insurance policies, including universal life

13  insurance policies with features like those related to the product at issue in this case.

14       6.     I have served as an expert in litigation involving life insurance policies and cost of

15  insurance charges, including litigation involving State Farm Life Insurance Company ("State Farm") and

16  the universal life insurance product at issue in this case ("Form 94030"). Specifically, I served as an

17  expert at trial in *Vogt v. State Farm Life Insurance Company*, No. 2:16-cv-04170-NKL in the Western

18  District of Missouri, Central Division. I also have offered opinions as an expert in *Bally v. State Farm*

19  *Life Insurance Company*, No. 3:18-CV-04954-CRB in the Northern District of California. Among other

20  opinions in both cases, I testified as to State Farm's determination of cost of insurance rates ("COI rates")

21  and calculation of cost of insurance charges ("COI charges") for Form 94030, and I presented a

22  methodology for determining lost Account Values for a class of Missouri policy owners (*Vogt*) and

23  California policy owners (*Bally*) resulting from COI overcharges.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 3

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

7.      I maintain actuarial designations as a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein. I am a Financial Services Affiliate member of the National Association of Personal Financial Advisors. I am licensed to engage in the business of insurance in the state of Wisconsin, and I have completed the Series 65 examination administered by the Financial Industry Regulatory Authority.

8.      All my opinions and conclusions are consistent with my training, experience, education, and judgment as an insurance actuary. All my opinions and conclusions have been reached to a reasonable degree of actuarial and mathematical certainty using available data and information.

### Materials Considered

9.      In preparing to make this Declaration and Report, I have reviewed and/or relied upon the following documents:

- Mr. Whitman's Second Amended Class Action Complaint filed March 16, 2020;

- Form 94030, including the policy insuring the life of Mr. Whitman and bearing a policy number of LF-1853-4088 and policy date of January 16, 2001 ("Whitman Policy" at Exhibit B);

- January 15, 2019 and January 15, 2018 Annual Statements provided to Mr. Whitman by State Farm (PLTF-WHITMAN-00000019-24 & PLTF-WHITMAN-00000031-36) (Exhibit C);

- June 20, 2013 and April 29, 2019 Life Insurance Illustrations provided to Mr. Whitman by State Farm (PLTF-WHITMAN-00000109-14 & PLTF-WHITMAN-00000660-65) (Exhibit D);

- Mr. Whitman's discovery requests and State Farm's responses to those requests;

- Documents reflecting the pricing and determination of COI rates for Form 94030, including:

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

- o Form 94030 New Jersey Actuarial Memorandum (VOGTM00001398PROD-1418PROD)[1] (Exhibit G);

- o Form 94030 South Carolina Actuarial Memorandum (VOGTM00001455PROD-1475PROD) (Exhibit H);

- o Form 94030 2001 COI rate Adjustment Actuarial Memorandum (SFLIC-W-067057-67065) (Exhibit K);

- o 10/4/2001 Email re: Mortality Assumption Documentation (VOGTM00122308PROD) (Exhibit J);

- o 94000 UL – Historical Asset Share Input Screens Workbook (VOGTM00003020PROD);

- o 94000 UL – Historical Asset Share Input Screens Workbook (VOGTM00003019PROD);

  - • Deposition testimony about Form 94030, including:

- o Transcript of the deposition of State Farm employee and expert Carl Streily, taken on November 7, 2017 (Exhibit E), including exhibits to the deposition;

- o Transcript of the deposition of State Farm's corporate representative Jeff Holzbauer, taken on November 30, 2017 and December 1, 2017 (Exhibit I), including exhibits to the deposition;

- o Transcript of the deposition of State Farm's corporate representative Tony Phipps, taken on December 8, 2017 (Exhibit F), including exhibits to the deposition;

- o Transcript of the deposition of State Farm's employee and corporate representative at trial, Alan "Rusty" Hendren, taken on November 30, 2017 (Exhibit M), including exhibits to the deposition;

  - • Certain other documents provided in or prepared during the *Vogt* and *Bally* litigation, including:

- o The declarations I provided in those cases, including declarations I offered in support of the plaintiffs' motions for class certification, declarations I offered for trial, and exhibits and materials used in support of those declarations;

- o State Farm's discovery responses, including its Supplemental Answers and Objections to plaintiff Vogt's Third Interrogatories; and,

---

[1] I understand that the same materials produced and at issue in the *Vogt* case have been reproduced here. As such, there are instances where I refer to documents bearing Bates numbers beginning with the prefix "VOGTM."

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

o December 21, 2017 letter from counsel for State Farm to counsel for plaintiff Vogt, regarding "Policyholder Account Data 94030 policies issued in Missouri."

- Policy-level data produced for Washington Form 94030 policy owners (SFLIC-W-000001-26);

- 1980 Commissioners Standard Ordinary mortality tables, available at mort.soa.org;

- Documents produced in my turnover materials; and

- All other documents specifically referenced, herein.

## Summary of Opinions

10. Relying on my training, background, experience, and judgment as an insurance actuary, as well as my review of documents produced in this case, including those identified above, I have reached the following opinions.

a. When Form 94030 was originally priced, State Farm determined a "pricing mortality rate" (an assumption for its mortality expectations used in pricing Form 94030) using age, sex, rate class, and policy year. Monthly COI rates for Form 94030, however, were determined using not only State Farm's mortality expectations used in pricing Form 94030 but also loads for other non-mortality related factors in excess of and in addition to those mortality expectations.

b. Form 94030 was subject to a repricing of its COI rates effective at the beginning of the 2002 calendar year. When Form 94030 was repriced, State Farm determined a "repricing mortality rate" (an assumption for its mortality expectations used in repricing Form 94030) using age, sex, rate class, and policy year. State Farm's repricing of monthly COI rates for Form 94030 did not eliminate State Farm's inclusion of loads for other non-mortality related factors in excess of and in addition to mortality expectations.

c. Using State Farm's own documents and data, and the methodology proposed herein, I can calculate amounts attributable to these loads to a reasonable degree of actuarial and mathematical certainty for each and every Form 94030 policy issued to members of the class. Specifically, using State Farm's own documents and data, and the formula for calculation of each policy's "Account Value," as provided by the terms of Form 94030, I can calculate lost Account Value for each policy in the class that resulted from State Farm's deduction of COI charges calculated using COI rates that included loads in excess of its mortality expectations used in pricing/repricing. I employed the same methodology for Missouri owners of the same policy form in *Vogt* where it was accepted at trial and used by the jury to determine class-wide damages. I employed the same

DECLARATION AND REPORT OF SCOTT J. WITT - NO. 3:19-CV-06025-BJR - 6

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

methodology for California owners of the same policy form in *Bally* where the class was certified.

d. Using State Farm's own data and the model/formula proposed herein, the lost policy Account Value resulting from State Farm's deduction of COI charges calculated using COI rates that include loads in excess of State Farm's mortality expectations used in pricing/repricing, can readily be determined to a reasonable degree of actuarial and mathematical certainty for each and every Form 94030 policy issued to class members. Using the policy-level data produced by State Farm, I have determined that amount to be $16,304,618.86.[2]

11.    As stated above, I previously reviewed and relied upon materials produced in the *Vogt* and *Bally* cases in issuing opinions in those matters on the same policy form that is at issue in this case, Form 94030. I offered my opinions in those cases as to State Farm's pricing, repricing, and determination of COI rates for Form 94030, and also offered a methodology for determining lost Account Values for policy owners class wide. I offer those same opinions again here. As in *Vogt* and *Bally*, my methodology for assessing lost Account Values in this case relies on removing the non-mortality related loads from COI rates. In other words, I replace the loaded COI rates actually charged by State Farm with COI rates where amounts in excess of State Farm's stated mortality expectations for Form 94030 are removed. As described below, State Farm's mortality expectations used in pricing and repricing COI rates for Form 94030 were determined using the mortality factors of age, sex, rate class, and policy year (or duration).

12.    My declarations in both *Vogt* and *Bally* include explanation of the methodology for calculating lost Account Values employed in those cases and further include reference to certain deposition transcripts, pricing materials, actuarial memoranda, mortality expectations (assumptions), mortality studies, and mortality rate tables that were provided by State Farm and that I reviewed and/or

---

[2] Given my experience in *Bally* and *Vogt*, I understand that certain policies included in the policy-level data will ultimately be excluded from the class prior to trial because they do not meet the class definition or their owners decide to exclude themselves from this lawsuit. I offer the total lost Account Value calculation here only to demonstrate that class-wide calculation can be done and my methodology can be commonly applied to every Washington Form 94030 owner.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 7

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

relied upon in forming my opinions in those matters. I rely on these same materials here, a number of which I again identify above.

13.     Although the *Vogt* and *Bally* classes consisted of Missouri and California policy owners, respectively, the opinions and analysis that I presented in those cases are applicable here. As verified by State Farm's own employees (and actuarial expert offered at trial in *Vogt* and again in *Bally*), the pricing, re-pricing, and determination of COI rates for Form 94030 are the same everywhere Form 94030 was sold, including being the same for Missouri, California, and Washington policy owners. State Farm has identified and produced the same relevant materials in *Vogt*, *Bally*, and this matter. For example, in both the *Vogt* and *Bally* cases, State Farm produced and relied upon the New Jersey actuarial memorandum for Form 94030 as setting forth the pricing assumptions for Form 94030. I relied on this same document in my declarations and testimony in *Vogt* and *Bally*, and do so again here.

## **Pertinent Facts**

### *Whitman's Class Action Counts*

14.     I understand Count I of Mr. Whitman's Class Action Complaint asserts that the COI rates provision in Form 94030 precludes State Farm from calculating COI charges using COI rates that are loaded with non-mortality related factors in addition to and in excess of State Farm's mortality expectations used in pricing/repricing COI rates for Form 94030. I understand Count I further asserts that State Farm did, in fact, breach the policies to the extent that COI rates and charges were loaded with non-mortality related factors in addition to and in excess of those mortality expectations.

15.     I understand Count II of Mr. Whitman's Class Action Complaint asserts that the monthly expense charge ("Expense charge") provision in Form 94030 precludes State Farm from deducting monthly Expense charges to policy owners in excess of the specified amount of $5 identified in the policy. I understand Count II further asserts that State Farm did, in fact, breach the policies to the extent that

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 8

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

State Farm's loading of COI rates and charges resulted in additional expenses to policy owners in excess of the fixed monthly Expense charge.

16.    I understand Mr. Whitman's Class Action Complaint includes additional Counts for conversion, violation of the Washington Consumer Protection Act, and declaratory and injunctive relief due to the alleged conduct I have summarized above.

***Universal Life Insurance***

17.    State Farm's Form 94030 – the policy form on which the Whitman Policy was issued – is a type of permanent life insurance commonly known in the industry as "universal life." Universal life policies are intended to provide coverage for the life of the insured. Universal life policies differ from more "traditional" life insurance, such as "term life" or "whole life" insurance, in several respects:

- Generally speaking, universal life policies include both a death benefit and an investment feature that allows the owner to pay premiums into a policy's cash value (the "Account Value" in the Whitman Policy). This cash value has the potential to grow over time with additional premium payments and interest credits as identified in the policy. The policy remains in force as long as the cash value remains positive, meaning it is sufficient to cover the policy's specified charges each month.

- The cash value of universal life policies is subject to a "Monthly Deduction," which typically includes separately identified and defined charges, including a non-guaranteed cost of insurance charge (determined using certain factors disclosed in the life insurance policy) and a fixed expense charge. These policies typically also provide for a number of other various charges taken on the occurrence of certain policy events (for example, a surrender charge).

- Universal life policies generally provide more flexibility as to the amount and timing of premium payments than that afforded by more "traditional" life insurance.

DECLARATION AND REPORT OF SCOTT J. WITT - NO. 3:19-CV-06025-BJR - 9

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

- Universal life policies are designed to offer more transparency to the policy owner than more "traditional" types of life insurance by separately identifying cash flows for premiums, policy charges, and interest gains. The monthly deductions for universal life policies are often described as "unbundled," meaning the monthly deductions are broken down into separately identified charges.

18.     Here, Form 94030 identifies the components of the Monthly Deduction as including the "Cost of Insurance," determined through application of the "Monthly Cost of Insurance Rates," and a fixed policy expense charge, separately identified as the "monthly expense charge." The unbundling of policy charges for Form 94030 is demonstrated in the "Guaranteed Values Provisions" section, which identifies the formula for calculating the policy Account Value. See attached as Exhibit B, the Whitman Policy at pp. 9-10.

*Washington 94030 Policy and Insured Characteristics*

19.     State Farm issued thousands of policies in Washington over the course of a decade. The first policy was issued 1994 and the last policy was issued 2004. State Farm has provided data sufficient for identifying its Form 94030 policies issued in Washington through its policyholder master record ("PMR") data produced at SFLIC-W-000001 and SFLIC-W-000026. The PMR data identifies insured and policy characteristics for each Form 94030 policy issued in Washington. I understand that the data was provided as current through October 14, 2020.[3]

20.     I can identify members of the class by applying basic Excel filters to the data. For instance, by filtering for policies that contain a kind status, or "kstat," equal to 1 or 5, I can eliminate riders, paid-

---

[3] I note that some transactions entered on October 14, 2020 have an effective date of October 15, 2020. I anticipate it may be necessary to update my calculation at a future date using then current data (in other words, as additional COI transactions take place for currently in-force policies after the last available transaction date in the data as currently produced). Inputting these additional transactions into my methodology is simply an administrative function and can be done if and when required.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 10

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

up dependent policies, and death benefit increases. I can omit policies that were cancelled and refunded in full (and thus ultimately did not pay cost of insurance charges) by filtering for policies with the status "TRM-NOT-TKN." I can likewise omit policies terminated prior to January 1, 2002, and can filter out those policies issued to age zero males that were terminated on or before their first policy anniversary, as those policies were not subject to any non-mortality load. Additionally, I can filter for those policies for which State Farm's transactional data reflects no transactions. Applying each of these filters results in a count of 11,116 policies.

21.    The PMR data (filtered as stated above) reflects that 4,281 policies (38.51%) remain in force. In contrast 6,809 policies (61.25%) had been terminated. There are 25 additional policies pending lapse due to insufficient cash value, and 1 additional policy had a death claim pending (0.23% combined). Only 247 policies in the proposed class were terminated by death claim, which accounts for 2.2% of all policies and 3.6% of policy terminations.

**_Form 94030_**

22.    The terms of Form 94030 provide that, upon issuance of the policy, the Account Value is equal to the initial premium, after the deduction of a percent of premium charge in the amount of five percent, less the Monthly Deduction for the first policy month. Exhibit B at pp. 3, 9. Thereafter:

> The account value on any deduction date after the policy date is the account value on the prior deduction date:
>
> (1)    plus 95% of any premiums received since the prior deduction date,
> (2)    less the deduction for the cost of insurance for any increase in Basic Amount and the monthly charges for any riders that became effective since the prior deduction date,
> (3)    less any withdrawals since the prior deduction date,
> (4)    less the current monthly deduction,
> (5)    plus any dividend paid and added to the account value on the current deduction date, and
> (6)    plus any interest accrued since the prior deduction date.
>
> The account value on any other date is the account value on the prior deduction date:
>     (1) plus 95% of any premiums received since the prior deduction date,

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 11

**Tousley Brain Stephens PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

       (2) less the deduction for the cost of insurance for any increase in Basic Amount and the monthly charges for any riders that became effective since the prior deduction date,

       (3) less any withdrawals since the prior deduction date, and

       (4) plus any interest accrued since the prior deduction date.

Exhibit B at p. 9.

23.     Form 94030 separately identifies the COI charge and Expense charge as components of the policy's "Monthly Deduction" as follows:

**Monthly Deduction**. This deduction is made each month, whether or not premiums are paid, as long as the cash surrender value is enough to cover that monthly deduction. Each deduction includes:

       (1) the cost of insurance,

       (2) the monthly charges for any riders, and

       (3) the monthly expense charge.

Exhibit B at p. 9.

24.     A Form 94030 policy remains in force as long as the Account Value remains positive, meaning it is sufficient to cover the Monthly Deduction, including the COI charge and Expense charge. See Exhibit B at p. 9.

25.     Form 94030 describes the calculation of the COI charge as follows:

**Cost of Insurance.** This cost is calculated each month.  The cost is determined separately for the Initial Basic Amount and each increase in Basic Amount.

The cost of insurance is the monthly cost of insurance rate times the difference between (1) and (2), where:

       (1) is the amount of insurance on the deduction date at the start of the month divided by 1.0032737, and

       (2) is the account value on the deduction date at the start of the month before the cost of insurance and the monthly charge for any waiver of monthly deduction benefit rider are deducted.

Until the account value exceeds the Initial Basic Amount, the account value is part of the Initial Basic Amount.  Once the account value exceeds that amount, if there have been any increases in Basic Amount, the excess will be part of the increases in order in which the increases occurred.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 12

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1    Exhibit B at p. 10. The divisor 1.0032737 is equal to one month of an annual accumulation rate of 4%,

2    compounded monthly (rounded to seven decimal places).

3        26.     Therefore, the monthly COI charge is calculated by multiplying the COI rate by the

4    policy's net amount at risk. Exhibit B at p. 10. The net amount at risk represents the amount by which

5    the policy's specified death benefit (discounted by one month of accumulation at 4% interest) exceeds

6    the Account Value. Thus, the net amount at risk is the net amount of its own funds State Farm would

7    expect to pay in the event the policy insured dies at any given time.

8        27.     Regarding the "Cost of Insurance Rates," the policy states:

9            **Monthly Cost of Insurance Rates.** These rates for each policy year are based on the
             Insured's age on the policy anniversary, sex, and applicable rate class. A rate class will

10           be determined for the Initial Basic Amount and for each increase. The rates shown on
             page 4 are the maximum monthly cost of insurance rates for the Initial Basic Amount.

11           Maximum monthly cost of insurance rates will be provided for each increase in the
             Basic Amount. We can charge rates lower than those shown. Such rates can be adjusted

12           for projected changes in mortality but cannot exceed the maximum monthly cost of
             insurance rates. Such adjustments cannot be made more than once a calendar year.

13

14   Exhibit B at p.10.

15       28.     Form 94030's Expense charge is a separate, fixed amount deducted from the Account

16   Value. Exhibit B at pp. 3, 9.

17       29.     In addition to policy charges, State Farm earns revenue through its investment spread,

18   essentially the difference between the amount it earns investing the policyholders' Account Value and

19   what it credits to policyholders in interest. Likewise, State Farm earns revenue through policy loan

20   interest (see Exhibit B at p. 11) and surrender charges (see Exhibit B at pp. 4, 10).

21

22

23

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 13

1      *State Farm's Mortality Assumptions for Form 94030*

2           30.     Policy year[4], age, sex, and rate class (or the "underwriting class of the person insured,"

3      see Exhibit B at p. 5) are characteristics associated with an insured's mortality risk. See attached as

4      Exhibit E, the deposition of State Farm employee (and offered expert in the *Vogt* case), Carl Streily, at

5      pp. 64, 87-88, 155-160, 196-197 (explaining that policy year, age, sex, and rate class are used to

6      determine the expected mortality risk of an insured); attached as Exhibit F, the deposition of State Farm

7      employee and designated representative in the *Vogt* case, Tony Phipps, at pp. 24-25 (explaining that

8      duration, age, sex, and rate class are "mortality factors" used in "mortality tables"). In other words, these

9      are characteristics used to determine mortality expectations for insureds – a probabilistic forecast,

10     commonly associated with and quantified as a rate, that insureds sharing a common set of mortality

11     characteristics will die.

12          31.     To determine the mortality expectations associated with Form 94030, I relied on State

13     Farm's own pricing and repricing documents for Form 94030. I also relied upon the testimony of State

14     Farm's employees and representatives. In other words, I have used the mortality expectations that State

15     Farm states it actually incorporated into its pricing and repricing models for Form 94030 for purposes of

16     the methodology for calculating lost Account Values explained in this report.

17          32.     Carl Streily, a State Farm employee and proffered expert in *Vogt*, identified "mortality

18     assumption" as synonymous with "the expected mortality that we expect on that business" and further

19     confirmed the mortality assumption, or expected mortality, for Form 94030 was the "assumption

20     embedded into the pricing or repricing of that particular policy form." Exhibit E at pp. 64, 87 – 88.

21

22

23     _____

[4] Duration, or "policy year," matters for purposes of determining an insured's mortality expectation. See Exhibit E at p. 196-197. As additional years pass since an insured has gone through underwriting, the greater the chance the assigned risk classification is no longer accurate due to changes in insured behavior, circumstances, health conditions, etc.

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 14

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

33.     Different states have different filing requirements when an insurance company intends to issue a new policy form in a given state. Therefore, not all state filings for Form 94030 contain an identification of the assumptions used in pricing the policy. Here, the pricing of Form 94030 is reflected in the New Jersey Actuarial Memorandum for Form 94030. See attached as Exhibit G, the New Jersey Actuarial Memorandum for Form 94030; Exhibit H, the South Carolina Actuarial Memorandum for Form 94030 (generally reflecting same as New Jersey Actuarial Memorandum for Form 94030); see also, e.g., Exhibit E at pp. 146 – 152, 166; attached as Exhibit I, the deposition of State Farm employee and designated representative, Jeff Holzbauer, at p. 65, 73 – 77. The pricing approach described in the New Jersey Actuarial Memorandum is the same approach used for any state, i.e., State Farm used a single approach to pricing, regardless of where a policy was sold.

34.     The New Jersey Actuarial Memorandum for Form 94030 provides that its mortality assumption at pricing was determined to be "X% of 88- 91 SFL" mortality table where X% is equal to "85% for ages less than 61 and increases 1% for each age after 60 to a maximum of 100% for ages > 74." See Exhibit G at p. 5; Exhibit F at p. 7. As identified in the New Jersey Actuarial Memorandum, the following adjustments are used to convert State Farm's 88-91 SFL table to the Form 94030 mortality expectations prior to 2002:

| Age | % 88-91SFL | Age | % 88-91SFL | Age | % 88-91SFL | Age | % 88-91SFL |
|-----|-----------|-----|-----------|-----|-----------|-----|-----------|
| <61 | 85% | 64 | 89% | 68 | 93% | 72 | 97% |
| 61 | 86% | 65 | 90% | 69 | 94% | 73 | 98% |
| 62 | 87% | 66 | 91% | 70 | 95% | 74 | 99% |
| 63 | 88% | 67 | 92% | 71 | 96% | >74 | 100% |

35.     The deposition testimony of Carl Streily further confirms these percentages of the 88-91 SFL table as State Farm's mortality assumption used in pricing Form 94030. See Exhibit E at pp. 149 – 151. Jeff Holzbauer also confirmed that the above percentages of the 88-91 SFL mortality table were used as the mortality assumptions for Form 94030 at the time of pricing. See Exhibit I at pp. 73 – 74, 77 – 78, 90 – 91.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

36.     Effective January 1, 2002, State Farm reduced its COI rates for insured's aged 31 and above. See attached as Exhibit J, an October 4, 2001 email between employees of State Farm regarding "Mortality Assumption Documentation" for Form 94030; attached as Exhibit K, the 2001 Actuarial Memorandum for the Form 94030 repricing. "The current monthly cost of insurance rates were redetermined based on revised pricing mortality." Exhibit K at SFLIC-W-067057. The revised pricing mortality was "89% of 93-97 SFL for male lives" and "86% of 93-97 SFL for female lives." Exhibit K at SFLIC-W-067059; see also Exhibit I at pp. 92-93 ("Q. Yeah, is the mortality here that's listed . . . as a percentage of the 93-97 SFL table, . . . the repriced mortality assumption that was used in the 2002 repricing of 94[0]30? A. It was used in 2002, but only for future mortality. Q. Okay.  By future mortality, you mean that was the projection from that point forward, is that correct?  A. Yes."), and at pp. 103-104 ("Q. Is this the 93-97 table that was used in the repricing of the current cost of insurance rate tables for Form 94[0]30 that was effective in January of 2002?  A. To the best of my knowledge it was."). "93-97 SFL is a (sex distinct) company experience table with a twenty-five year select period. 93-97 SFL mortality rates for male lives and female[] lives for ages 20, 35, and 55 are attached (Attachment 3)." Exhibit K at SFLIC-W-067059.

37.     The aforementioned mortality assumptions were the same assumptions I testified to and incorporated into the methodology that I presented to, and that was accepted by, the jury at trial in the *Vogt* case. These are the same mortality assumptions that I also testified to and incorporated into my methodology in *Bally*. Again here, I incorporate these assumptions into my methodology for calculating lost Account Values for the prospective class.

38.     At the *Vogt* trial, and again in the *Bally* case, State Farm has challenged my methodology and the assumptions input into my methodology on several grounds. For instance, State Farm contended that use of the aforementioned mortality assumptions was improper because they are not "tobacco-distinct." Tobacco-distinct, in this instance, references where mortality rates for individuals of the same

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

age, sex, rate class, and policy year are different for tobacco users as compared to non-tobacco users. I did not use tobacco-distinct mortality tables because the documents and testimony revealed that percentages of the 88-91 SFL tobacco/nontobacco blended ("blended") pricing mortality table and 93-97 SFL blended repricing mortality table were the mortality assumptions actually used by State Farm in determining COI rates, rather than tobacco-distinct mortality rates. See, for example, the 94000 UL – Historical Asset Share Input Screens Workbooks (VOGTM00003019PROD-3020PROD), containing blended pricing and repricing mortality tables; Exhibit G, Attachment 1 (same); Exhibit H, Attachment 1 (same). The New Jersey Actuarial Memorandum – the document that describes State Farm's pricing approach – does not reflect a tobacco distinct mortality rate. See Exhibit G. I have seen no evidence in this case, nor in *Vogt* or *Bally*, that State Farm used tobacco-distinct versions of the 88-91 SFL or 93-97 SFL mortality tables in pricing and repricing COI rates for Form 94030.

39.     At the *Vogt* trial, and again in the *Bally* case, State Farm also challenged my methodology where I used the "unpooled" mortality rates identified by State Farm in its pricing materials rather than "pooled" mortality rates. "Pooled," in this instance, references where mortality rates for individuals of the same age, sex, and rate class are the same regardless of how long they have held the policy, whereas mortality rates that are "unpooled" are different for individuals of the same age, sex, and rate class if they have been insured for different lengths of time.[5] The reason I did not use "pooled" mortality is because the documents and testimony revealed that the percentages of the "unpooled" 88-91 SFL pricing mortality table and 93-97 SFL repricing mortality table were the mortality assumptions actually used by State Farm in determining COI rates, rather than "pooled" mortality rates. See, for example, the 94000 UL – Historical Asset Share Input Screens Workbooks (VOGTM00003019PROD-3020PROD), containing

---

[5] Duration, or "policy year," matters for purposes of determining an insured's mortality expectation (see Exhibit E at p. 196-197), but a "pooled" mortality rate does not differentiate for duration.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

"unpooled" pricing and repricing mortality tables; Exhibit G, Attachment 1 (same); Exhibit H, Attachment 1 (same). The New Jersey Actuarial Memorandum – the document that describes State Farm's pricing approach – does not reflect "pooled" mortality rates. See Exhibit G. I have seen no evidence suggesting that a "pooled" version of the 88-91 SFL or 93-97 SFL mortality tables existed at the time of pricing or repricing.

40.     I understand that, in awarding damages consistent with my methodology, the jury in *Vogt* rejected State Farm's contention that its mortality assumption used in pricing and repricing Form 94030 was "pooled," tobacco-distinct, or anything other than the mortality assumptions reflected in State Farm's Form 94030 pricing and repricing materials and incorporated into my methodology. I am unaware as to whether State Farm intends to, or is permitted to, renew those contentions here. I have seen no evidence suggesting the existence or use of any "pooled" or tobacco-distinct version of either pricing or repricing mortality for Form 94030. I do note that as part of the *Vogt* litigation one of State Farm's actuaries attempted to retroactively "pool" the 88-91 SFL and 93-97 SFL tables, but that is the only "pooled" mortality table I have seen. That actuary conceded at the time that he had to create these tables "because State Farm did not actually assign mortality-only charges to each attained age cost of insurance rate." Exhibit L, excerpt of Feb. 28, 2018 Declaration of Jeffrey Holzbauer. While I would not agree that use of pooled or tobacco-distinct assumptions is supported by fact, in the event the Court or jury were to agree such assumptions were appropriate, I can input those assumptions into my methodology to determine lost Account Values. I would simply substitute such rates into my model instead of the pricing and repricing mortality rates that I have currently input. However, appropriate pooled or tobacco-distinct mortality tables would need to be created because State Farm did not develop such tables in setting COI rates for Form 94030.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 18

1

*State Farm Loads Amounts in Excess of its Mortality Expectations in its COI Rates*

2          41.      My review of the documents produced by State Farm, along with my training, experience,

3    education, and judgment as an insurance actuary, have led me to conclude that the COI rates for Form

4    94030 include non-mortality related loads in addition to and in excess of State Farm's mortality

5    expectations, as used in pricing and repricing Form 94030.

6          42.      In reaching this conclusion, I have reviewed, among other documents referenced herein,

7    COI rate tables produced by State Farm, actuarial memoranda for Form 94030, State Farm's discovery

8    admissions, certain native Excel workbooks containing pricing inputs and tables of mortality assumptions

9    and COI rates for Form 94030, and the deposition transcripts of State Farm employees, among other

10   documents I have referenced in this report.

11         43.      For instance, the New Jersey Actuarial Memorandum for Form 94030 reveals that, in

12   addition to using its pricing mortality rates, State Farm's COI rates also "were loaded for expenses and

13   profit margins." See Exhibit G at p. 3; see also Exhibit H at p. 5 (South Carolina Actuarial Memorandum

14   for Form 94030 and reflecting same). State Farm has confirmed numerous times that it loaded COI rates

15   with non-mortality related expenses and profit. See, for instance, Exhibit E at pp. 141, 143-145 ("Then

16   those rates that -- were then loaded for expenses and profit margins," and stating pricing mortality "was

17   used to determine a cost of insurance rate, and that cost of insurance rate was then loaded for expenses

18   and profit."); Exhibit I at pp. 76, 80 (same); and attached as Exhibit M, the deposition transcript of State

19   Farm representative and employee Rusty Hendren, at pp. 15-16, 66 (same).

20         44.      State Farm representatives and employees have confirmed that the loads for expenses and

21   profit included in the COI rates were not related to mortality: "I would not consider expenses and profit

22   to be mortality related." Exhibit E at p. 224; see also Exhibit I at p. 165 ("The margin would be the

23   difference between the mortality component and the rest of the cost of insurance," which is expenses and

profit.).

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 19

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

45.     It has further been confirmed that State Farm's inclusion of loads for expenses and profit within COI rates continued with the 2002 repricing of COI rates for Form 94030. See Exhibit E at pp. 268 – 269 (confirming "understanding" that the repricing of COI rates in 2002 would not have made any adjustment to the load for expenses and profit, but rather "would have tried to isolate that change to just the mortality impact."). In addition, a simple comparison between the 1994 COI rates and the pricing mortality rates and between the 2002 COI rates and the repricing mortality rates confirms that State Farm included substantial loads in its COI rates.

***Individual Policyholder Data for Form 94030***

46.     State Farm has produced in this litigation individual policyholder data for Washington owners of Form 94030. This data includes static data from the PMR, which identifies, among other things, each individual policy number, policy status, issue age, rate class, gender, termination date (if applicable), and policy anniversary. State Farm has also produced dynamic, transactional level data. The transactional level data contains, among other things, the credits and debits that have been applied to determine the monthly Account Value of each policy.[6]

47.     To understand the data as produced by State Farm, I relied upon State Farm's Supplemental Answers and Objections to Plaintiff's Third Interrogatories in *Vogt*, and a December 21, 2017 letter from State Farm's counsel to Mr. Vogt's counsel regarding "Policyholder Account Data 94030 policies issued in Missouri." I additionally relied upon State Farm's discovery responses in this case. These documents contain explanation of the policy-level data as produced by State Farm, including the meaning of each type of transaction code referenced in the data for each credit and debit to the Account Value of each policy.

---

[6] These same categories of static data and dynamic, transactional level data were produced by State Farm for the class of Missouri Form 94030 policy owners in the *Vogt* matter and the class of California Form 94030 policy owners in the *Bally* matter.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 20

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1

### Methodology

2    48.    The amount of non-mortality related profit and expense loads in COI rates can be

3 demonstrated for Mr. Whitman (and all policy owners) by comparing the actual COI rates charged by

4 State Farm in its COI rate tables for Form 94030 with the mortality expectations used in pricing repricing.

5 I demonstrate that comparison below:

| Policy Year End | Policy Year | Age | Mortality Only Rate | Actual COI Rate | % of COI Attributable to Mortality Factors | % of COI Attributable to Amts in Excess of Mortality Factors |
|---|---|---|---|---|---|---|
| 2002 | 1 | 20 | | | 45% | 55% |
| 2002 | 1 | 20 | | | 53% | 47% |
| 2003 | 2 | 21 | | | 49% | 51% |
| 2004 | 3 | 22 | | | 54% | 46% |
| 2005 | 4 | 23 | | | 57% | 43% |
| 2006 | 5 | 24 | | | 54% | 46% |
| 2007 | 6 | 25 | | | 54% | 46% |
| 2008 | 7 | 26 | | | 54% | 46% |
| 2009 | 8 | 27 | | | 55% | 45% |
| 2010 | 9 | 28 | | | 56% | 44% |
| 2011 | 10 | 29 | | | 57% | 43% |
| 2012 | 11 | 30 | | | 65% | 35% |
| 2013 | 12 | 31 | | | 75% | 25% |
| 2014 | 13 | 32 | | | 83% | 17% |
| 2015 | 14 | 33 | | | 93% | 7% |
| 2016 | 15 | 34 | | | 96% | 4% |
| 2017 | 16 | 35 | | | 98% | 2% |
| 2018 | 17 | 36 | | | 100% | 0% |
| 2019 | 18 | 37 | | | 97% | 3% |
| 2020 | 19 | 38 | | | 94% | 6% |
| 2021 | 20 | 39 | | ■ | 97% | 3% |
| | | **AVERAGE** | | | **71%** | **29%** |

\* 2001-2002 policy year split into before and after COI and pricing mortality changes on 1/1/2002

    49.    The methodology I offered in *Vogt* and *Bally*, and offer again here, calculates lost Account

Values that have occurred as a result of State Farm's use of COI rates that include loads in excess of COI

rates determined from State Farm's mortality expectations used in pricing/repricing Form 94030. This

methodology takes into account that a policy's Account Value – and therefore the net amount at risk and

COI charges – will be affected by any assumed changes in COI charges for any prior period. When

changes are made to the assumed COI charges in any given policy period, the Account Value in that

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 21

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

policy period will be affected, and all calculations of net amounts at risk, COI charges, and interest income in subsequent policy periods will also be affected. Thus, my methodology recalculates policy Account Values over the life of the policy in order to quantify the total loss attributable to the inclusion of amounts in excess of pricing/repricing mortality expectations in the COI charge calculation.

50.      This methodology calculates lost Account Values to a reasonable degree of actuarial and mathematical certainty for all proposed class members using available policy-level data from State Farm. This methodology can also be used to calculate lost Account Value as of any date over the life of a policy. In other words, I compute lost Account Value as of the last transaction date for all policies, which is generally the date of data collection for in-force policies and the termination date for terminated policies.

51.      My methodology keeps all other past policy activity unchanged, and I recalculate Account Values and COI charges using substitute COI rates where non-mortality loads in excess of pricing and repricing mortality have been removed ("mortality-only COI rates"). The Account Value (on the most recent available policy date for in-force policies, or on the date of termination for previously terminated policies) can then be subtracted from the recalculated Account Value to arrive at the lost Account Value.

52.      As described above, Form 94030 sets out how the Account Value is calculated. It provides that, upon issuance of the policy, the Account Value is equal to the initial premium, after the deduction of a five-percent premium charge, less the monthly deduction for the first policy month. Exhibit B at p. 9. Thereafter:

> The account value on any deduction date after the policy date is the account value on the prior deduction date:
>
> (1)      plus 95% of any premiums received since the prior deduction date,
> (2)      less the deduction for the cost of insurance for any increase in Basic Amount and the monthly charges for any riders that became effective since the prior deduction date,
> (3)      less any withdrawals since the prior deduction date,
> (4)      less the current monthly deduction,
> (5)      plus any dividend paid and added to the account value on the current deduction date, and

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 22

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(6)     plus any interest accrued since the prior deduction date.

The account value on any other date is the account value on the prior deduction date:
- (1)     plus 95% of any premiums received since the prior deduction date,
- (2)     less the deduction for the cost of insurance for any increase in Basic Amount and the monthly charges for any riders that became effective since the prior deduction date,
- (3)     less any withdrawals since the prior deduction date, and
- (4)     plus any interest accrued since the prior deduction date.

Exhibit B at p. 9. My recalculation of Account Values is consistent with how the determination of the Account Value is described in the Form 94030.

53.     Recalculation of Account Value for a given policy month under my methodology is simply a matter of replacing past COI charges with recalculated COI charges, while holding all other past policy activity[7] constant and applying all other policy debits and credits as they actually occurred.[8] In formulaic terms, the recalculation of Account Value can be expressed as follows:

**Recalculated Account Value** = Prior Period Recalculated Account Value[9] + Premium Payments – Premium Expense charge – Monthly Expense charge – *Recalculated COI* – Withdrawals + Interest

**Where:**

*Recalculated COI = Net Amount at Risk* * Pricing Mortality Rate[10]

And:

*Net Amount at Risk* = Death Benefit/1.0032737 – (Prior Period Recalculated Account Value)

---

[7] "The methodology underlying the determination of account values may be viewed as a retrospective accumulation at interest…of net premiums…less a $5 monthly expense charge and less the cost of insurance based on the net amount at risk under the policy." Ex. G at p. 1.

[8] The one exception to this is the interest income. Interest income is adjusted using the recalculated Account Value.

[9] In the first policy period, the "Prior Period Recalculated Account Value" is zero.

[10] After 2002, this would be the repriced mortality assumption due to the repricing of COI rates and mortality that was effective January 1, 2002.

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 23

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

54.     Once I have determined the Recalculated Account Value, calculation of the lost Account Value is a simple matter of subtraction where the Account Value for a policy is subtracted from the Recalculated Ending Account Value.

55.     By application of this formula to each proposed class member, I determined lost Account Values and aggregated those losses to calculate total lost Account Value for the class as a whole. This calculation determines lost Account Value resulting solely from the inclusion of loads in excess of State Farm's mortality expectations in the monthly COI rates.[11] Thus, in the limited instances where State Farm used a COI rate that was less than its mortality rate assumed in pricing or repricing, such that there is no non-mortality related load, I assign no overcharge to that transaction.

56.     My methodology relies on past policy amounts and experience calculated retrospectively from a fixed point in time – the present date[12] for currently in-force policies, and the date of termination for previously terminated policies.

57.     This methodology calculates losses incurred as a result of State Farm using COI rates that include loads in excess of mortality expectations. Because I use the data for each individual policy as maintained by State Farm, this methodology did not require any policy owner to provide any information. Although the amount of loss for each class member varies, I applied the same methodology for each policy owner using State Farm's own policy-level data.

---

[11] For insureds that were assigned a "substandard rating," their total COI charges are calculated using the standard COI rate plus a substandard rating add-on rate. As such, their lost Account Values are calculated by substitution of State Farm's mortality expectations used to price/reprice Form 94030 for the standard COI rate while keeping the substandard rating add-on the same. State Farm has produced its table of substandard ratings for Form 94030, and the policy-level data includes reference to the rating assigned to a policy insured, where applicable.

[12] Because the policy-level data provided is current as of October 14, 2020, I generally calculate retrospectively from that date for in-force policies, specifically from the last available transaction date.

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 24

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

58.     There is nothing speculative about the proposed methodology for calculating lost Account Values attributable to the non-mortality loads because it addresses only past losses in Account Value resulting from State Farm's alleged wrongful conduct. My methodology relies on past policy experience calculated retrospectively from a fixed point in time – the present date for currently in-force policies, and the date of termination for previously terminated policies.[13]

### Conclusions

59.     My analysis reveals that the class has an aggregate lost Account Value of $16,304,618.86 due to State Farm's impermissible deductions of COI charges calculated using loaded COI rates.[14] The lost Account Value for each class policy is identified in Exhibit N. As of the final policy date within the policy-level data produced by State Farm, Mr. Whitman had a total lost Account Value of $5,566.82.[15]

---

[13] I note that State Farm contended in *Vogt* and *Bally* that policy owners who selected death benefit option 1 (i.e., those typically receive the face value of the policy as a death benefit regardless of the account value) and the insured died while the policy is in force are not damaged. Plaintiffs in those cases disagreed, and my methodology identified the amount of lost Account Value these policyholders incurred as of the day of their death. The death benefits under either option require consideration of the "account value on the date of death" to determine the amount of insurance. Exhibit B at p. 6. I have again calculated the lost Account Value as of the policy termination date for those death benefit option 1 policies where the policy insured died. I have identified 145 such policy owners who selected death benefit option 1 and the beneficiary was paid a death benefit or has a death benefit claim pending. Additionally, even for those policies where the death benefit would be unaffected by the Account Value, the lost account value calculation provides a reasonable, if conservative, estimate of the additional premiums required to keep the Account Value at the goal set by the policyholder during the insured's life.

[14] I also note that there are no policies for which my methodology reveals no overcharges (after exclusions).

[15] State Farm contended in *Vogt* and *Bally* that it should be entitled to an offset for transactions where it used a COI rate that did not exceed the assumed mortality rate. Should the Court agree with State Farm's contention, I can alternatively calculate lost Account Values to each class member with an offset applied. In *Bally* my analysis resulted in only 121 of more than 80,000 policy owners who would have no lost Account Value if the offset was applied. In *Vogt* it was only 29 of approximately 24,000 policy owners.

---

DECLARATION AND REPORT OF SCOTT J. WITT
- NO. 3:19-CV-06025-BJR - 25

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements

2    are true and correct.

3

4    Dated: 2/16/2021

5                                                          Scott J. Witt

6                                        Scott J. Witt

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION AND REPORT OF SCOTT J. WITT                    TOUSLEY BRAIN STEPHENS PLLC
- NO. 3:19-CV-06025-BJR - 26                               1700 Seventh Avenue, Suite 2200
                                                           Seattle, Washington 98101
                                                           TEL. 206.682.5600 ● FAX 206.682.2992