**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| WILLIAM T. WHITMAN, individually and on behalf of all others similarly situated, | No. 3:19-cv-06025 |
| | DECLARATION OF STEVEN WILLIAMS |
| Plaintiff, | |
| v. | |
| STATE FARM LIFE INSURANCE COMPANY, an Illinois corporation | |
| Defendant. | |

DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR

1

BETTS, PATTERSON & MINES, P.S.
One Convention Place, Suite 1400
701 Pike Street
Seattle, WA 98101-3927

1   I, Steven Williams, have personal knowledge of the information below and declare as follows:

2   1.      I am an independent contractor agent for State Farm Life Insurance Company ("State

3   Farm Life") in Washington.

4   2.      I am not an employee of State Farm.

5   3.      As an independent contractor agent for State Farm, I provide information to potential

6   policyholders on the many products State Farm offers that help people manage the risks of everyday

7   life and recover from the unexpected so that potential policyholders can select the products of their

8   choice. I provide information about insurance, the risks that make it necessary, how to protect

9   individuals and their property from those risks, and how to help individuals achieve important goals

10  for themselves and their families.

11  4.      I am licensed to market, solicit, and service insurance in Washington. I have been an

12  independent contractor agent for State Farm since August 2000.

13  5.      I have been involved with State Farm for nearly thirty years, giving me deep familiarity

14  with the products that State Farm offers. From 1992-1995, I worked for State Farm as a Life/Health

15  underwriter. Underwriting is the process by which State Farm Life evaluates the health and risk

16  characteristics of the insured before assigning a final rate class. In that position, I analyzed

17  applications from potential policyholders, assessed any risks, and determined insurance eligibility. I

18  often draw on this experience in talking to policyholders as an Agent, explaining how the underwriting

19  process may impact the cost of insurance rates assigned to a policyholder.

20  6.      From 1995 through 1998, I worked for State Farm as a Life/Health Liaison. As a

21  liaison, it was my job to teach State Farm agents about State Farm's products. Then, from 1998-2000,

22  I was an agency field consultant, during which time I assisted agents with marketing State Farm's

23  products. During these years, I became very familiar with all of the ways that State Farm's products

24  can help policyholders prepare for their worst days and protect their families. I wanted to be a part of

25  that, more directly, which led me to switching away from my role as an agency field consultant and

26  into the Agent role that I'm in today. My belief in these products has not wavered, which is why I'm

27  still an agent to this day, twenty-one years later.

28
DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR                               2                BETTS, PATTERSON & MINES, P.S.
                                                                    One Convention Place, Suite 1400
                                                                          701 Pike Street
                                                                      Seattle, WA 98101-3927

7.      I understand that this lawsuit involves claims against State Farm Life relating to the Universal Life insurance policy issued on Form 94030, which was sold in Washington between 1994 and 2004 ("the Policy" or "Universal Life").  I marketed this Policy from when I first started as an Agent in 2000 until the Policy was discontinued in 2004.

8.      My office is located in Port Townsend, Washington, and the majority of the State Farm policyholders assigned to me are located in the Jefferson County, Washington area.  Jefferson County is unique in that it is primarily a retirement community located in a Victorian-seaside town with a tourist emphasis. Because of this, we have fewer younger policyholders for whom we market, solicit, and service insurance.

9.      My wife and I each have a Policy.  The same year that I became an agent, my wife and I each bought a Policy, and then we bought a Policy for our son, three years later in 2003.  When we bought our Policies, I had a comfortable understanding of the cost of insurance associated with the product, the way those rates were calculated (including that they covered expenses), and the potential for adjustments.

10.     It is my standard practice to market life insurance to policyholders of other State Farm products.  Typically, policyholders come into the office to talk to me about their other policies with State Farm or to make changes.  During this conversation, sometimes the subject matter pivots to life insurance, and I ask about what the policyholder has done to protect his/her family in the event of an untimely death.  If the policyholder is interested, my custom and practice is to set up a separate appointment, focused just on life insurance; I will encourage spouses to join these meetings if the policyholder is married so that any decision can be a joint one.

11.     I encourage separate meetings to discuss life insurance because policyholders, due to their own life obligations, tend to want to minimize the time they spend with me, asking questions and learning about the products.  Because my goal is to make sure that policyholders have all of the facts they need to select a State Farm product that will accomplish the policyholder's goals, I try to maximize the time I have with the policyholder to the extent possible.  I know that the policyholder

1  will be leaving my office at some point, and I want to make sure that the policyholder's family is

2  protected in case something unexpected happens the moment that policyholder leaves.

3        12.    During the relevant time period, the individuals to whom I marketed the Policy varied

4  greatly, and included people of different demographics, different incomes, different motivations for

5  buying the Policy, different objectives, and different levels of familiarity with life insurance products.

6  Because of the differences among policyholders, the discussions I had with potential policyholders,

7  including conversations about the Policy, including the potential performance of the product over time,

8  any charges or deductions payable by the policyholder, and benefits of the Policy varied across those

9  different policyholders depending on their individual characteristics.

10       13.    During meetings with potential life insurance policyholders, I often began by asking

11  big picture questions to understand the person's circumstances. These circumstances change from

12  individual to individual because potential policyholders have different educations, motivations,

13  financial sophistication, budgets, knowledge of life insurance, financial security, marital status,

14  economic conditions, and personal objectives for themselves and their families, among many other

15  differences. I offer potential policyholders a needs-analysis to get an idea for the range of insurance

16  that may be needed.  Again, this varies by policyholder according to their individual needs. I would

17  usually follow the needs-analysis with a big picture discussion of the types of life insurance available.

18  Broadly, State Farm Life has two types: term and permanent. After I get an idea for the policyholder's

19  needs, I try to get an idea for the policyholder's goals and desires.  State Farm Life's products each

20  help to accomplish various goals, so I seek feedback from the policyholder on his/her desire for cash

21  value build-up and whether he/she wanted the policy to be in force during retirement years.

22       14.    Depending on these answers, I would provide information about the various types of

23  policies and how they can be used.  If the policyholder was interested in permanent insurance, I would

24  explain the differences between whole life and universal life.  Again, these two types of insurance are

25  unique, so I would make sure to explain to the policyholder the differences, including fixed premium

26  (whole) vs flexible (universal), dividends (whole) vs interest-accumulation (universal), and the

27  availability of funds within the policy types (the universal life account value is more available during

28

DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR

4

BETTS, PATTERSON & MINES, P.S.
One Convention Place, Suite 1400
701 Pike Street
Seattle, WA 98101-3927

the lifetime of the insured). I talk the policyholder through how each of these different aspects of the policies interact with the policyholder's needs and goals, as previously discussed.

15.     With any life insurance policy, it is my practice to explain to policyholders how the costs and values will work. It is my experience that the out of pocket costs and the death benefit are truly the two things most important to nearly all policyholders. For the Policy, I would also explain how the account value and deductions work. If the client was interested in universal life, we would run some illustrations to help explain to the policyholders the mechanics of the Policy. Illustrations are tools that allow agents to present to the policyholder an example of how the Policy may perform. For the illustration, I would select the proposed insured's current age and sex and then select (typically) a standard rate class.

16.     At this time, it was my custom and practice to talk to people about how they could be charged differently than the illustrated rates I was showing depending on various factors. Before I run the illustration, I would get clarity on their tobacco use. I also drew on my experience as an underwriter to explain that there are situations where State Farm Life may offer to issue a policy with an assigned rate class different than the standard tobacco or non-tobacco rate, due to the insured's medical history.

17.     It was my impression that the potential policyholders I spoke to knew that they would be assigned a cost of insurance rate developed for persons of their age, sex, and applicable rate class (e.g. the rate State Farm has developed for a 35-year-old female of standard tobacco health). The rates that are illustrated to them are State Farm's rates for an insured with the characteristics that they shared with me – the relevant age, sex, and tobacco status (which is the main rate class difference for insureds of standard health).

18.     State Farm did not mandate any specific way that agents were to market the Policy, so I developed my own manner to market the Policy to policyholders. I used a handout developed by State Farm, like the one attached here as Exhibit 1, and the illustration together with an analogy. I described a tub, with a faucet representing the premiums going into the tub. When the faucet fills the tub, some spills out, representing the 5% premium expense charge that comes off the top. At the bottom of the tub is a drain, out of which comes the monthly cost of insurance deduction and the monthly fee.

That drain gets bigger and bigger over time, as the insured increases in age, and the goal is to make sure that there is always still water in the tub. I explained that for any water that stayed in the tub, interest (with 4% guaranteed) would be applied. Some policyholders (but not all) also asked about the ability to access that tub of water during the life of the policy. For those policyholders, I explained that a second drain can be added, and money can be withdrawn or borrowed from the tub of water. I did not emphasize this during the meeting unless it was raised by the policyholder, but for all policyholders, I explained that although the universal life policy is flexible enough to add that second drain, the number one goal of the policy is to insure the life of the proposed insured.

19.    For all policyholders, however, I discuss the drain that *will* exist – the monthly cost of insurance deduction. I never used the term "mortality" expense when describing monthly deductions, instead using the phrase "cost of insurance." In my experience, most policyholders do not want to focus on "mortality" during the meeting to purchase life insurance because the idea of insuring the life of another already brings about unpleasant thoughts.

20.    Going back to the tub analogy, my standard practice is to explain that water will "splash out" of the tub as the faucet fills it, in the form of a standard percentage that comes off the top of the premium payment. Then, on a monthly basis, water comes out of the drain at the bottom in the form of a monthly fee of $5 and a monthly "cost of insurance" deduction.

21.    After talking about the tub, it is here that I switch focus back to the illustration because the illustration shows the size of the drain and information about how the tub of water will grow. I explained that the illustrations include projections based on the current cost of insurance rates and the current interest rate (emphasizing these are **not** static) as well as guaranteed values within the Policy. I would explain that interest rates will change and cost of insurance rates can change subject to the guaranteed maximums.

22.    My goal is and always has been to make sure that potential policyholders understand what could cause a shift from the "non-guaranteed" values to the "guaranteed" values, so I always explain that the costs in that column may fluctuate due to unexpected events occurring in in the world. I made sure that the policyholders to whom I sold universal life insurance policies understood that the

DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR

6

BETTS, PATTERSON & MINES, P.S.
One Convention Place, Suite 1400
701 Pike Street
Seattle, WA 98101-3927

non-guaranteed rates they see on the illustration and will see on their offer represent "today's" expenses, values, and expectancies in the real world.

23.    In other words, as it pertains to cost of insurance, I explained that State Farm has developed those non-guaranteed cost of insurance rates using today's expectations, and as it pertains to the interest rate, I explained that the non-guaranteed interest represented today's interest rate (or 4%, whichever was higher).

24.    However, unexpected events will happen. I told some policyholders to think of a bird flu pandemic, causing mass disruption to the world's economy and large changes in expectations. For others, I used the 1980s AIDs epidemic as a real world example of a time when changes to the economy, expectations, and values in the real world had an impact on life insurance. And as time went on and large-scale events happened, like September 11, I drew on those real world events to provide examples to policyholders of things that may impact the economy, values, and expectations in ways that will impact the interest rates and can impact the cost of insurance.

25.    By the end of the conversation, I make sure the policyholders understand that although they will be assigned the cost of insurance State Farm has developed for an individual with the characteristics of the proposed insured, those rates represent "today's" expectations. How the policy performs will change depending on real world impacts to the cost of insurance and interest rates. But, I emphasized that the cost of insurance will never exceed the guaranteed cost of insurance rates in their offer, and the interest will never be below 4%.

26.    Because the policyholders all have different life needs and reasons for wanting life insurance, the conversations I have with policyholders about life insurance are all different depending on the policyholder. For example, some potential policyholders had very specific ideas about how long they wanted to fund the Policy while others had not thought about that issue. For those that did not have an idea, I would talk the issue through with them, explaining that premium amounts change depending on what your cash objective is at various ages (e.g. do you want the policy to last for 100 years or do you want to last for a shorter time?).

DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR
7
BETTS, PATTERSON & MINES, P.S.
One Convention Place, Suite 1400
701 Pike Street
Seattle, WA 98101-3927

27.     Typically, however, all potential policyholders were interested in what the premium payments would be.  Again, I used the illustration to talk about this point and explain that because the cost of insurance increases every year (which means the drain gets bigger and bigger on the tub), I would encourage them to choose a planned premium higher than the minimum.  For example, if a minimum premium showed a charge of $43, I would suggest perhaps putting in $50 so that if something comes up down the road, the policyholder would have the choice to decrease premium payments for a time without emptying the tub of all water.  Multiple policyholders of form 94030 took this approach.

28.     Because the interest rates and cost of insurance will change over time, it is my custom and practice to advise policyholders to meet with me every three to four years, to check on the policy.  I use these regular meetings with policyholders to go through their annual statements and make sure that the tub of water will remain filled enough to accomplish the policyholder's long-term insurance goals and desires while still staying within the policyholder's budget.  An annual statement shows how the policy is performing and how long it will last if the policyholder continues the current premium amount.  Some policyholders have a goal of stopping premium payments by the time they retire, which the universal life policy does allow.  For those policyholders, I used the annual statement and would occasionally re-run the illustration, just so the policyholder could see if that goal was possible using their current payment plan and today's cost of insurance and interest rates. Sometimes, as a result of the meeting, the policyholder would increase his/her premium payments to make sure he/she would have the ability to reduce or suspend payments during retirement.

29.     These regular meetings also helped me to guide policyholders who wanted to take advantage of the Policy's flexibility.  The Policy is very flexible, allowing policyholders to increase or decrease coverage, increase or decrease premium payments (or stop payments all together), and withdraw from or borrow against the account value.   It is my experience that most policyholders of the Policy use the Policy's flexibility in some way, differing by policyholder.  For example, some policyholders quit their job or switched jobs and had a sudden income reduction as a result.  Those policyholders would take advantage of the ability to decrease premium payments or discontinue it all

together. For those policyholders, we discussed during the regular meetings what needed to be done to make sure the premium payments were eventually increased so that the tub of water remained filled.

30.     Many policyholders took advantage of that "second faucet," treating the tub of water as an emergency fund. For example, I have worked with some policyholders who have experienced car transmission issues and needed to borrow against the cash value to cover the car repair. Others have had unexpected house expenses. When situations like this occur, my custom and practice is to meet with the policyholder to talk about ways to set up a loan repayment. These plans were not "one-size fits all" and were dependent on the individual policyholder's policy cash value and ability to repay. Some policyholders immediately repaid. Others would create a "stair-step" repayment plan, gradually increase the payments until the loan was repaid. And others would simply enter into a set repayment plan.

31.     Again, my goal is to make sure the policyholders can protect their families in whatever way they want. The policyholders all vary in how much protection they want (some want to replace an income; others want to provide just enough for the family to pay expenses), but they all generally buy insurance to help protect against those unexpected circumstances. The Universal Life Policy is so flexible that there is not one set way in which policyholders use or fund the Policy during the life of the insured – I strive to provide the policyholders with the facts and information they need to use this flexibility (if they want) while still ensuring the Policy can accomplish its ultimate goal.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th of March, 2021 in Reno, Nevada.

Steven Williams

DECLARATION OF STEVEN WILLIAMS
No. 3:19-cv-06025-BJR

9

BETTS, PATTERSON & MINES, P.S.
One Convention Place, Suite 1400
701 Pike Street
Seattle, WA 98101-3927