**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| **William T. Whitman v. State Farm Life Ins. Co.** | 3:19-cv-06025-BJR |

**EXPERT REPORT OF MARY JO HUDSON**

**<u>CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER</u>**

**TABLE OF CONTENTS**

**Page**

A.    QUALIFICATIONS ................................................................................... 1

B.    SUMMARY OF OPINIONS ..................................................................... 4

C.    BACKGROUND ON STATE INSURANCE REGULATION ....................................... 5

    (a)    Foundations of State-Based Insurance Regulation and NAIC............................. 5

    (b)    Goals and Framework for Insurance Regulation ................................. 6

    (c)    Actuarial Science and Insurance Regulation ....................................... 10

D.    LIFE INSURANCE REGULATION ......................................................... 11

E.    PRICING AND SOLVENCY REGULATION........................................... 13

    (a)    Establishing Rate Classes .................................................................. 13

    (b)    Nonforfeiture, Policy Valuation and Maximum Cost of Insurance .................... 15

    (c)    Applications and Underwriting Process................................................ 14

    (d)    Nonforfeiture Value Testing and Self-Support.................................... 16

F.    FACTS ................................................................................................... 17

OPINION 1:  **The at-issue language in the Policy addressing monthly cost of insurance rates is common to universal life insurance policies and serves to tell an individual policyholder the criteria unique to that person (here, that individual's age on the policy anniversary, sex, and applicable rate class) that will be used by the insurer in assigning that person a cost of insurance rate for each month over the life of the Policy.  In my experience as a regulator, this language, in addition to advising each Insured that his or her rate will be based on these criteria, ensures that similarly situated policyholders are charged the same rate.  This language would not be understood to describe the actuarial process by which the company develops its underlying rates in the first instance**................................................................................................. 20

OPINION 2:  **The process by which an insurer develops its underlying rate structure is separate from the process of assigning a rate to an individual Insured pursuant to the Policy.  Universal Life insurance policies, such as this Policy, contemplate that the insurer will utilize an already determined holistic pricing structure, including a monthly cost of insurance rate that collectively accounts for reserve requirements, interest earnings and operational expenses.  Regulators would understand that the insurer will then apply that rate to each individual Insured by reference to that Insured's age on the last policy anniversary, sex, and rate class** .................................................................. 22

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**TABLE OF CONTENTS**
(continued)

Page

OPINION 3:  **The process by which an insurer develops its underlying cost of insurance rate structure must comply with the broader insurance regulatory framework, in which state insurance regulators protect life insurance consumers, as well as the safety and soundness of the regulators' respective markets, through a comprehensive regulatory framework for life insurance companies.  This includes the regulators' expectation that insurance companies will align policy terms and actuarially developed rate formulas with financial regulation requirements, subject to state regulatory and enforcement authority** ................................................................................................................. 24

OPINION 4:  **A pricing model for an insurance company's cost of insurance rate structure that used only mortality factors and did not take into account the insurer's overall operating costs, expenses, reserve requirements, and other revenue needs would not satisfy established regulatory expectations, without significant changes to other charges associated with the policy.** ................. 26

OPINION 5:  **The imposition of an alternative pricing model for cost of insurance rates that appears to be actuarially untested, through a reinterpretation of the Policy  "based on"  language as applying to the development of a company's cost of insurance rate structure, would jeopardize the vital role of insurance regulatory oversight and the well-established state insurance regulatory framework that has operated successfully for centuries** ....... 28

EXHIBIT A - Index of Materials Relied Upon ............................................................. 1

EXHIBIT B - Mary Jo Hudson CV ............................................................................. 1

## A.     QUALIFICATIONS

1.      I am the former Director of the Ohio Department of Insurance ("Director"), a cabinet-level position that I held from 2007 to 2011, and that is the equivalent of the "Insurance Commissioner" role in some states such as Washington.  By virtue of that position, I served in a number of national leadership capacities that focused specifically on life insurance product regulation, solvency regulation, and market conduct regulation.  I served in these positions through the National Association of Insurance Commissioners ("NAIC") and the Interstate Insurance Product Regulation Commission ("ICC").

2.      The NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.  State insurance regulators created the NAIC in 1871 to address the need to coordinate regulation of multistate insurers.  Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight.  NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally.  NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S.[1]

3.      The ICC is an interstate commission of national life insurance regulators from 45 states and Puerto Rico, represented by each state's life insurance regulators.[2]  The ICC develops and maintains product standards and reviews and approves products to be sold in each member state.  In particular, the ICC develops and maintains product standards for individual and group life insurance, annuities, disability, and long term care insurance.  The ICC serves as a regulator working on behalf of the member states, and reviews and approves product filings from life insurance companies so that the products can be sold in member states and territories, with the product standards operating in lieu of individual state law.

4.      I was active with national leadership at the NAIC[3] and the ICC[4], where I was elected or selected by my fellow Commissioners to serve in a number of key leadership roles.  In

---

[1] NAIC CIPR Report https://content.naic.org/documents/topics_white_paper_hist_ins_reg.pdf?59index_about.htm.

[2]     ICC,    "A    Summary    of    the    Insurance    Compact's    Background    and    History", https://www.insurancecompact.org/history.htm

[3]  As further noted on my CV, attached as Exhibit B, I served as an NAIC Executive Committee member and as an Internal Administration (EX1) Subcommittee member.  On national standard-setting and policy matters associated with solvency, I served as Co-Chair of the NAIC EX Task Force on Regulatory Modernization, Vice Chair of the NAIC Financial Examination (E) Committee, and as a Member of the NAIC EX Task Force on Retained Asset Accounts, the Financial Examination (E) Committee and the Financial Regulation Standards and Accreditation (F) Committee.  On matters associated with product standards and product regulation, I served as Chair of the System of Electronic Rate and Form Filing (SERFF) Board of Directors, and Chair of the NAIC Speed to Market Task Force. On matters related to market regulation, I served as a member of the NAIC EX Task Force on Market Conduct Accreditation, and the Market Regulation (D) Committee.  Additionally, on matters related to producer screening, licensing and discipline, I served as a member of the NAIC Producer Licensing Task Force, as a member of the national audit teams responsible for conducting Gramm-Leach-Bliley audits of state agent licensing activities, and studying surplus lines reform under the Dodd-Frank Act.

[4]  As further noted on my CV, attached as Exhibit B, I served as a national IIPRC officer for four years.  I served as Chair of the from 2009 to 2010, as Vice Chair from 2008 to 2009, and as Secretary-Treasurer from 2007 to 2008. During my period of service, the ICC adopted uniform standards for insurance products, began to accept product

each of these roles, I worked with regulators from states across the nation to establish regulatory improvements, such as model laws, regulatory policy regarding solvency regulation, market conduct examinations, life insurance claims issues, evaluation of agent licensing frameworks in the various states, and similar activities. I was active with the NAIC's critical financial regulation accreditation process, which involved all states. In each of these efforts, I was required to consider the operation of each state's insurance regulatory framework and its connection to the national insurance regulatory framework. I also became aware of the many similarities and variances in each state's insurance regulatory climate, code and expectations, including Washington. In the course of preparing this Report, I also have reviewed or re-reviewed Washington's statutory and regulatory scheme as it relates to life insurance, as reflected in Exhibit B hereto.

5.      In my leadership service with the ICC, I was actively engaged in addressing the life insurance product and actuarial review process with the then-new joint state commission. My involvement with the ICC required me to understand how to identify variations among state regulations, and to assist member states with understanding and trusting the ICC process. While serving in ICC leadership, I worked closely with Washington regulators as Washington was an ICC member state. In order to conduct this work, I was required to work with ICC staff and fellow regulators to discuss the many similarities between Washington's insurance regulatory framework and other states' insurance laws and regulations. Through these efforts, I learned that the basic regulatory structures were quite similar between Washington and other states, with the regulatory oversight and expectations in Washington being heavily focused on consumer protection.

6.      I also have extensive direct experience with state regulation of insurance from my role as Director of Insurance for Ohio.[5] As Director, I oversaw the Ohio Department of Insurance ("ODI" or the "Department"), which is the State of Ohio's executive branch agency responsible for regulating the Ohio insurance market and its participants. During my tenure as Director, ODI had approximately 270 staff members and an annual budget of approximately $35 million.

7.      During the time of my service, Ohio had the ninth-largest insurance market in the United States and the 19th largest insurance market in the world. At that time, Ohio had approximately 250 domestic insurance companies, almost 1,400 licensed non-domestic insurance companies, and over 283,000 resident and nonresident insurance agents. Collectively, these companies wrote more than $55 billion in annual premiums in Ohio.

8.      While I served as Director, the Department was responsible for the comprehensive regulation, oversight, and licensing of insurance companies and agents operating in Ohio. On an almost daily basis, I was involved with the Department's oversight activities and matters touching many corners of insurance regulation, including solvency regulation and liquidations, product regulation, market conduct enforcement, agent licensing and discipline, and fraud prevention and enforcement. I served as the fiduciary liquidator for up to 11 insurance companies that were in liquidation, a state-based insurance company receivership process. The Department also served as a law enforcement agency, so periodically I was involved with cases that were referred to

_____

filings, and grew from 29 states to 37 states and developed and adopted new product standards for individual life insurance, annuity, and long term care products.

[5] Insurance directors are commonly referred to as "Commissioners."

federal, state and local authorities for prosecution of insurance fraud and other criminal activity related to insurance.

9.      Among the significant issues my team and I addressed regarding solvency regulation were review and approval of numerous mergers, acquisitions and company licenses, initiation of significant insurance company financial examinations, and development and enactment of financial reporting revisions.  As the Recession of 2008 strained financial services markets, our financial regulation team helped lead national efforts to develop and conduct stress testing and analysis of insurance companies to ensure the strength of their respective reserves and surplus.  I was engaged closely with these efforts.  I also worked with our financial regulation team to review and act on corrective action plans of companies with stressed risk-based capital, diminishing surplus or other triggers for potential corrective action.

10.      In the area of product regulation, my team and I were involved closely with the development and implementation of new life and annuity product standards.  We were also closely involved with review of health insurance market reform, including significant actuarial analysis and review of rates.  My team and I worked on developing new regulations on critical issues such as life insurance sales, life settlement, and premium finance matters, and we developed an updated regulatory scheme for fraternal benefit societies and recommended updates to the insurance company investment regulations.  I worked with our team to develop and amend regulatory policy associated with life, health, homeowners, automobile, commercial property casualty, long term care, credit life and title insurance, and addressing regulatory issues associated with transition of life insurance and related product filings from the 1980 to 2001 CSO Mortality table.

11.      In the area of market regulation and consumer assistance, my team and I initiated and conducted numerous examinations regarding life insurance products, disclosures and distribution.  We regularly addressed issues and concerns of consumers on issues involving universal life insurance policies, including questions associated with monthly cost of insurance assessments.

12.      In addition to the above roles, I have experience in insurance regulation through my earlier work at ODI and in my law practice.  From 1991 to 1996, I served as Deputy Liquidator and General Counsel to the Office of the Ohio Insurance Liquidator (the "Liquidation Office") where I worked on the liquidations of insurance companies and health maintenance organizations. From 1989 to 1991, I served as a Special Services Attorney for the Department, representing the Department's Deputy Director and working with the financial regulation and property and casualty divisions.  During this time, I worked on many issues associated with financially-troubled companies, and assisted the Deputy Director and Department staff with drafting and implementing amendments to state solvency laws and regulations, and implementation of federal risk retention group laws.

13.      I am currently a Partner with Squire Patton Boggs US LLP, where I lead the firm's insurance regulation practice team.  My insurance regulatory practice involves representation of clients on market conduct, product, and solvency matters pending in various state insurance departments across the country and at the NAIC.  I work with insurance trade associations on regulatory policy matters pending with the NAIC.  I provide strategic advice on regulatory matters

to insurance companies and serve as a consulting and testifying witness in litigation involving insurance regulatory matters.

14.     I have been qualified as an expert witness in numerous cases, all involving insurance regulation and issues related to insurer responsibilities associated with life insurance policies.  While serving as Director, I was a frequent speaker on insurance regulatory issues.  Since returning to private practice, I work regularly on developing and presenting in continuing legal education programs with emphasis on life insurance and insurance regulatory matters.

15.     A copy of my curriculum vitae is included as Exhibit B.  I am being compensated at the rate of $710 per hour for this engagement.  This compensation is not contingent on, and does not affect, my opinions in this case.  In reaching the opinions and conclusions contained in this Report, I have relied on the documents listed in Exhibit A.  Those opinions and conclusions also are supported by my experience, education, and training.  To the extent any additional relevant information becomes available, including any rebuttal reports of Plaintiffs' experts and the deposition testimony of any of Plaintiffs' experts, I reserve the right to modify or revise this Report.

## B.     SUMMARY OF OPINIONS

### OPINION 1:

**The at-issue language in the Policy addressing monthly cost of insurance rates is common to universal life insurance policies and serves to tell an individual policyholder the criteria unique to that person (here, that individual's age on the policy anniversary, sex, and applicable rate class) that will be used by the insurer in assigning that person a cost of insurance rate for each month over the life of the Policy.  In my experience as a regulator, this language, in addition to advising each Insured that his or her rate will be based on these criteria, ensures that similarly situated policyholders are charged the same rate.  This language would not be understood to describe the actuarial process by which the company develops its underlying rates in the first instance.**

### OPINION 2:

**The process by which an insurer develops its underlying rate structure is separate from the process of assigning a rate to an individual Insured pursuant to the Policy.  Universal Life insurance policies, such as this Policy, contemplate that the insurer will utilize an already determined holistic pricing structure, including a monthly cost of insurance rate that collectively accounts for reserve requirements, interest earnings and operational expenses.  Regulators would understand that the insurer will then apply that rate to each individual Insured by reference to that Insured's age on the last policy anniversary, sex, and rate class.**

### OPINION 3:

**The process by which an insurer develops its underlying cost of insurance rate structure must comply with the broader insurance regulatory framework, in**

**which state insurance regulators protect life insurance consumers, as well as the safety and soundness of the regulators' respective markets, through a comprehensive regulatory framework for life insurance companies.  This includes the regulators' expectation that insurance companies will align policy terms and actuarially developed rate formulas with financial regulation requirements, subject to state regulatory and enforcement authority.**

**OPINION 4:**

**A pricing model for an insurance company's cost of insurance rate structure that used only mortality factors and did not take into account the insurer's overall operating costs, expenses, reserve requirements, and other revenue needs would not satisfy established regulatory expectations, without significant changes to other charges associated with the policy.**

**OPINION 5:**

**The imposition of an alternative pricing model for cost of insurance rates that appears to be actuarially untested, through a reinterpretation of the Policy "based on" language as applying to the development of a company's cost of insurance rate structure, would jeopardize the vital role of insurance regulatory oversight and the well-established state insurance regulatory framework that has operated successfully for centuries.**

## C.      BACKGROUND ON STATE INSURANCE REGULATION

### (a)      Foundations of State-Based Insurance Regulation and NAIC

16.      Insurance is a complex mechanism for risk transfer and pooling.[6]  Insurance operates through the "law of large numbers," under which individual risks are aggregated into risk pools.  Because the risks of loss of any sort, whether to life, health, or property, are not certain, insurance companies and regulators in every state focus on studying similar risks and use various statistical tools and actuarial science to estimate possible losses, and to estimate the costs and expenses necessary to provide insurance to cover these possible losses.[7]  These fundamental principles of insurance form the foundation of many contemporary insurance regulations.

17.      Life insurance products have been sold in the United States since the mid-1700s.  As early as 1831, states began to regulate insurance companies, with New York in particular requiring insurers to report to the state comptroller.[8]  In 1849, states began to impose solvency requirements on life insurers.[9]  These laws were enacted in reaction to reports of a trend of life insurers that started up without any sufficient capital, sold policies "on the cheap," and then closed

---

[6]  Emmet J. Vaughan & Therese M. Vaughan, Fundamentals of Risk and Insurance 34-35 (Joel Hollenbeck et al. eds., 11th ed. 2013).

[7]  *Id*. at 36-40.

[8]  R. Carlyle Buley, *The American Life Convention 1906–1952: A Study in the History of Life Insurance* at 64 n.27 (1953).

[9]  *Id.* at 64; H. Roger Grant, Insurance Reform at 4–5 (1979).

down or otherwise were not available to pay on the claims for the policies they had sold.[10]  During the late 1800s, state insurance regulators began to collaborate, working through the organization now known as NAIC. [11]   In 1945, Congress passed the McCarran-Ferguson Act ("McCarran-Ferguson"), specifically delegating to the states its Commerce Clause-based authority to regulate the business of insurance within their respective territories.[12]  Insurance in the United States, including life insurance, continues to be regulated on a state-by-state basis.

18.    Today, as described above, the chief insurance regulators from the executive branches of each of the 50 states, as well as the District of Columbia and several territories, work together through the NAIC to develop regulatory standards, model laws and, where appropriate, coordinated regulatory examinations and actions by the states.[13]  Through these activities and others, including conferences and publications, the NAIC allows insurance regulators around to country to coordinate on best regulatory practices and also to understand variances in regulatory schemes and approaches among states.   Likewise, as also described more fully above, chief insurance regulators from 45 states and Puerto Rico work together to operate the ICC for the regulation of life insurance product standard and related actuarial reviews

### (b)    Goals and Framework for Insurance Regulation

19.    Insurance regulation is unique in the financial services world, in large part because state regulators and insurance companies want to ensure that all insurance companies in a given market maintain the financial ability to pay claims or benefits when they come due—a time that may be years or even decades after the policyholder purchases the policy and begins making the required payments.   In this way, insurance regulation ensures that consumers who pay for insurance receive the benefits that they pay for, and encourages individuals to protect themselves by purchasing insurance.  Among the ways in which state regulators protect consumers is to review policy forms and terms, as well as related actuarial pricing models for the products, before the product goes to market, with a focus on ensuring that the Form is clear and understandable and with the expectation that the insurance company will follow sound actuarial standards and practices in establishing its pricing.[14]  State regulation of insurance providers is comprehensive, and focuses on all aspects of insurance company finances, product development and distribution, and interaction with consumers.

20.    As detailed below, each state's insurance laws vest regulators with authority to ensure that, among other things:

---

[10]  *Id.*

[11]  Anne Obersteadt, et al., State of the Life Insurance Industry: Implications of Industry Trends at 7, Nat'l Ass'n Ins. Comm'rs & Ctr. for Ins. Policy & Research (2013).

[12]  Codified as 15 U.S.C. §§ 1011–1015; *see* Anne Obersteadt, et al., State of the Life Insurance Industry: Implications of Industry Trends at 14, Nat'l Ass'n Ins. Comm'rs & Ctr. for Ins. Policy & Research (2013).

[13]  Obersteadt, State of the Life Insurance Industry: Implications of Industry Trends at 7; About the NAIC, Nat'l Ass'n Ins. Comm'rs, available at http://www.naic.org/index_about.htm.

[14]  Vaughan at 132.

- Insurers operating in their states are solvent and maintain their finances in a manner that adequately anticipates future responsibilities for paying claims;

- Insurance rates take into account (a) the continued ability of the insurer to operate and pay claims over the number of years that the insurer may be obligated under a policy, including the payment of operational expenses, and the maintenance of sufficient reserves and surplus to pay claims, even in the event of unforeseen circumstances, and (b) the need to ensure that rates to consumers are applied equitably among all policyholders, based on risk, and also are not excessive;

- Insurance products are sold to consumers (a) through educated, screened and licensed professional producers or agents in a way that makes the products understandable, so that the customer can decide what product will work for them, and (b) in a manner that is compliant with state law;

- A company's proposed insurance policy language (sometimes called the policy "Form") and any related disclosures combine to accurately describe for the prospective customer how the insurance product works; and

- Insurers engage in appropriate claims practices.[15]

21.    As noted, insurance regulators review the business conducted by insurers with an eye toward protecting consumers—a process that involves analyzing the complex finances and operations of insurers, establishing the base requirements for products, reviewing the products before they go on the market, reviewing the policy "Forms" or policy language that will be used to sell the products to consumers, and determining whether claims are being paid appropriately. Although there is some variation in this process from state to state, Forms and rating information related to the policies typically are filed in some manner with a state's insurance regulators before being offered in that state.  Insurance regulators review the Forms and any supporting actuarial submissions to ensure that the products are being offered in a way that accurately explains to customers the features of the insurance product.  Regulators also want to ensure that the product terms comply with the provisions of that state's laws, including laws relating to the solvency and financial health of the issuer, which in turn require the use of sound actuarial practices. In this way, the insurance regulators serve a consumer protection function by conducting a form of due diligence on the products before they are offered, including by making sure that the appropriate processes are in place to ensure the company's long-term financial health.

22.    In order to support the regulatory functions described above, each state's insurance code, including Washington's, reflects three primary areas of authority: (a) financial or solvency regulation, (b) product regulation, and (c) market regulation.[16]  These areas are summarized below. Although there is some variation, the various states' insurance codes generally are aligned in their

---

[15]  Gary M. Cohen, 2 Appleman on Insurance § 8.02[2][a] (Lib. ed. 2015); State Insurance Regulation at 2, Nat'l Ass'n Ins. Comm'rs (2011).

[16]  *See* State Insurance Regulation at 2, Nat'l Ass'n Ins. Comm'rs (2011).

core terms and their focus, and combine to form what I will refer to in this Report as the "<u>insurance regulatory framework</u>."

23.     *Financial or Solvency Regulation.*  Solvency regulation is a critical focus of the insurance regulatory framework.[17]  Each insurance company must be licensed and must agree to the regulatory oversight of each state in which it seeks to sell its products.[18]  In this way, insurance regulators can ensure on behalf of the consuming public that an insurance company is safe, sound, and reliable for the future, so that it will be available and able to pay claims when they come due at a later time.

24.     Toward that end, state insurance laws require insurance companies to provide extensive financial and actuarial reports that allow regulators to analyze the company's stability and liquidity in the short term and also for projections far into the future.[19]  Among other things, these rules ensure that the company has adequate reserves, surplus, and liquidity to ensure its ability to pay claims for many years into the future, including under unforeseen circumstances.

25.     Because many companies operate in more than one state, insurers generally are subject to solvency regulation in each state where the insurance is sold.[20]  Through the NAIC, state regulators have developed a system of financial surveillance and solvency oversight that is similar from state to state.  State insurance regulators utilize a peer review and accreditation system to ensure consistency and uniformity in financial oversight rules from state to state, and in this system, they designate the domiciliary state to serve as the company's lead regulator with oversight transparency for all other states.[21]  State insurance solvency laws focus on insurer liquidity at all times and require insurance companies to prepare financial reports using accounting rules that are tailored to the business of insurance and that, as a general matter, place a greater emphasis on each company's stability and liquidity than do the Generally Accepted Accounting Principles employed for financial reporting in most other industries.[22]

26.     *Product Regulation*.  State insurance laws and regulations govern insurance product terms and disclosures, and generally require some form of prior filing and oversight of products by state insurance regulators.[23]  For example, insurance codes include product terms to address issues such as when coverage becomes effective, how premiums are payable, the circumstances in

---

[17]  *See* Gary M. Cohen, 2 Appleman on Insurance § 8.02[2][d] (Lib. ed. 2015).  *See e.g.*, Wash. Rev. Code Ann. 48.05.030;Wash. Rev. Code Ann.48.37.040-48.37.060

[18]  *See, e.g.,* Wash. Rev. Code Ann.48.05.030

[19]  These disclosures include (1) quarterly and annual financial reports, (2) reports on risk-based capital, evaluating the liquidity of the company's assets as compared to the level of insurance, investment and operational risks and (3) annual actuarial reports and certification of reserve adequacy. Wash. Rev. Code Ann. 48.05.250**;** Wash. Rev. Code Ann. 48.05.400; Wash. Rev. Code Ann. 48.05.43; Wash. Rev. Code Ann. 48.74.026 and 48.74.028.

[20]  *See* Framework for Insurance Holding Company Analysis at 7, Nat'l Ass'n Ins. Comm'rs (2002).

[21]  NAIC CIPR, at 5.   *Id.*

[22]  *NAIC/CIPR, Background on Statutory Accounting Principles",*
*https://content.naic.org/cipr_topics/topic_statutory_accounting_principles.htm.  Id.*

[23]  See note 17, supra.   Under the prior approval system, the insurance company must obtain approval of its intended rates from the commissioner before they may be used.  Under the file-and-use system, the insurer must file proposed rate changes but may use the new rates after a short waiting period. Vaughan at 110-111.

which an insurer can deny a claim, how a claim is made, and the options that a beneficiary has when selecting a method for payment of policy proceeds.[24]

27.     Insurance companies must file the Form, or contract language, with insurance regulators before a product sold through that Form can be marketed to consumers.  In a similar way, states review and regulate application terms and pre-purchase disclosures, such as sales illustrations, distribution of buyer's guides, and product description disclosures.[25]  States prescribe notices and "buyer's guides" that insurance companies are expected to provide to the consumer before or at the time of issuance of a life insurance policy.[26]  States also mandate information that insurers must provide to prospective customers in the application to replace a policy.[27]  This review process helps ensure that consumers understand the product they are buying and are able to maximize their ability to ensure that the product features are aligned with their risk-protection or financial planning needs.  As discussed more fully below, in the life insurance context, the Form also advises a customer what personal characteristics specific to them—such as their age, gender, and applicable rate class (often finally determined after a medical examination reveals their individual health characteristics)—may be used to determine what insurance rate will be assigned to that person.[28]

28.     Separate from the Form is the process by which an insurance company develops its underlying rate structure.  Insurance rates for all lines of insurance are regulated in order to ensure that an insurance company's rate structure across all Insureds produces rates that are neither inadequate nor excessive, that ensure the company's long-term financial health and ability to pay claims and benefits, and that do not unfairly discriminate against similarly situated policyholders.  As former insurance commissioner and insurance professor Dr. Therese Vaughan has written in her text on insurance and insurance regulation, "[a]dequacy [of rates] is the primary requirement.  The rates … must be sufficient to pay all losses as they occur and all expenses connected with the production and servicing of the business."[29]  In other words, adequacy is a critical focus of any insurance rates, including life insurance rates, as discussed in more detail below.

29.     *Market Conduct Regulation*.  Another key element of state insurance regulation is market conduct regulation, meaning the regulators' oversight of the manner in which insurance companies sell their products and interact with the state's consumers.[30]  Through laws, regulations,

---

[24] *See, e.g.*, Wash. Rev. Code Ann. 48.76.020 and Wash. Admin Code 284-84-070 (required provisions); Individual Term Life Insurance Policy Standards § 3, Interstate Ins. Prod. Reg. Comm'n (2014).

[25] Disclosures/Buyers Guide Model Law (Model 580); Life Insurance Illustrations Model Law (Model 582)

[26] *See, e.g.*, Wash. Admin. Code 284-23-200 to 284-23-250 (delivery of Buyer's Guide required)"); Cal. Ins. Code 10509.975 (delivery of Buyer's Guide required); NJAC 11:4-11.1 (delivery of Buyer's Guide required); Ill. Admin. Code 930.10 to 930.90 (delivery of Buyer's Guide required).

[27] *See, e.g.*, Wash. Rev. Code Ann. 48.76.010, et seq.; Individual Term Life Insurance Policy Standards § 3, Interstate Ins. Prod. Reg. Comm'n (2014). These requirements have evolved over time such that the requirements that may apply today would not have applied at the time this policy was marketed and sold to new customers.

[28] S*ee Life Office Management Association (LOMA), Life and Health Insurance Underwriting* at 5.18-5.22.

[29] Vaughan at 109.  As for the concern for excessiveness, Dr. Vaughan notes "[i]nsurance has become regarded as a product that is essential to the well-being of society's members, and insurers may not take advantage of this need to realize unreasonable returns.

[30] Market Conduct Regulation, Nat'l Ass'n Ins. Comm'rs available at https://www.naic.org/cipr_topics/topic_market_conduct_regulation.htm.

regulatory oversight and enforcement practices, regulators work to ensure that, among other things: (a) consumers are receiving the required product disclosures, (b) insurers are implementing their policies in accordance with their terms, (c) an insurer's product sales practices are being conducted appropriately, and (d) claims are handled as required by law.[31]

30.     States, including Washington, utilize standardized company reporting and examinations to monitor compliance with their respective market conduct regulation requirements. States also work collaboratively through the NAIC to monitor or examine companies on a national basis.[32]

### (c)     Actuarial Science and Insurance Regulation

31.     Actuarial science plays a significant role in insurance regulation and shaping regulatory policy and the regulators' expectations as to how insurance companies will determine the pricing for their policies.   As noted above, insurance is the pooling of similar risks from individual interests and transferring the risk of loss to one enterprise.  Actuarial science applies the mathematics of probability and statistics to define and study potential risks such as insurance risks. It also helps regulators and insurance companies to ensure that the pricing of products is appropriate to achieve the regulatory goals discussed above.

32.     Insurance regulators place heavy emphasis on the actuarial analysis as part of their expectations for how insurers will structure and price their products.[33]  State regulators expect that insurance companies will follow sound actuarial standards and practices in determining their rate structure.   Some states, including Washington, also require the insurance company to submit a memorandum from a qualified actuary describing how each life insurance product is valued and priced, along with accompanying financial information regarding the accuracy of its reserves for anticipated losses and a statement of the maximum or "not to exceed" pricing for a product.[34]  In conjunction with the actuarially certified material as submitted to an insurance department, the company's pricing is subject to both actuarial standards of practice and state insurance code

---

[31]  *Id.*

[32] Market Conduct Regulation, Nat'l Ass'n Ins. Comm'rs, available at https://www.naic.org/cipr_topics/topic_market_conduct_regulation.htm.

[33]  *See e.g.,* Wash. Rev. Code Ann. 48.74.015 (Washington standards defining "Qualified Actuary" for submission of actuarial opinion on life reserves).

[34]  Actuaries operate in the United States as part of a professional framework that involves detailed professional certification through the American Academy of Actuaries (the "Academy"), but not licensure through states.  Only actuaries meeting high levels of education, training, and experience ("Qualification Standards") as defined by the Academy are able to provide these certifications or opinions. *See* Qualification Standards for Actuaries Issuing Statements of Actuarial Opinion in the United States (2008)(available at http://www.actuarialstandardsboard.org/wp-content/uploads/2014/06/qualification_standards.pdf.).   Actuaries are subject to a code of professional conduct, requiring them to follow Actuarial Standards of Practice ("ASOPs") when rendering opinions and subjecting them to professional discipline for failing to adhere to professional guidelines and ethical standards. ASOPs are guidelines established by the Actuarial Standards Board ("ASB"), a professional body created from membership of the Academy, the Society of Actuaries ("SOA"), and the Casualty Actuarial Society ("CAS"). ASOP 1 at 3.1.4 (2013)(ASB describes itself as working through ASOPs to "provide the actuary with an analytical framework for exercising professional judgment," since "actuaries can and do reasonably differ in their preferred methodologies and choices of assumptions and can reasonably reach differing opinions, even when faced with the same facts); see ASOP 11 at 4.1 (2013);  NJAC 11:1-21A.1 to 11:1-21A.9.

requirements.  In addition to certification of reserves, state regulators may also require actuarial certification of other product and financial regulation requirements such as illustrations, asset adequacy analysis, risk-based capital analysis, and certain standard nonforfeiture calculations.[35] And even beyond the regulators' review of actuarial support for a particular product, regulators fully expect that the insurance companies will employ sound actuarial standards and practices in developing a product, including its pricing structure for particular products.

## D.    LIFE INSURANCE REGULATION

33.    Life insurance is a financial service product that families and businesses have used for centuries to plan for the financial consequences that may affect survivors when an Insured passes away.[36]  Today, many consumer protections are in place to protect the Insured and his or her beneficiaries and to incentivize early and continuous contingency planning through the use of life insurance.  For example, an Insured's qualifications for insurance, as well as the policyholder's ability to accumulate value under a policy, are generally determined by terms established at the time the policy is purchased so future changes in the Insured's health do not affect continued coverage.[37]  This feature of life insurance is a significant consumer benefit that requires substantial regulatory oversight of insurance company pricing and solvency in order to ensure the availability of the insurer to pay all benefits in the short and long term.[38]

34.    Life insurance companies memorialize all types of life insurance in a contract known as a policy.  The policy and the application (which becomes part of the policy), include many terms mandated by state insurance law.  Such terms may include language limiting issues that the insurer may consider as part of the application,[39] limits on defenses the insurance company may raise regarding the Insured's application responses once the policy is issued,[40] methods the insurance company must use to calculate policy values and benefits, policyholder rights associated with lapse and policy cancellation, and procedures for submitting a claim under the policy.  A further discussion of regulation applicable to life insurance policies is set forth below.

35.    Although this case involves only universal life insurance, general background information on the various types of life insurance products is helpful for context in order to avoid confusing the policies at issue with other types of insurance.  The Washington Office of the State Insurance Commissioner ("Washington" or "Washington Department of Insurance") identifies two general types of life insurance: term life and cash value life.[41]  The Washington Life Insurance Buyer's Guide (the "Buyer's Guide") notes that "term policies offer a death benefit with no savings

---

[35] *Id.*

[36] NAIC CIPR, "Life Insurance" (https://content.naic.org/cipr_topics/topic_life_insurance.htm); Since the enactment of federal tax laws, public policy has strongly encouraged the purchase of life insurance to protect vulnerable dependents through tax exemptions on benefits and policy earnings. IRC 101(a)(1).

[37] NAIC CIPR, "Life Insurance" (https://content.naic.org/cipr_topics/topic_life_insurance.htm); *McGill's Life Insurance*, 10th Ed., The America College Press at 4.2-4.3.

[38] *See supra* Section C (a).

[39] Vaughan at 253-258.

[40] *Id.*

[41] Wash. Admin. Code §§ 284-23-200 to 284-23-250(WA Buyer's Guide); see also https://www.insurance.wa.gov/sites/default/files/documents/life-insurance-guide.pdf.

element or cash value."[42] Once the time period for fixed premiums expires, the monthly premium amount increases significantly, usually making the policy unaffordable.

36.     The Buyer's Guide defines "cash value life insurance" as life insurance including both a death benefit and a cash accumulation feature in each policy.[43]  The Buyer's Guide explains that "[t]he buyer of a cash value policy pays more in the early years than for term insurance, but the premium not needed to pay for the cost of the death benefit accumulates with interest within the policy.  If the policy is surrendered before the Insured person dies, there may be a cash value paid to the owner, less any outstanding loans placed against the policy."[44]  These policies also have the option to take loans on the policy value that can be deducted from any future death benefit, or repaid into the policy to support a death benefit.

37.     Cash value life insurance would include whole life, variable life, and universal life insurance.  Whole life insurance features a level premium that is paid for a fixed time period or the entire life of the Insured.  As described in the Buyer's Guide, whole life insurance stretches the cost of insurance over a longer period of time in order to level out the otherwise increasing cost of insurance.  Whole life insurance provides so-called "permanent protection": "the term never expires, and the policy never has to be renewed or converted."[45]

38.     Universal Life insurance, the type of product at issue in this case and as described further below, allows the Insured to make flexible premium payments, combining the coverage features of term insurance with the cash value accumulation of whole life insurance.  Amounts paid into a universal life insurance policy in excess of the deductions needed to support the immediate life insurance benefit become the "cash value" of the policy, which is a feature similar to a whole life policy.[46]  Variable life insurance is similar to universal life, except that it also allows the policy owner the ability to select how the underlying policy value is invested, so that the death benefit varies in relation to the investment experience of the assets underlying the policy.[47]

39.     In a Universal Life product, the Policy includes a schedule of "not to exceed" or maximum cost of insurance rates.  State insurance laws require the insurer to disclose to the regulator how the maximum cost of insurance is calculated.

40.     The lower or "non-guaranteed" rate in a Universal Life insurance policy is known as the *cost of insurance rate*, which typically includes (a) the anticipated amounts, including

---

[42]     Wash. Admin. Code §§ 284-23-200 to 284-23-250 (WA Buyer's Guide); see also https://www.insurance.wa.gov/sites/default/files/documents/life-insurance-guide.pdf.

[43]     Wash. Admin. Code §§ 284-23-200 to 284-23-250 (WA Buyer's Guide); see also https://www.insurance.wa.gov/sites/default/files/documents/life-insurance-guide.pdf.

[44]     Wash. Admin. Code §§ 284-23-200 to 284-23-250 (WA Buyer's Guide); see also https://www.insurance.wa.gov/sites/default/files/documents/life-insurance-guide.pdf.

[45]     *McGill's Life Insurance*, 10th Ed., The America College Press at 5.3.

[46]     Payments made towards a universal life policy's cash value are often referred to as being paid into an "account value".  Based on state insurance laws, these funds are held in the general assets of the insurance company with the insurance company accounting for each policy's funds as being applied to their respective policyholders.  These accounts are not comparable to escrow accounts or "separate accounts" that are common with certain annuity products.

[47]     Wash. Admin. Code §§ 284-23-200 to 284-23-250 (WA Buyer's Guide); see also https://www.insurance.wa.gov/sites/default/files/documents/life-insurance-guide.pdf.

reserves, necessary for the insurer to meet its long term death benefit obligations under its policies, and (b) all of the anticipated operating expenses of the insurer necessary to cover its costs and meet all of its regulatory requirements, beyond the monthly expense fee and premium expenses charge.[48]

42. Insurers are required to disclose to the regulator their actuarial basis for how the maximum cost of insurance rates are calculated—a disclosure that is accomplished through the Actuarial Memorandum.

42. Importantly, the Universal Life Policy is not intended or understood by regulators as a pricing document. As regards pricing, its principal function is to identify for an insurance customer the characteristics specific to them—typically, age, gender, and health characteristics—that will determine the cost of insurance rate that will apply to them within the company's pre-established rate structure. The Policy also sets out the maximum cost of insurance rates that may be charged, as set out in the Actuarial Memorandum. The Policy is not intended or understood by regulators as setting out or describing the actuarial process by which the insurance company determines its underlying rate structure.

## E.   PRICING AND SOLVENCY REGULATION

43. Likewise, rates must account for different life expectancies for certain groups of people, such as male versus female, smoker versus non-smoker, and certain other characteristics. As noted, the development of life insurance rates is a complex process governed by rigorous actuarial and regulatory requirements. The rates and attendant pricing structure must account for long-term mortality or life span expectations for all Insureds, contingencies for Insureds whose life spans vary from actuarial expectations, accumulation and losses of investment earnings, necessary reserves and surpluses, and the overall cost of doing business.[49] Insurance regulators expect insurance company actuaries to take the Insured's specific characteristics into account in developing their underlying rates structure through assumptions about mortality, and also to ensure that the rates take other important factors into account, including reserves, expenses, and required surplus, as well as policyholder rights to cash value upon termination or change in premium payment practices. Insurers are expected to provide regulators with certified actuarial evidence of how the policy terms align with valuation terms before selling the policy, and to provide an actuarial opinion supporting all reserve calculations for outstanding life insurance policies.[50] These elements are described below.

### (a)   Establishing Rate Classes

44. Establishing rate classes—including age, gender and health status—is key to determining the appropriate price for the risks presented by various categories of life insurance applicants. As background, actuarially based "classes" have been a foundation for creating life insurance products since the late 1700s. Prior to that time, life insurance-type products were sold in Europe through "dividing societies," a form of mutual insurance company where members divided all losses evenly, regardless of their ages, as their premium payment in exchange for their

---

[48] *See* Vaughan at 240-241.

[49] *See* Vaughan at 226-227.

[50] *See* Vaughan at 241.

own contract of life insurance.[51]   These societies were financial failures because of adverse selection, meaning that people who were at higher risk of death joined in greater numbers than healthy people.[52]

45.      In the twentieth century, life insurance companies in Europe and the United States began to base premiums on classes of additional criteria such as gender, smoker/nonsmoker status, and identification of other risks, such as health or occupation, that were grouped into categories such as preferred, standard, substandard and uninsurable.[53]   Rate classes are defined through actuarial standards and, although the creation and selection of rate classes is an actuarial exercise, classes also are fundamental to the regulation of insurance products, particularly regulations related to consumer protection.   Although states and their insurance regulators do not define rate classes, they expect any rate classes used by an insurer to meet accepted actuarial standards.   States do place important limits on how classes can be defined, such as prohibiting classes based on racial differences.[54]   Each state requires insurers seeking to offer a product to identify in the policy and in the accompanying actuarial submissions the risk variables that the company intends to use to differentiate classes of Insureds.

**(b)      Applications and Underwriting Process**

46.      In addition to the Form and Actuarial Memorandum, life insurance companies will file their form of application with regulators.   The application seeks basic information about the applicant, including certain health and financial information.   The application facilitates the life insurance company's application review, or underwriting process, described further below, by providing information that the company will use to apply the accurate rate classes to the applicant. Insurance regulators specify the information that may be sought through the application and specifically prohibit the use of the application to solicit certain information.[55]   As noted, the completed application form becomes part of the life insurance policy, once the policy is issued.

47.      Life insurance policies typically are sold through agents.   As I understand this process through my many years in insurance regulation and other insurance-related experience, when a consumer seeks to purchase life insurance, the insurance agent will explain to that customer what products are available and seek to find out from the consumer what his or her financial needs and objectives are, among other information.   If a consumer is interested in the Universal Life product, the agent will explain how that product functions, including the account value feature, the flexible features of the policy, and the cost of insurance and other payment features.   The agent will work with the consumer to complete the application, submit the application to the insurance

---

[51]   Ogborn, The Practice of Life Assurance at 13; Atkinson, Life Insurance Products and Finance at 140.

[52]   Ogborn, The Practice of Life Assurance at 13; Atkinson, Life Insurance Products and Finance at 140.

[53]   Atkinson, Life Insurance Products and Finance at 140.

[54]   Unfair Discrimination Model (Model 887); Wash. Rev. Code Ann 48.30.300; N.J. Admin Code 11:4-20.1 to 11:4-20.2; 215 Il. Comp. State. 5/236.

[55]   *See* Wash. Rev. Code Ann. 48.18.480 ("No insurer shall make or permit any unfair discrimination between insureds or subjects of insurance having substantially like insuring, risk, and exposure factors, and expense elements, in the terms or conditions of any insurance contract, or in the rate or amount of premium charged therefor, or in the benefits payable or in any other rights or privileges accruing thereunder")."); *see Life Office Management Association (LOMA), Life and Health Insurance Underwriting* at 3.18.

company, and begin to provide the customer with information regarding the proposed policy, including potential costs.

48.     Once a consumer completes an application, the information that he or she provides will assist the insurer in identifying specific characteristics of that person—such as age, gender, and rate class—that will determine what monthly cost of insurance rate that person will be assigned within the company's underlying rate structure.  Gender (or sex as it is referred to in many policies) and age are identified through the consumer's responses in the completed application.  As for rate class, the application contains numerous questions regarding health, such as tobacco use history, and may also require a medical examination.  The insurer will also conduct an underwriting process, which generally involves a comprehensive review of application data and frequently a medical examination in order to make a final determination of whether the policy can issue and, if so, the appropriate rate class for the consumer.  The underwriting process considers a range of factors, such as family health history, tobacco use, and other individualized information, with the end result being a more precise determination of that person's insurability and rate class.  Once the rate class is determined, that information, together with sex and age, determine the person's cost of insurance rate.

### (c)     Nonforfeiture, Policy Valuation and Maximum Cost of Insurance

49.     State insurance regulators mandate that insurance companies utilize pre-established, industry-standard mortality tables as a basis for their guaranteed maximum rates, as well as for policy and reserve valuation calculations.[56]  These mortality tables are known as the Commissioners Standard Ordinary ("CSO") mortality tables for insurance companies. Periodically, regulators require all life insurance companies to update their policies and their related reserves for newly issued business due to updates to the CSO mortality tables.[57]  The Policy in this case used the 1980 CSO Mortality Table to support its valuation calculations for the maximum rates disclosed in the Policy.

50.     State regulators exercise significant oversight over life insurance pricing models through their regulation of life insurance policy valuation—referred to in insurance codes as the Standard Nonforfeiture Law.  To determine value, all fixed and varying rates and charges must be described to and reviewed by regulators, and this information generally is communicated to regulators through an Actuarial Memorandum.[58]

---

[56] See e.g., NAIC Model Recognition of the 2001 CSO Mortality Table for Use in Determining Minimum Reserve Liabilities and Nonforfeiture Benefits Model Regulation (Model 814)(State Disposition listing 50 states enacting).

[57] Insurance regulators work with the American Academy of Actuaries and the Society of Actuaries to develop the CSO Commissioners Standard Ordinary ("CSO") composite mortality tables for insurance companies to use for calculation of financial reserves.  The CSO mortality tables have been developed by periodically since 1941, with updates based on the addition of women to the calculations, the evolution of mortality rates and the increase then decrease in smoking-related deaths.  Hustead, *The History of Actuarial Mortality Tables in the United States*, Journal of Insurance Medicine (Vol. 20, No. 4) (1988) at 14.

[58] *See,* WAC 284-58-023 (life insurance filings must be certified by Washington Insurance Department); Washington Insurance Department life insurance filing instructions require actuarial memorandum (https://www.insurance.wa.gov/life-insurance-filing-requirements).

51.     The function of the Actuarial Memorandum, required to be completed by a qualified actuary, is to demonstrate that all nonforfeiture terms are in the policy and that maximum rates include the necessary elements to meet solvency requirements.  The Actuarial Memorandum should include a comprehensive description of how the insurance rates will support the policy's valuation terms, and how the policy features and charges will support those values.[59]

52.     Ultimately, the pricing model for maximum rates described in the Actuarial Memorandum must align with the policy terms and be included for each policy.  Generally, the Form should describe to the consumer the nature of the relevant charges, including cash value provisions, and policy features.[60]  Insurance regulators do not require the policy forms to describe the actuarial process used to develop rates for the product as a whole.[61]

53.     Beyond these points, regulators fully expect insurance companies to employ generally accepted actuarial standards and practices in establishing the formulas for developing cost of insurance rates that, consistent with the policy terms, are set at less than the maximum rate. Thus, regulatory and actuarial principles must be taken into account in establishing and implementing the monthly or maximum cost of insurance rates.[62]

**(c)     Nonforfeiture Value Testing and Self-Support**

54.     As noted above, state insurance codes generally seek to align insurance policy rates with the financial reserves held by the insurer to support anticipated liabilities under the policy.[63] As a result, in the Actuarial Memorandum filed with the policy, the insurer's actuary certifies that the insurer will monitor and test mortality and operating expenses, along with investment yields, to determine if the policy's non-guaranteed rates are sufficient.  Additionally, when the insurer files its annual financial statements with regulators, it must also include an Actuarial Memorandum certifying its reserves to support anticipated obligations, including mortality, interest and operating expenses.[64]  And, once again, the regulator expects that sound actuarial standards and principles taking these factors into account will be followed even if the company uses rates lower than the maximum rates identified in the Actuarial Memorandum.

55.     As an additional method of monitoring prices and reserves, insurance regulators require the insurer's actuaries to conduct a "lapse support" and a self-support" test to determine if the policy's pricing is in a safe and sound range as part of preparing performance estimates, or illustrations, for policyholders.[65]  Generally, the "lapse support" test requires the insurer to assume that after policy year six, no Insured chooses to terminate the insurance voluntarily, even though many policyholders do choose to terminate their Universal Life insurance coverage and recover

---

[59] *Id.*

[60] *See e.g.,* Wash. Rev. Code Ann. 48.76.020 ; NAIC Model Universal Life Insurance Regulation (Model 585).

[61] *See e.g.,* Wash. Rev. Code Ann. 48.76.020

[62] *See e.g.* Wash. Rev. Code Ann. 48.76.060 ; Wash. Admin. Code 284-84-030

[63] *Id.*

[64]  Wash. Rev. Code Ann. 48.74.028

[65]  See e.g., Wash. Rev. Code Ann. 48.23A.080; NAIC Annual Statement Blank, Life/Accident/Health (2017), Exhibit 5, Interrogatory No. 3, pg. 13; NAIC Model Illustrations Regulation Section 11 (Model 582); ASOP 24 "Compliance with the NAIC Model Illustrations Rule, §2.10.

the cash value.  The lapse-support test requires the company to show that the prices it is offering for the product do not depend on an assumption that Insureds will terminate their policies.

56.     Generally, the self-support test requires the insurer to show that the expected revenues from the product will support the benefits expected to be paid on the product after fifteen years.  The self-support test seeks to ensure that an insurer will not offer a product at an artificially low cost—a practice that could result in the insurer having to draw support from some other policy offering to sustain the benefits it is promising to pay to Insureds on the policy in question.  This test also seeks to ensure that the products are fairly priced, and that policyholders who purchase one product like Universal Life do not have to be subsidized by policyholders who purchase a different type of insurance.

57.     Most state insurance regulators, including Washington, require company actuaries to certify to them that the prices they are offering for any product that they intend to illustrate pass both the lapse-support and self-support test.  If the products do not pass the lapse-support and self-support tests, the company may not illustrate the product at the prices it intends to offer to any customer.

## F.     FACTS

58.     The subject of this Report is a universal life insurance policy issued on Form 94030 (the "Policy") by State Farm Life Insurance Company (the "Company") and offered for purchase in Washington from January 1, 1994 to June 30, 2004.[66]  The Policy includes terms applicable to all purchasers and several pages of terms that are tailored to individual policyholders.

59.     The Policy terms that are common to all policyholders include the Cover Page, Definitions, Death Benefit and Death Benefit Options Provisions, Payment of Benefit Options, Premium Provisions, Guaranteed Value Provisions, Policy Loan Provisions and General Provisions.  Certain portions of the Guaranteed Value Provisions, describing the Policy valuation terms as required by state insurance laws, are key to understanding the monthly cost of insurance rates at issue for this case.

60.     The *Guaranteed Values Provisions* section describes how the Policy is valued, and what factors contribute to changes in its value.[67]  The hallmark of a universal life insurance policy is that the policyholder can control the value of the Policy, cash surrender value and/or Death Benefit through the amounts that the policyholder pays into the Policy and the variable features the policyholder chooses to use.  The Policy's cash surrender value can increase if the Policyholder pays more than the expected monthly charges

61.     The *Monthly Cost of Insurance* section outlines the rating class basis for the Cost of Insurance calculation for each individual Insured.[68]  It states that "*the monthly Cost of Insurance for each policy year will be based on the Insured's age on the policy anniversary, sex, and*

---

[66] Plaintiff's Complaint, Exhibit A ("Whitman Policy").

[67] Whitman Policy, pg. 10 of 14.

[68] Whitman Policy, pg. 10.

*applicable rate class.*"[69]  This provision, as discussed below, defines the individual characteristics of the Insured that will be used to assign, from an already existing rate structure, an individual Insured's monthly cost of insurance rate.  These individual characteristics are also set forth in the *Maximum Monthly Cost of Insurance* table on page 4 of the Insured's policy.  This paragraph also notifies the Insured that these costs can increase up to but not beyond the maximum as stated in the Policy.  This section clarifies that (a) the Policy shows the *Maximum Monthly Cost of Insurance Rates*, (b) the Company can (but is not required to) use rates lower than the maximum monthly rates, and (c) adjustments in the rates can be made (but are not required to be made) for changes in mortality.

62.     Finally, the *Basis of Computation* section of the *Guaranteed Values Provisions* assures the policyholder that the Policy's guaranteed values meet the requirements of state insurance law and informs the policyholder that "*[t]he insurance authority there has a statement of how these values are determined.*"[70]

63.     The individualized Policy terms include the Policy Identification, Schedule of Benefits, Schedule of Premiums, Monthly Deductions, Schedule of Surrender Charges, and Cost of Insurance Rates and Monthly Charges.[71]

64.     The *Policy Identification* section denotes the policy Insured's name and age at the time of issuance, Policy number, policy date, and issue date.[72]

65.     The *Schedule of Benefits* section denotes the type of policy (in this case, Universal Life Basic Plan), the death benefit option the policyholder selected (Death Benefit Option 1), the basic amount of the initial death benefit ($500,000), the Insured's applicable rate class (in the policy attached to the Complaint, a Standard Rate Class, Male, Non-tobacco), with no additional rider benefits referenced as elected by the policyholder.[73]

66.     The *Schedule of Premiums* is the amount of planned monthly premium for the first year ($2,076) and for the second year ($2100).[74]  This section also advises that a premium expense fee of 5 percent deducted from each premium paid.

67.     The *Monthly Deductions* section describes when the Cost of Insurance payments will be deducted from the Policy's account value.[75]  This section notes that there is a guaranteed, or fixed expense payment of $5.00 each month, and also references that the guaranteed maximum monthly cost of insurance charges.  The policy shows the guaranteed maximum monthly cost of insurance rates for every age from the Insured's current age to age 99 and over.[76]

---

[69] *Id.*

[70] Whitman Policy, pg. 10.

[71] Whitman Policy, pg. 3.

[72] *Id*.

[73] *Id.*

[74] *Id*.

[75] *Id.*

[76] *Id.* at pg. 4.

68.     My understanding is that, in 1993, before making sales in any state, the Company filed the Policy and an Actuarial Memorandum with each respective state insurance regulator in the states where it would be sold.[77]   In 2001, the Company updated the Actuarial Memorandum filing to indicate that the Company was lowering its Cost of Insurance Rates.[78]

69.     The Insured in this case is William T. Whitman, who was 20 years old he purchased the Policy in 2001.[79]   Throughout the 20 years that Mr. Whitman has owned the Policy, he has paid sufficient monthly premiums to keep the policy active.   In 2003, Mr. Whitman took out a $3000 loan on the policy that reduced the Policy death benefit from $500,000 to $497,000.[80]   In subsequent years, Mr. Whitman took out loans of $2000, 2005 and $5500 respectively.[81]   In 2019, Mr. Whitman restructured these outstanding loans using the Policy, and reducing his death benefit from $497,000 to $474,000.[82]

70.     The policy expresses a plan to contribute $2076 in the first year and $2100 in premium per policy year starting on January 16, 2001 to support the policy.[83]   The policy also indicates that "a premium expense charge of 5 percent is deducted from each premium paid."[84] The record of Mr. Whitman's annual policy statements shows that Mr. Whitman contributed the planned premium through regular contributions of $175 per month.[85]   The annual policy notice dated January 15, 2002 notes that "[c]ontinued planned payments of $175 each month will provide coverage until July 15, 2045, based on guaranteed rates and until the policy anniversary when the insured is age 100, January 16, 2081, based on current rates."[86]   The annual notices show that State Farm deducted $8.75 from each premium contribution of $175; $8.75 is 5% of $175 as specified in the policy.[87]

71.     Although Mr. Whitman did not contribute any additional premium to the insurance account and took several loans on the policy through the past 20 years, the earlier contributions, together with the interest that the Company credited to the account value, were sufficient to sustain the policy.[88]

**OPINION 1:  The at-issue language in the Policy addressing monthly cost of insurance rates is common to universal life insurance policies and serves to tell an individual policyholder the criteria unique to that person (here, that individual's age on the**

---

[77] Nationwide Actuarial Memorandum.[VOGTM00001419PROD]; NJ Actuarial Memorandum [VOGTM00001398PROD-VOGTM00001418PROD]; VOGTM00005717PROD – VOGTM00005739PROD (Washington Approval Correspondence).

[78] 2001 NJ Actuarial Memorandum, [SFLIC-W-067057].

[79] William Whitman Deposition ("Whitman Dep.") at 85:7-10.

[80] Whitman Dep. 188:10-14.

[81] *Id.* at 191:14-18 and  193:16-23.

[82] *Id*. at 230-235.

[83] PLTF-WHITMAN-00000003

[84] PLTF-WHITMAN-000000003

[85] Whitman Dep. Ex. 11 – Annual Notices, SFLIC-W-0000207168 to SFLIC-W-0000207271.

[86] See e.g., SFLIC-W-0000207168.

[87] *Id.*

[88] SFLIC-W-0000207168.

policy anniversary, sex, and applicable rate class) that will be used by the insurer in assigning that person a cost of insurance rate for each month over the life of the Policy.  In my experience as a regulator, this language, in addition to advising each Insured that his or her rate will be based on these criteria, ensures that similarly situated policyholders are charged the same rate.  This language would not be understood to describe the actuarial process by which the company develops its underlying rates in the first instance.

72.     In my opinion as a former insurance commissioner and insurance regulatory expert, the language in the Policy stating that the Monthly Cost of Insurance Rate will be "based on the Insured's age on the policy anniversary, sex, and applicable rate class" (the "Policyholder Characteristics") would reasonably be understood by a regulator as identifying the individual characteristics of the Insured that the insurance company will use to assign, from an already existing rate structure, an individual Insured's Monthly Cost of Insurance Rate—that is, the process by which a rate is assigned to each individual Insured.  Regulators are well aware that the insurer's underwriting process is used with each policyholder to determine each person's age on the date of the Policy's issuance, sex, and "applicable rate class" (i.e., health status based on smoking or non-smoking, or other health characteristics).  A regulator would view the language describing the Policyholder Characteristics as explaining to the policyholder how a rate from the Company's existing schedule of rates will be assigned to them.

73.     As a regulator, I would not understand (and would not believe a consumer would understand) the Policyholder Characteristics to refer to, or otherwise place limitations on, the separate and distinct process by which the Company determines its monthly cost of insurance rate structure in the first instance—that is, the rate development process for the product as a whole.  Such a reading would not be reasonable from a regulatory perspective, as discussed more fully below.

74.     As described above, as a regulator, one of my primary responsibilities was to seek to protect the interests of consumers in my state in all aspects of the insurance transaction, and to work with my fellow regulators in other states in that process.  Toward that end, and as part of the policy approval process, I would expect that any insurance department staff would carefully examine the specific language in the Form to make sure the language is not misleading.  When reviewing a Form like the Policy at issue in this case, a regulator would consider how a consumer would understand the language contained in the policy and also how it is aligned with the actuarial process associated with the Policy's rate formulas.

75.     In reviewing the record in this case, I did not find any reference to concerns expressed by state insurance regulators, including Washington, about whether the Policy terms accurately reflected the underwriting process or whether the Actuarial Memorandum reflected a sound actuarial approach.  Based on my experience as a regulator and with insurance regulation, I know that the Washington Department of Insurance is thorough in its product reviews and known nationally as a stringent insurance regulator.  Had Plaintiff's interpretation of the "based on" cost of insurance language been expressed in the Policy—i.e., if the Policy had stated that the Company's underlying cost of insurance rates would be determined solely by reference to mortality factors—I would have expected to see serious concerns expressed by regulators.

76.     An important insurance regulatory requirement is that the Insured offers insurance on terms that generally charge similarly situated Insureds the same rate.  As I understand it, the Company offers its universal life product to customers with sex-distinct cost of insurance rates that, for Insureds in standard health, include up to three separate rate classes: juvenile aggregate rates (not differentiated by tobacco), and separate adult rates classes for non-tobacco and tobacco users.  The company also has substandard table-rating classes that it uses for Insureds who are revealed through underwriting to be in substandard health.  The policy language at issue in this case—stating that the monthly cost of insurance rate for each policy year (meaning each year the Insured holds the Policy) is based on the Insured's age, sex, and applicable rate class, would be understood by a regulator to refer to the process of assigning a rate to an individual Insured by reference to those characteristics.  After the customer's rate class is determined through the application and underwriting process described above, the individual policyholder receives an assignment of his or her rate from the schedule of rates the insurer has developed for use with the policy based upon his or her individual characteristics of age, sex, and rate class.  To avoid doubt, the Company sets forth the policy Insured's age, sex, and rate class in the policy identification pages of the Form.

77.     This regulatory understanding of the policy terms is consistent with the process an individual consumer goes through in purchasing insurance, as described above.  Typically, the individual will discuss the policy with an insurance agent or broker, including discussion of that individual's needs.  In my experience, the consumer will be advised that his or her rate will be determined by the specified factors, and the agent will walk through those factors and ask questions:  What is your age?  Do you smoke?  This will yield a preliminary "rate class" for that individual that is used to generate illustrations of the product.  If the customer chooses to apply for life insurance as illustrated, the customer goes through an underwriting process, which often involves a medical examination to determine the health of the Insured, with the end result being an applicable rate class being assigned to that individual.  If the rate class after underwriting is different than the expected rate class at the time of the illustration, the consumer is advised of the reason for the change and offered an opportunity to amend the application to reflect the offer to provide insurance at the assigned rate. Once the rate class is assigned through this process, and together with the other factors (the Insured's age on the policy anniversary and his or her sex, i.e., the Policyholder Characteristics), that Insured's rate is established, and the offer of insurance is made.

78.     In my experience as the Director of the Ohio Department of Insurance and working with other insurance directors nationwide, this language is not intended to and does not describe the company's actuarial rate development processes.  The actuarial analysis that supports policy valuation and rate development is conducted separately to permit regulators and insurers to be in dialogue, via the Form and Actuarial Memorandum filings and the understanding that the Company developed the rates following accepted actuarial practices and standards, regarding the price structure before the product is ever offered to consumers.  Insurers are not required to, and often do not, describe their actuarial processes to consumers in the Forms.  In my experience as a regulator, and, again, viewing the form from the standpoint of the customer and their experience, my understanding of the at-issue "based on" language is that it is referring to this process of assigning a rate to each individual Insured, meaning the Policyholder Characteristics, not how the rate structure is developed.

79.     I understand that Plaintiff also contends that the Policy obligates it to differentiate its cost of insurance rates by the length of time a policy has been in force.  As I understand it, Plaintiff contends that cost of insurance rates for two similarly situated policyholders (i.e., policyholders of the same age, sex, and applicable rate class,) should be different if they bought their policies at different times.  As an example, if the Company insured two 50 year-old men, each with the same rate class and death benefit amounts, but one of them had owned their policy since age 20 and the other had just purchased it, Plaintiff would contend that the Company's policy obligates it to use a lower cost of insurance rate for the policyholder who just purchased his policy.  As I understand it, Plaintiff contends that this obligation comes from the following sentence in the policy: "[t]hese rates for each policy year are based on the Insured's age on the policy anniversary, sex, and applicable rate class" (emphasis added).

80.     The reference to an Insured's age on the policy anniversary is, in my experience, common in life insurance policies where the rate changes by age, and it simply refers to the fact that the monthly rate for each Insured will change going forward in time as that individual ages. In my experience, this type of language is typically included to avoid confusion for the policyholder over how their age will be measured in a 12-month period, and it also tells them that the rate will change as the Insured ages.  If the policy anniversary is on January 1, and the insured's birthday is on July 1, for example, this clause tells the Insured that monthly rate will be determined by the age on the policy anniversary, not the age as of the birthday.  This avoids any uncertainty over which age the company will use for purposes of determining that person's cost of insurance rate during the course of any calendar year, or whether the rate would change during that calendar year.  By making clear that Insured knows what their rate will be for the balance of that calendar year even though the Insured's age changes on July 1.

81.     Some life insurers choose to vary their cost of insurance rates by the amount of time a policy has been in force.  An insurance company is not required to do so, and, in my experience, where the company does so, it commonly states that practice explicitly in the policy.[89]  The Policy contains no such language and, as noted, the "anniversary" language discussed above cannot reasonably be understood to express such a requirement.

**OPINION 2:  The process by which an insurer develops its underlying rate structure is separate from the process of assigning a rate to an individual Insured pursuant to the Policy.  Universal Life insurance policies, such as this Policy, contemplate that the insurer will utilize an already determined holistic pricing structure, including a monthly cost of insurance rate that collectively accounts for reserve requirements, interest earnings and operational expenses.  Regulators would understand that the insurer will then apply that rate to each individual Insured by reference to that Insured's age on the policy anniversary, sex, and rate class.**

82.     In my opinion as a former regulator and in my insurance-regulation practice more generally, the process by which an insurance company assigns a policyholder's individual rate within an existing and pre-established set of rates, as described in Opinion 1, is entirely different

---

[89] *See, e.g., Dean v. United of Omaha Life Ins.*, 2007 WL 7079558 at *2 (C.D. Cal. 2007) ("Current cost of insurance charges are based on the Insured's issue age, sex, rate and risk classes, the current specified amount, and the length of time the policy has been in force.") (emphasis added).

from the process by which the company develops those rates in the first instance. A regulator would understand that the insurance company's cost of insurance rates would be developed through a comprehensive actuarial formula the results of which would not exceed the maximum rate formula found in the Actuarial Memorandum filed with the regulator before the Policy was offered for sale in their state. Likewise, in my opinion, a regulator would not view the Policy terms stating that the Monthly Cost of Insurance Rate will be "based on" the "the Insured's" age, sex, and rate class as describing the process by which the insurance company sets its underlying rates in the first instance. Not only does the language naturally and logically refer to the process of determining an individual Insured's rate within a pre-existing rate structure, as discussed above, but the rate development process involves many more variables and is driven by regulatory concerns.

83.     In my experience, the ratemaking process occurs separately, before the "based on" policy language even comes into play with respect to any particular insurance customer. The ratemaking process is subject to actuarial and regulatory standards to ensure that the rates collectively expected to be paid by policyholders will allow the Insurer to pay expenses and maintain adequate surplus and reserves to protect policyholders when it comes time for the Company to pay out on its policies, among other considerations. In developing its underlying rates, and in order to provide adequate surplus and reserves, the Company must take into account numerous factors including, for example, operational expenses, reserves, surplus, and the need to pay benefits when due. Accordingly, it would make no sense, and would not be reasonable from a regulatory standpoint, for the "based on" language in the policy to refer to the underlying process of developing the underlying rates.

84.     As noted above, an insurer's underlying cost of insurance rate structure is determined by a mix of projections about life expectancy, the Company's interest earnings, and operational expenses, calculated through actuarial formulas.[90] As also noted above, and unlike term or whole life insurance, universal life policies do not utilize a level premium. Instead, the monthly cost of insurance rate appropriate to each policyholder's age, sex, and applicable rate class is used to calculate monthly deductions from the cash value of the universal life insurance policy, along with several fixed charges, allowing the policyholder to pay for coverage "as they go." The Standard Nonforfeiture Law requires the life insurance company to establish a Maximum Cost of Insurance Rate, but does not require the company to charge the maximum rates.

85.     When the insurer assesses the Monthly Cost of Insurance Rate for an individual Insured, it aligns the Insured's Policyholder Characteristics (age on the policy anniversary, sex and rate class) with the company's pre-existing rate structure as described above. As noted, the Policyholder Characteristics are determined during the underwriting process and fixed upon issuance of the Policy. In my experience as a regulator, regulators view the fixing of Policyholder Characteristics at Policy issuance as an important consumer protection element of insurance regulation. That said, these terms do not replace the actuarial development of rates, including the underlying cost of insurance rate structure. In my opinion, Plaintiff's claims in this case attempt to confuse the two concepts in a troubling manner that is inconsistent with any state insurance code, including Washington's.

---

[90] See paragraphs 40-41 above.

86.     As I read Plaintiff's claims and Mr. Witt's Report[91], it is clear that Plaintiff is seeking to allow the class to avoid payment of some of the operating expense portion of the Company's cost of insurance rates, as well as other necessary actuarial inputs.[92]   In my opinion, a regulator would be troubled if any life insurance company sought to eliminate these expenses and other elements from its cost of insurance rates.   In general, all insurance rates include an element of operating expenses because their corresponding financial reserves for these policy obligations also include reserves for operating expenses.   In my opinion, the comprehensive regulation of these various expenses, including operating expenses, are indicia that all are important to the solvency regulation of a life insurance company.

87.     In light of the comprehensive regulation of and expectations regarding an insurance company's cost of insurance rates, it is my opinion that a regulator would be concerned if those rates were developed solely on the basis of the Policyholder Characteristics because this methodology would deviate sharply from the regulatory standards contemplated in the Standard Valuation Law and described in the Policy and the Actuarial Memorandum.

88.     In sum, the approach advocated by Plaintiff and the assumptions underlying Mr. Witt's report inappropriately conflate the process by which the company develops the underlying rates with the process by which each individual Insured's rate is assigned.   In the assumptions underlying Witt's model, Universal Life insurance policyholders would be exempted from paying their full share of the cost of the insurance.[93]   This is because Mr. Witt's model would apply policyholder rates without considering all necessary costs, expenses, reserves, surplus, and other experience assumptions that actuaries must consider when developing the rates in the first instance.   I have never seen a company price an insurance product in this way.   And, in my experience as a regulator and in collaborating with every insurance department in the country, such a rate structure almost certainly would not be approved by a regulator based on the solvency and equity principles that are necessarily built into the insurance regulatory framework.

89.     Mr. Witt also models rates that he claims the Company was required to offer to policyholders that do not differentiate Insureds based on their tobacco status.[94]   This is an unreasonable interpretation of the policy that is inconsistent with the Company's existing rate classes and the specific facts underlying Plaintiff's policy.   Regulators and consumers alike would expect the Company to differentiate the rates used with adult Insureds on the basis of tobacco use.

**OPINION 3:   The process by which an insurer develops its underlying cost of insurance rate structure must comply with the broader insurance regulatory framework, in which state insurance regulators protect life insurance consumers, as well as the safety and soundness of the regulators' respective markets, through a comprehensive regulatory framework for life insurance companies.   This includes the regulators' expectation that insurance companies will align policy terms and**

---

[91] Deposition of Scott J. Witt, Whitman v. State Farm Life Ins. Co., Case No. 3:19-cv-06025, Ex. 2)("Witt Deposition") Ex. 4, Declaration and Report of Scott J. Witt, ¶59.

[92] Id.

[93] See Witt Deposition, Ex. 4, ¶¶49-51.

[94] Id. at ¶38.

**actuarially developed rate formulas with financial regulation requirements, subject to state regulatory and enforcement authority.**

90.     As described above, state insurance laws mandate coverage, valuation and nonforfeiture terms for all types of life insurance products, including universal life insurance. These same laws also require insurance companies to file proposed product forms and accompanying Actuarial Memoranda describing policy valuation, nonforfeiture terms and calculation of maximum rates.

91.     When an insurance regulator accepts the Form and Actuarial Memorandum for a Universal Life insurance policy, the state's insurance laws effectively place the regulator in the shoes of the entire group of consumers who may purchase the product.  Likewise, the filing company submits the product to the jurisdiction of the state, committing to the terms it will provide to each purchasing consumer.  Through this filing, and through the regulatory expectation that insurers will comply with sound actuarial standards and practices, the insurer also is committing to reserving appropriate funds to meet the policy obligations, along with continuous oversight of sales and expenses to ensure that such reserves are sufficient.

92.     The result is to provide an added layer of consumer protection in a complex consumer-facing industry.  In my experience, state insurance regulators are staffed with individuals who are knowledgeable and experienced insurance professionals and actuaries.  These regulators review the Forms with an eye toward overall operation of the product, and not simply for mandated terms and conditions.

93.     State insurance laws recognize the importance of encouraging consumers to purchase life insurance in order to provide for dependents in the event of an unexpected death. Insurance regulators mandate disclosures, illustrations and agent training for many products, but because the policy is a contract that is a significant and important purchase for the consumer, and because of the paramount importance of ensuring the insurance company's ability to pay benefits when they come due, additional regulatory expectations are warranted.  It is for these reasons that the insurance codes in the respective states provide regulators with significant oversight authority and broad enforcement powers.

94.     Another of the regulator's goals is solvency regulation, which depends even more on the precise nature of the policy and the information provided in the Actuarial Memorandum. As discussed above, each state insurance code includes a standard nonforfeiture law, outlining how a life insurance company values an insurance policy.  These code sections include terms and conditions that must be included in a policy.  In my opinion and experience, regulators expect an insurance company to follow sound actuarial standards and practices and regulatory guidelines to ensure that it is properly pricing its products so that its reserves are sufficient, thus contributing to the financial stability, safety and soundness of the company.  In my opinion, a regulator would find it highly problematic if an insurance company did not include operational expenses, reserves, or other necessary factors in the development of its cost of insurance rate structure.

95.     State insurance regulators have broad examination authority to review an insurance company's policy and rate administration, as well as the company's finances. Each state, including Washington, has similar authority.  While I served as Ohio's Director of Insurance, our market

regulation staff examined many life insurance companies in Ohio to determine whether they were working with appropriately licensed agents and abiding by our regulations regarding annuity sales.[95]  In preparing this Report, I reviewed examination reports and regulations issued by the Washington Department of Insurance and confirmed that Washington has exercised, and likely will continue to exercise, its market regulation authority to validate the rate methodology used by life insurance companies operating in Washington.[96]  In my experience, these examinations are conducted by regulators who are well-trained and knowledgeable in life insurance products.  State insurance laws require insurance companies to undergo a financial examination at least once every five years.  As discussed above, financial oversight is coordinated among the states with the domiciliary state serving as the lead examiner.  These examinations focus on many aspects of the company, including the adequacy of its financial reserves.  Although insurance companies will annually certify their reserves to insurance regulators, insurance regulators have authority to, and will, conduct their own actuarial review of reserves often hiring an outside actuary to complete this review.  In my opinion, insurance regulation is comprehensive and insurance regulators regularly utilize their market regulation and examination authority to validate compliance and enforce their state's regulatory requirements associated with life insurance policy rates and reserving.

96.     In my opinion, Plaintiff's assertions that she can substitute her views for those of the regulator on issues such as actuarial analysis of rates would undermine, and is counter to, the comprehensive nature of the insurance regulatory framework as described in this Report.  State insurance code regulation of life insurance policy terms, including nonforfeiture, is a significant part of the financial and solvency regulatory duties assigned to state insurance regulators.  In my opinion, insurance regulatory oversight of insurance policy terms, is directly tied to financial and solvency regulation.  State insurance regulators implement a comprehensive regulatory framework that addresses policy issuance, policy maintenance, and financial reserves to support obligations under the issued policies.  This framework has been applied consistently and successfully with all universal life insurance products issued under Policy 94030, including the Policy.  The insurance regulatory framework serves to protect all policyholders and, in my opinion, its history demonstrates that regulators have done so with overall success.

97.     Additionally, in my opinion, where Policy terms and related materials, such as the actuarial analysis of rates, have met the regulatory standards and requirements described above, these Policy terms certainly are not unfair or deceptive.  The Policy terms and related cost of insurance charges are calculated and implemented as part of a larger process that is tied to solvency regulation by the states.  Again, Plaintiff's attempt to substitute his views for those of the regulator on issues such as actuarial analysis of rates by claiming that the Company's actions resulted in an unfair and deceptive insurance practice is counter to the comprehensive nature of the insurance regulatory framework as described in this Report.  In my opinion, the Company acted as required

---

[95]  Ohio Department of Insurance Market Conduct Reports: American Equity Investment Life Insurance Company (December 2009); Life Insurance Company of the Southwest (December 2009); Equitrust Life Insurance Company (December 2009).

[96]  *See e.g.*, WAC 284-58-023; Washington Department of Insurance Market Conduct Examination Reports: Farmers New World Life Ins. Co. (2004 WA Market Conduct LEXIS 12); Jackson National Life Insurance Co. (1996 WA Market Conduct LEXIS 10); Sunset Life Insurance Co. (1996 WA Market Conduct LEXIS 23).

by regulators, and regulators reviewed and approved the Company's Form and accompanying actuarial analysis.  As a former regulator, I would not view a company acting in compliance with regulatory requirements as conducting an unfair and deceptive practice.[97]

> **OPINION 4:  An insurance pricing model for an insurance company's cost of insurance rate structure that used only mortality factors and did not take into account the insurer's overall operating costs, expenses, reserve requirements, and other revenue needs would not satisfy the established regulatory expectations referred to in this Report.**

98.     As a general matter, state insurance regulators expect life insurers to develop actuarially sound insurance rates, developed in accordance with Actuarial Standards of Practice, and to be able to attest that such rates are self-supporting and non-discriminatory. These are essential to any state regulator to make sure the consumer will be treated fairly, and that the rates will be adequate to cover all costs associated with the policy.

99.     The insurance rates must be sufficient to pay many expenses beyond just the mortality expenses—the death benefit—on each policy, including:

- Premium taxes

- Financial reserves

- Operational expenses (agent commissions, employee salaries, employee benefits, and the like)

- Funding of regulatory financial surplus requirements

100.     If the rates are insufficient to cover these and other attendant costs, even if the insurer is collecting rates based on anticipated mortality costs, an insurer risks insolvency and will not be able to meet its obligations to Insureds because it will not have collected sufficient funds from its Insureds.  As noted above, collecting insufficient funds was a shortcoming of early life insurance companies (dividing societies) that modern regulators seek to avoid.

101.     Another important regulatory consideration is that the operating expenses of the company be allocated equitably among policyholders.  Some of the expenses will be the same for all policyholders, regardless of amount of insurance purchased, or other attributes unique to the Insured.  It is thus common and appropriate to charge such policyholders a flat, monthly charge. Other expenses will vary by the amount of premium paid on the policy. These expenses, such as

---

[97] The Washington Insurance Code, like many other state insurance laws, appears to reserve enforcement of unfair and deceptive insurance practice claims primarily for enforcement by the regulator except with respect to certain claims handling matters.  *See* Wash. Rev. Code §48.30.010-.015; Wash. Admin. Code 284-30-300 to 284-30-390; *Perez-Crisantos v. State Farm Fire & Cas. Co.,*187 Wn.2d 669, 681, 389 P.3d 476,478 (2016). The public policy associated with limiting a private right of action for unfair and deceptive insurance practices, as compared to other consumer claims, is that many insurance company practices are tied to other portions of insurance code compliance, as detailed in this Report.  In my experience and opinion, this is a sound public policy practice, given the uniquely comprehensive role of insurance regulators with respect to consumer protection with respect to insurance products.

agent commissions, are most equitably covered through a premium expense charge that is typically a percentage of each premium paid to the insurer. There are still other expenses that vary by the size of the policy, and those are most equitably covered through the underlying cost of insurance rate. Breaking the expenses incurred by an insurer into these different categories, and including a portion of them into the cost of insurance rates themselves, is an appropriate and industry standard means of insuring that the actual costs of maintaining a policy are allocated equitably and fairly among the Insured population.

102.    The alternative cost of insurance rates suggested by Mr. Witt and Plaintiff do not reflect any of these important regulatory considerations and, in my opinion, could not be charged to policyholders.  Because the rates appear to be based entirely on mortality considerations, and do not take any of the operational costs, reserves or other regulatory requirements into account, the rates are not likely to be self-supporting.

103.    In contrast, the Company's cost of insurance rates appear to have been developed in accordance with Actuarial Standards of Practice, with consideration given to each of the costs and other regulatory considerations discussed above, and then sorted into the various classifications set forth in the policy (age, sex and applicable rate class).

**OPINION 5:  The imposition of an alternative pricing model for cost of insurance rates that appears to be actuarially untested, through a reinterpretation of the Policy "based on" language as applying to the development of a company's cost of insurance rate structure, would jeopardize the vital role of insurance regulatory oversight and the well-established state insurance regulatory framework that has operated successfully for centuries.**

104.    In my opinion, Plaintiff's assertions that the Policy terms prevent the Company from including relevant business variables beyond mortality in developing its cost of insurance rates is a selfish and dangerous claim.  I am most concerned that the crux of this action, as supported by Mr. Witt's opinion, seeks to negate or ignore the important insurance regulatory considerations described above in favor of a form of contrary and self-serving private regulation through an alternative pricing model for cost of insurance rates that does not take into account regulatory or actuarial considerations and that repurposes the "based upon" language of the Policy to mean something other than what regulators would understand it to mean.

105.    Mr. Witt and Plaintiff would replace the Company's cost of insurance rate structure, which was subject to actuarial analysis and regulatory scrutiny and illustrated to consumers at the time they bought their policy, with a replacement rate of his own choosing without subjecting the resulting rate structure to actuarial testing or regulatory scrutiny.  Such a process would be is inconsistent with my understanding of actuarial practice, in which products are priced holistically with all charges and features together contributing to the solvency and sustainability of the product for both the consumer and the insurer.

106.    As described above, insurance is regulated comprehensively, from products and sales, to solvency and claims.  Each state insurance code grants broad authority for state insurance regulators to step into the shoes of their state's insurance consumers to examine product terms and maximum rates, to evaluate the financial strength of companies selling insurance in their state, and

to ensure that companies are following sound actuarial standards and practices. In my opinion, the insurance regulatory framework has been successful for its almost two century history because of its rigorous solvency regime and its basis in sound actuarial principle.

107.     At bottom, Mr. Witt's analysis is an effort to disregard this comprehensive regulatory scheme and renegotiate the price of Mr. Whitman's universal life insurance policy more than 20 years after its issuance. This is at odds with over a quarter century of regulatory oversight by state insurance regulators. Through this time, regulators ensured that Plaintiff's insurance was valued properly, that the Policy remained in force even after a lengthy period of non-payment of premiums, and that the Company remained solvent to make a loan, distribute the surrender value, or provide coverage or pay a death benefit at any time since the policy was purchased in 2001. As described above, the Company uses the rate and valuation methodology to establish financial reserves to support its potential liability options under this and all other coverage issued under Policy LF-1853-4088. The Company has also aligned these efforts with its rate and valuation methodologies for all other policies it has issued, and has done so in compliance with and as directed by state insurance codes. All of these aligned regulatory actions result from the carefully crafted state insurance regulatory framework, and none of them work if a private litigant is permitted to disrupt them retroactively.

108.     Mr. Witt claims that the Company should refund Plaintiff $5,566.82.[98] On a gross basis, it is my understanding that the entire cost of insurance deductions that the Company made from Plaintiff's account value to provide $500,000 in life insurance ranged from a low of $45.14 per month to a high of $53.64 per month.[99] The total sum of all the cost of insurance deductions on his policy from 2001 to 2018 was $9441.66.[100] When Mr. Witt projects his untested replacement rates across the entire class, the amount of the refund he claims the Company owes exceeds $16 million.[101]

109.     These figures are only for one product and are only retroactive. Imposing this type of retroactive recreation of rates and rate classes outside of the actuarial and regulatory framework that governs rate development would create unplanned uncertainties that the insurance regulatory framework seeks to avoid through its oversight function and its linkage of product issuance to solvency protection.

110.     The allegations in this case are also contrary to the intentions of the insurance regulatory framework as they apply to the Policy and its rating and valuation terms. The pre-issuance review of life insurance products and, more importantly, their actuarial basis is central to the insurance industry. As noted above, the insurance regulatory framework places the regulator into the shoes of their state consumers. The Company communicates with regulators through the Form and Actuarial Memorandum filing, as well as through the expectation that the Company will follow the insurance regulatory framework, which expects application of sound actuarial standards and practices in determining its cost of insurance rate structure. This exchange is the negotiation,

---

[98] Witt Deposition, Ex. 4, ¶59.

[99] See SFLIC-W-0000207171, SFLIC-W-0000207264.

[100] State Farm Life Ins. Company's Responses to First Interrogatories, pp 12-13.

[101] Witt Deposition, Ex. 4, ¶59.

conducted at inception of the product's offering so the Company can make the appropriate financial arrangements to support its liabilities for decades to come.

111.    This regulatory framework has been successful for decades and is in place to protect consumers.  In my opinion, this protective framework would be significantly weakened if private litigants were permitted to override it.  The work of regulators is embedded in each insurance policy sold in Washington and every other state in the nation.  The end result is consumer protection and, in my opinion, the impact of regulators and the insurance regulatory framework on each and every insurance policy is vital to the safety and soundness of each state insurance market. In my opinion as a former insurance director, a private litigant should not be permitted to assert his own rates in the manner asserted in this case.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing statements are true and correct.

Respectfully Submitted,


_____
Mary Jo Hudson