**The Honorable Barbara J. Rothstein**

1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
8
AT TACOMA

9
WILLIAM T. WHITMAN, individually and
on behalf of all others similarly situated,

NO. 3:19-cv-06025-BJR

10
DECLARATION OF ALAN R. HENDREN

11
Plaintiffs,

12
vs.

13
STATE FARM LIFE INSURANCE
COMPANY, an Illinois corporation,
14

15
Defendant.

16

17

18

19

20

21

22

23

24

25

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR
- 1 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

## DECLARATION OF ALAN R. HENDREN

I, Alan R. Hendren, have personal knowledge of the information below and declare as follows:

1.      I am an Assistant Vice President at State Farm Life Insurance Company ("State Farm").  I have been a member of the American Academy of Actuaries since 1989.  I also have been a fellow of the Society of Actuaries since 1993.  I have worked for State Farm in various capacities since 1985.  My present duties include supervising actuaries in the Life/Health Actuarial group at State Farm.  Approximately 50 employees, including 13 who are fellows of the Society of Actuaries and 20 who are members of the American Academy of Actuaries, currently operate within my area of supervision.

2.      An actuary is a professional who analyzes the financial consequences of risk.  Actuaries use mathematics, statistics, and financial theory to evaluate uncertain future events.  In the context of life insurance, actuaries develop, price, and manage life insurance products.  All practicing actuaries in the United States are bound by the American Academy of Actuaries Code of Professional Conduct and Actuarial Standards of Practice ("ASOPs") developed and promulgated by the Actuarial Standards Board.  I faithfully adhere to each in my actuarial work for State Farm.

3.      The life insurance policy at issue in this litigation is a Universal Life Insurance product that State Farm offered to customers in Washington on Form 94030-05 from January 1, 1994 to June 30, 2004 (the "Policy").  The Policy provides for a payment of a death benefit to beneficiaries upon the death of the named Insured.  It also had a cash value component that allows policyholders to accumulate an account value that State Farm will credit with interest at a rate of at least 4%.  Policyholder premium payments, less a 5% premium expense charge, are added to this account value.  State Farm takes monthly deductions from the account value for cost of insurance, a $5 monthly expense charge, and any rider charges.

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 2 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

4.      I have been involved in the process by which State Farm prices and reprices its universal life insurance products.  I was on the pricing team when State Farm revised its pricing for several life insurance products in 1994.  This effort to revise and reprice life insurance products was referred to internally at State Farm as the 94000 series, and included the Policy at issue in this litigation.

5.      The development of products for the 94000 series was a substantial effort that required coordination from many employees in State Farm's actuarial group over a period of time from 1991 to the rollout of the new products in 1994.  I maintained a reference binder of my work on the 94000 series (also sometimes known as the "Lifeline").  The binder contains my work on mortality scaling for tobacco, asset share assumptions for pricing, expense assumptions to use in development of the new products, and other reference material.  A true and correct copy of the binder and its contents is attached here as **Exhibit A**.

6.      From my experience at State Farm, I am familiar with the language in the Policy regarding cost of insurance rates, and in particular the language referring to the cost of insurance rates "for each policy year" being "based on the Insured's age on the policy anniversary, sex, and applicable rate class," defined as "[t]he underwriting class of the person insured."  In my experience at State Farm, and especially my experience with developing the company's underlying rate structure and rate tables that are used to assign cost of insurance rates to individual Insureds, this provision advised each individual Insured of the personal characteristics relevant to that person that would be used to assign his or her cost of insurance rate for a given policy year—that is, for the policy year in which the rate would be charged to each policyholder.  I have never understood this language to describe the more comprehensive actuarial process that we at State Farm used to develop the cost of insurance rate structure and rate tables for this insurance product. Nor did anyone at State Farm indicate to me that they understood this language to speak to the process of developing State Farm's underlying rates.  Rather, State Farm's comprehensive actuarial process

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR                                           - 3 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

was used to develop rate tables that were organized by age, sex, and rate class.  At all relevant times, the process of identifying the rate for a particular Insured of a given age, sex, and rate class was fundamentally separate and distinct from the process of developing the rates for the Policy.

7.     That the process of developing the rates was different from the process of identifying the rate for a particular individual is confirmed by the Policy's reference to "applicable rate class," with "rate class" being further defined as "the underwriting class of the person insured." Again, and in my experience at State Farm, this language refers to the Insured's individual rate class as assigned to the Insured through the underwriting process—hence, the word "applicable." Based on my experience, because the "applicable" rate class would not be known or determined for any individual Insured until that Insured is assessed at the time of purchase, and because the Policy language presupposes an existing rate table, the term "applicable rate class" cannot be referring to the rate development process.  Nor did anyone at State Farm indicate to me that they understood the concept of "applicable rate class" to refer to the process of developing rates.

8.     This understanding of "applicable rate class" is also consistent with the clause in the Policy stating that a rate class "will be determined for the Initial Basic Amount and each increase in the Basic Amount."  In my experience at State Farm, this again speaks to the individual Insured.  The "applicable rate class" is determined for that Insured at the time of the initial policy purchase, and then (unless the customer has purchased a Guaranteed Insurability Option rider) is re-determined in the event that a customer increases his or her coverage, to the extent of the coverage increase.

## Development of State Farm's Cost of Insurance Rates

9.     As a member of the American Academy of Actuaries and a fellow of the Society of Actuaries for several decades, I am familiar with the insurance industry.  Prior to filing the Policy with the relevant insurance regulators and seeking whatever approvals are necessary to offer the insurance product to consumers in the relevant states, State Farm actuaries developed an

DECLARATION OF ALAN R. HENDREN         - 4 -
NO. 3:19-cv-06025-BJR

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1    actuarially sound set of cost of insurance rates.  The rate tables that are produced as a result of this

2    underlying process of developing an insurance company's cost of insurance rate structure are then

3    used to assign a rate to an individual Insured.  For the Policy at issue here, this process of

4    identifying an individual Insured's rate from the rate tables was described in the Policy's cost of

5    insurance clause at page 10 of the Policy.  From my experience at State Farm, I know that the rate

6    tables produced by the ratemaking process for the Policy at issue were used by independent

7    contractor agents and by State Farm to assign cost of insurance rates to individual Insureds.

8        10.      At all relevant times, the development of cost of insurance rates for the Policy was

9    subject to the binding Actuarial Standards of Practice, as well as to regulatory oversight in every

10   state where State Farm offered this life insurance product.  The Actuarial Standards of Practice

11   identify what the actuary should consider, which include any legal and regulatory requirements.

12   This includes requirements of state regulators that insurance products are sustainable to ensure the

13   financial solvency of the company.

14        11.      The National Association of Insurance Commissioners ("NAIC") is the U.S.

15   standard-setting and regulatory support organization created and governed by the chief insurance

16   regulators from the 50 states, the District of Columbia, and five U.S. territories. Through the NAIC,

17   state insurance regulators establish standards and best practices, conduct peer review, and

18   coordinate their regulatory oversight. The NAIC has adopted the model illustration regulation,

19   which imposes requirements on insurers who want to market to customers using illustrations to

20   show how the policy works based upon current non-guaranteed elements.  The regulation has many

21   facets, but as relevant here, it precludes the insurer from illustrating to customers rates that are not

22   supportable based upon the company's recent actual experience (*i.e.*, mortality, expenses,

23   persistency investment income, taxes, etc.), as certified annually by the company's Illustration

24   Actuary.  The Illustration Actuary must ensure the rates pass lapse-support and self-support tests

25   that are designed to ensure sufficiency of the rates.  Since June 1, 2014, I have been the Illustration

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR
- 5 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

Actuary appointed by State Farm.  Most states, including Washington, have adopted either the model illustration regulation or some analogous illustration requirement that prevents any insurer from illustrating a product to customers that does not satisfy the lapse and self-support tests.

12.     For Universal Life insurance products, including the Policy, insurance companies would develop maximum rates using standard mortality tables, referred to as the Commissioner's Standard Ordinary Mortality Tables (CSO Tables) and applying actuarial principles to generate a set of maximum rates that are submitted to the insurance regulator.  The company would also develop a set of lower, non-guaranteed rates that would be subject to change, using internal company data and assumptions to produce a rate structure, no part of which would exceed the maximum rate submitted to the regulators.  Regulators expect the insurance company will follow accepted actuarial principles in establishing their underlying rates to be charged to customers.

13.     An insurance company's maximum cost of insurance rates are fixed at the time the product is issued and cannot be changed by the company.  The company's lower, non-guaranteed cost of insurance rates are adjustable during the life of the policy, at the discretion of the insurer, subject to limitations set forth in the policy.  To protect policyholders, regulations, including those in the state of Washington, require State Farm to display the maximum cost of insurance rates in the Policy, but the insurer is not required to display the lower, non-guaranteed rates in the Policy, or to indicate the manner in which they will initially be determined.  Given that the lower, non-guaranteed rates are adjustable, regulators do require companies to indicate in the policy form the factors that will be considered if the company decides whether to adjust these rates.  In fact, State Farm never raised the cost of insurance rates for this Policy.  In 2002, State Farm actually lowered its cost of insurance rates for this Policy.

14.     According to the practices and principles for establishing cost of insurance rates for a Universal Life insurance product, actuaries must consider a range of anticipated experience assumptions in order to develop a rate structure that is actuarially sound.  For example, Actuarial

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 6 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

Standard of Practice (ASOP ) No. 2, Section 2.1 defines an "anticipated experience factor" as "[a]n assumption that reflects anticipated experience and may be used to determine nonguaranteed charges or benefits."  ASOP 2 further provides, "Examples of experience factors include investment income, mortality, policy termination, and expense rates."  State Farm used financial models of projected cash flows, given the anticipated experience factors, to establish a rate structure for the Policy that was projected to achieve the company's marketing, financial and other objectives.  Although mortality is one set of assumptions that was used to develop cost of insurance rates for the Policy, it was not the only factor.  The actuarial standards state that other experience factors are relevant to the development of an actuarially sound rate.

15.      The cost of insurance serves a function similar to a monthly premium in a more conventional policy, such as a car insurance policy or a term life insurance policy.  The cost of insurance is a charge taken each month that contributes to the company's ability to meet its operational needs, ensure sufficient funds to pay claims or benefits at a later time, and ensure the company's continued financial stability.  Cost of insurance rates are developed by considering factors related to the potential Insureds as a whole—such as anticipated premium payments, policy surrender rates, mix of business by sex and rate class, and mortality expectations, among others— and also to the operations of the company itself, such as the cost of doing business (*e.g.*, underwriting costs, employee salaries, agent commissions, costs of regulatory compliance, and overhead expenses), earned interest rates, inflation rates, tax rates, regulatory reserve and surplus requirements, among many others.  All of these considerations, taken together, allow the company to develop a set of rates that will ensure a competitive product that provides a benefit to policyholders and will generate income that will be sufficient for the company to meet its obligations to policyholders.

16.      The Policy design here was built to facilitate solvency and self-support across the entire universe of Form 94030 policyholders within the limits authorized by the Policy and the

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 7 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1  regulations and laws that govern insurance. State Farm would not and could not have offered this

2  product for sale if the product design was not expected to generate adequate revenue for self-

3  support. This would not make economic sense for State Farm and would not comport with

4  regulatory requirements and expectations. As I understand Plaintiff's expert's assumed rate

5  structure, significant changes to that rate structure would have been required in order to make it

6  actuarially sound, including to pass illustration regulatory requirements noted above (including

7  those of Washington).

8       17.     Consistent with the above-described actuarial standards, State Farm priced its

9  Universal Life products, including the Policy, holistically so that the features and charges of the

10  product—taken as a whole—would support its commitment to provide promised benefits to

11  policyholders for many years in the future. State Farm did not price its products so that it could

12  recover its expenses solely through the $5 monthly expense charge and the 5% premium expense

13  charge. The expenses the Policy will create for the company—including payment of death

14  benefits, payment of agent commissions, expenses associated with application processing and

15  medical examinations, investment management, and tax and regulatory compliance—must all be

16  supported through the policy charges in total. It is standard actuarial practice to seek to recover

17  these costs through overall operation of policy charges, rather than a direct match to specific

18  charges.

19       18.     It is not consistent with my experience as an actuary, prevailing actuarial standards,

20  or regulatory requirements simply to use an underlying company mortality table to determine the

21  cost of insurance rates for a universal life product, as I understand Plaintiff's expert has proposed

22  to do in this case. The mortality table merely expresses the number of people per thousand that

23  may die in a given year. A true and authentic copy of State Farm's mortality table from the relevant

24  timeframe is attached hereto as **Exhibit B**. One cannot translate a mortality table directly into the

25  cost for an insurance product without also considering other economic factors such as expenses,

DECLARATION OF ALAN R. HENDREN          - 8 -
NO. 3:19-cv-06025-BJR

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

reserves, taxes, etc., as discussed above.  I know of no company that prices universal life insurance simply by applying mortality factors to the overall insurance benefit for each Insured without considering the impact on other policy charges.  I also do not know of any actuarial principle or regulatory standard that required a company to do so.  If a company were going to use only mortality to determine cost of insurance rates, it would require significant adjustments to the other charges within the policy to meet solvency and self-support requirements.  Without making these significant adjustments, such a product could not have been marketed in the regulatory environment at the time.  In light of my experience, I believe that it would be unreasonable for any customer to expect a company to price its products in a way that does not account for expenses and the cost of doing business in pricing their product.

**Regulatory Approval of State Farm's Cost of Insurance Rates**

19.     After the intended product design and form was complete for the Policy at issue, State Farm began the process of seeking regulatory approval to offer the product to consumers. Because State Farm is an Illinois company, and thus Illinois is viewed as the primary regulator on certain financial matters, State Farm first sought approval to offer the Policy in its home state of Illinois.  On June 3, 1993, State Farm sent the policy form, a copy of its nationwide actuarial memorandum, a "John Doe" annual statement, and a copy of the statement of policy costs and benefits to the Department of Insurance in Illinois.  A true and authentic copy of this correspondence and accompanying materials is attached hereto as **Exhibit C**.

20.     On June 25, 1993, State Farm sent another letter to Illinois, enclosing a revised sample annual statement showing planned cost of insurance rate information and expense charges for the "John Doe" insured for the following policy year, as Illinois had requested.  A true and authentic copy of this correspondence is attached hereto as **Exhibit D**.

21.     On July 15, 1993, Illinois notified State Farm that it decided to drop any requirement to disclose cost of insurance rate information.  In the notice, Illinois included a form

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 9 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

showing that the policy was approved for use in Illinois on June 25, 1993. A true and authentic copy of this correspondence is attached hereto as **Exhibit E**.

22.     Thereafter, State Farm sought approval to offer the policy for use in other states, including Washington. The actuarial process State Farm followed to develop the rates for this product was the same in all states where the product was offered for sale, but some states have different requirements for information about that process. Washington's requirements were similar to those of Illinois, in that they required submission of the Policy form for approval.  On July 13, 1993, State Farm submitted the Policy form to the Washington state Office of the Insurance Commissioner. State Farm provided the same actuarial memorandum, John Doe Policy form, annual statement, and statement of policy cost and benefit information to Washington that State Farm provided to Illinois on June 3, 1993.  A true and authentic copy of this correspondence is attached hereto as **Exhibit F**.  On October 19, 1993, the Washington Insurance Commissioner provided notice to State Farm that the form would be "deemed approved" under Washington law. A true and authentic copy of this correspondence is attached hereto as **Exhibit K**.

23.     The actuarial memorandum State Farm submitted to New Jersey provides the most detailed description of the process that State Farm's actuaries followed to develop the cost of insurance rates for use with the Policy.  This includes identification of the fact that State Farm considered "expenses" and "profit margins" in the development of its underlying cost of insurance rates.  To the best of my knowledge, no state regulator raised concerns about the fact that State Farm considered non-mortality factors when developing its rates.  A true and authentic copy of this memorandum is attached hereto as **Exhibit G**.

24.     ASOP 24 establishes standards for actuaries in complying with the model illustration regulation.  Section 3.4 of ASOP 24 identifies specific experience factors on which the actuary should rely in testing the sufficiency of insurance rates. These experience factors include: investment return, mortality, persistency, direct sales expense, all other expenses, and taxes.

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR                                    - 10 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1  Generally, these are the same experience factors that State Farm actuaries evaluated at the time

2  they were developing the cost of insurance rates for use with this Policy.  They also are similar to

3  the experience factors identified in ASOP 2, which governs the development and determination of

4  non-guaranteed elements such as the cost of insurance rate.  Copies of ASOP 24 and ASOP 2 are

5  attached to this declaration as **Exhibit H** and **Exhibit I**.

6        25.    State Farm's Illustration Actuary certifies annually that its non-guaranteed

7  elements used in illustrations, including the cost of insurance rates for the Policy at issue here,

8  satisfy the lapse-support and self-support tests.  As stated above, since June 1, 2014, I have been

9  the Illustration Actuary appointed by the company to certify that the non-guaranteed elements for

10  our products, including cost of insurance rates, satisfy the illustration regulation requirements,

11  including Washington's illustration regulation requirement.

12        26.    As I understand the cost of insurance rates proposed by Plaintiff's expert for this

13  Policy, I believe they would not pass the lapse-support or the self-support tests.

14        **How State Farm Determined a Customer's Cost of Insurance Rate**

15        27.    In 1994, following regulatory approval of the cost of insurance rates for Universal

16  Life insurance and the Policy at issue, State Farm provided its employees and independent

17  contractor agents a rate book with tables reflecting the age, sex, and rate class categories that were

18  the end result of State Farm's actuarial process of establishing its rate structure, as described above.

19  During the time this Policy was being sold, agents and State Farm employees used this rate book

20  and the rate tables therein to identify customers' cost of insurance rates.  A true and correct excerpt

21  of the 1994 version of the rate book that was in place when the Plaintiff purchased his Policy is

22  attached to this declaration as **Exhibit J**, and the relevant cost of insurance rate tables are located

23  on page D-23.  During the time this Policy was being offered for sale, an electronic version of the

24  rate tables also was developed and became available for use by agents and State Farm employees.

25

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 11 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

28.     As I understand Plaintiff's expert's analysis, it assumes that State Farm differentiated on the basis of how long each Insured held his or her Policy in assigning a cost of insurance rate.  That is not true. At all relevant times, State Farm's pricing philosophy for Universal Life insurance was to charge all Insureds of the same age, sex, and rate class (such as tobacco status) the same cost of insurance rate.  *See* Exhibit J at D-23.  Although some companies do differentiate their rates charged to customers on the basis of how long each Insured has held the policy (sometimes called "duration")—and thus charge less for people who went through the underwriting process more recently—State Farm did not vary its prices for Insureds on this basis. This means that all State Farm Insureds for this product who were of the same age, sex, and rate class were offered insurance at the same cost of insurance rate, regardless of when the Policy issued or the size of the death benefit.

29.     From my experience at State Farm, State Farm's decision not to differentiate on the basis of duration was important to the overall design of the rate structure, because instead of duration, State Farm differentiated on the basis of "age on the policy anniversary"—meaning that an Insured's monthly rate would change depending on that person's age on each annual policy anniversary, a concept sometimes referred to as "attained age."  Determining a policyholder's cost of insurance rate based on his or her age on the policy anniversary means that the cost of insurance rate is determined only by reference to the Insured's age (expressed in the Policy as "the Insured's age on the policy anniversary"), in addition to sex and applicable rate class, rather than the length of time an Insured has held a product.  This is also consistent with the phrase "each policy year," which has nothing to do with duration.  From my experience at State Farm, the reference to "each policy year" simply means that, for each year going forward from the date an individual policyholder's policy goes into effect, the rate table will show the cost of insurance rate by reference to the Insured's age in that year, on the anniversary date of the policy, the Insured's sex, and the Insured's applicable rate class.   I understand that State Farm's practice of not

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 12 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

differentiating based on duration sometimes is described by Plaintiff's expert as meaning that policyholders' rates are "pooled," in the sense that those who have recently purchased the policy are treated the same, and charged the same monthly cost of insurance rate, as those of the same age, sex, and rate class who purchased the policy at an earlier time.

30.     I understand that Plaintiff's expert also assumes that State Farm did not differentiate among Insureds on the basis of tobacco use in determining the applicable cost of insurance rates— i.e., that tobacco use status was "pooled" among Insureds. That also is incorrect. Tobacco use was (and still is) a critical determinant for an Insured's "applicable rate class." At State Farm, as is common in the industry, the applicable rate class, or underwriting class, for each Insured is established by reference to tobacco use, as well as to a more detailed consideration of each Insured's relevant health characteristics, including personal health history and related factors. That detailed determination is made through the company's underwriting process.

31.     Specifically as to tobacco, at all relevant times, State Farm offered Universal Life insurance to the public with rates that varied on the basis of the adult Insured's tobacco use. *See* Exhibit J at D-23. For standard health Insureds, State Farm offered three rate classes for each sex: (1) aggregate, which was used with Insureds age 0 to 20 and did not differentiate on the basis of tobacco use; (2) standard, also referred to as tobacco, which was used with Insureds age 20 and above who used tobacco; and (3) non-tobacco, which was used with Insureds age 20 and above who did not use tobacco. *See* Exhibit J at D-23. For Insureds, age, sex, and rate class were the only three factors that State Farm used to determine the rate to apply to the insurance on an individual policy.

32.     State Farm also developed substandard rate classes for Insureds who are shown through underwriting to have certain types of health issues. *See* Exhibit J at page D-14. To determine the monthly cost of insurance rates for an Insured in substandard health, State Farm would add an amount associated with that rating to the underlying amount for an Insured of the

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR                              - 13 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

same, age, sex, and rate class who was in standard health.  So for a 30-year old non-tobacco female who is rated Table 3, the monthly cost of insurance rate State Farm used would be the sum of the rate for a 30-year-old non-tobacco female in standard health and the Additional Table 3 substandard cost of insurance for an Insured at age 30.

33.     Once the underwriting process is concluded, the Insured is assigned a "rate class" or "underwriting class" for that person's Policy, indicating "Tobacco" or "Non-Tobacco" and also indicating any other departure from a "standard" rate class.  That rate class determination, together with the Insured's sex and age on each Policy anniversary, determines his or her cost of insurance rate from State Farm's rate tables.

34.     Again, I know from my experience at State Farm that it is these three factors—age on the policy anniversary, sex, and applicable rate class or "underwriting class"—that determine the Insured's cost of insurance rate in accordance with the categories developed by State Farm through the actuarial pricing process.

35.     I understand that Plaintiff claims that State Farm (a) did not differentiate between Insureds in its cost of insurance rates on the basis of tobacco use; and (b) did differentiate between Insureds by the length of time the policy was in force.  I understand that he supports this argument with his expert's report in *Vogt*, where the expert made these two assumptions by reference to testimony about the mortality table discussed above.  But as noted, a mortality table is not the same thing as an Insured's age, sex, and applicable rate class, or underwriting class, as referenced in the Policy, nor is it the same thing as the cost of insurance rate tables that State Farm develops for this Universal Life product.  The mortality table supplied the foundation for one experience factor State Farm considered in the development of cost of insurance rates.  It did not itself set out any rates or dollar amounts—just percentages expressing the likelihood that people with certain characteristics would die in a given time frame.  The mortality table also was structured differently from State Farm's cost of insurance rates in two other ways.  First, State Farm's mortality table did not

DECLARATION OF ALAN R. HENDREN
NO. 3:19-cv-06025-BJR

- 14 -

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1    differentiate on the basis of tobacco use, but State Farm's cost of insurance rates were

2    differentiated by tobacco use.  In fact, as discussed above, tobacco use always has been a rate class

3    for Universal Life policies.  Policyholders pay a higher cost of insurance rate if they use tobacco

4    and a lower rate if they do not.  Second, State Farm's mortality table presented different mortality

5    expectations for people of a given age and sex depending on the length of time an insurance policy

6    had been in force.  By contrast, State Farm's final cost of insurance rates are not differentiated by

7    duration in this way.  Every Insured of the same age, sex, and applicable rate class has the same

8    monthly cost of insurance rate regardless of how long they have held the policy.

9         36.    My understanding is that Plaintiff's expert in *Vogt* used State Farm's mortality table

10   as a substitute for age, sex, and rate class to construct an alternative cost of insurance rate structure,

11   and relied on testimony from State Farm actuaries regarding the mortality tables to support this

12   type of replacement rate.  When the State Farm witnesses were asked about the mortality tables in

13   *Vogt*, they described State Farm's mortality tables.  But, again, those tables were never the same

14   thing as age, sex, and applicable rate class, or underwriting class, as defined in the Policy, and

15   were different from State Farm's cost of insurance rates at issue in this litigation, for the reasons

16   stated above.  State Farm's actual rates did not differentiate on the basis of duration and did

17   differentiate on the basis of tobacco.  A life insurance policy that did not vary rates according to

18   tobacco use and did vary rates according to policy duration would be a fundamentally different

19   product than State Farm's Universal Life Policy at issue in this litigation.

20        37.    In my experience at State Farm, State Farm's internal mortality tables are not shared

21   with independent contractor agents for use in marketing the Policy to policyholders or selecting

22   any individual insured's cost of insurance rate based on their personal characteristics (age, sex,

23   and rate class), nor have I seen or heard anything to suggest that agents use the tables in such a

24   way, or that insureds expect that their individual cost of insurance rate will be drawn from those

25

DECLARATION OF ALAN R. HENDREN              - 15 -
NO. 3:19-cv-06025-BJR

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1    mortality tables, as opposed to the Cost of Insurance (COI) rate tables that are placed in the Life

2    Ratebook at the end result of the ratemaking process.

3

4    I declare under penalty of perjury under the laws of the United States of America that the foregoing

5    is true and correct.

6

7    Executed this _27_th day of March, 2021, in Le Roy, Illinois.

8

9

10                                                          _____

                                                                        Alan R. Hendren

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF ALAN R. HENDREN                  - 16 -
NO. 3:19-cv-06025-BJR

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988