# EXHIBIT 12

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                  NORTHERN DISTRICT OF CALIFORNIA
 4
 5    ELIZABETH A. BALLY,           )
      Individually and On Behalf    )
 6    Of All Others Similarly       )
      Situated,                     )
 7                                  )
                  Plaintiffs,       )
 8                                  )
          vs.                       )   Case No. 3:18-CV-04954-CRB
 9                                  )
      STATE FARM LIFE INSURANCE     )
10    COMPANY,                      )
                                    )
11                Defendant.        )
      _____)
12
13          REMOTE VIDEOTAPED DEPOSITION OF SCOTT WITT
14                       Milwaukee, Wisconsin
15                   Friday, February 12, 2021
16
17
                 REPORTED BY: Dayna Michelle Glaysher
18                      CSR No. 13079; RPR, CRR No. 28081
19
20
21
22
23
24
25

                                                               Page 1
```

```
 1   example a few moments ago, right?
 2      A.  I did.
 3      Q.  And do you advise your clients that -- strike
 4   that.
 5           We can move on.                                    11:48:23
 6              MR. LYTLE:  Deborah, we've been going for an
 7   hour and 45 minutes here.
 8              Is now a good time for a quick break?
 9              MS. STEIN:  Yes, sure.
10              MR. LYTLE:  Okay.                               11:48:55
11              THE VIDEOGRAPHER:  Okay then.  This is the
12   end of Media Unit 1.
13              We are going off the record at 11:48 AM.
14              (Recess taken.)
15              We are going back on the record at 12:01 PM.    12:01:35
16              And this is the beginning of Media Unit 2.
17   BY MS. STEIN:
18      Q.  Mr. Witt, have you authored any publications that
19   address the methodology that you used in your work in
20   this case?                                                 12:01:51
21      A.  Nothing outside of the documents that have been
22   included in my reports for this case.
23      Q.  I'm asking whether you authored any publications
24   that addressed the methodology that you used in your
25   work in this case.                                         12:02:16
```

Page 65

```
 1   experience at Northwestern Mutual and subsequent 15, 16
 2   years of experience as a fee-only insurance advisor, and
 3   employing, you know, actuarial techniques on almost a
 4   daily basis.
 5       Q.  And what skills does it include?                    12:11:39
 6             MR. LYTLE:  Object to the form.
 7             THE WITNESS:  Well, it would include the
 8   skill set that actuaries have.  The ability to analyze
 9   complex situations, analyze risks, perform calculations
10   as necessary.  You know, it's a -- it's a wide ranging      12:12:02
11   skill set.
12   BY MS. STEIN:
13       Q.  Any other skills?
14       A.  Well, I mean the ability to operate in the
15   insurance world and to marry the insurance concepts with    12:12:22
16   mathematical concepts, the ability to explain technical
17   concepts in non-technical language hopefully.  Those
18   are -- you know, those are skill sets that actuaries
19   have.
20       Q.  And which of those skills did you utilize in your   12:12:41
21   expert work in this case?
22       A.  Frankly, there wasn't a lot of actuarial
23   expertise or judgment I should say that was required.
24   I -- I would say that I needed expertise just to be able
25   to sift through the documents, recognize what was needed    12:13:03
```

Veritext Legal Solutions
866 299-5127

```
 1   in order for me to calculate lost account value.
 2          But for the most part -- for the most part it was
 3   a relatively straightforward exercise applying
 4   plaintiffs' theory, and using that theory to come up
 5   with lost account value for each policyholder.              12:13:27
 6      Q.   And so the skills that you utilized in your
 7   calculation were computational?
 8      A.   I think that's fair to say.
 9      Q.   Okay.  So we talked about actuarial expertise and
10   the damages calculation issue.                              12:14:00
11          Any other things that you consider yourself an
12   expert in?
13      A.   I mean I have expertise in computer modeling.
14   That's tied in with computational and actuarial
15   expertise.  You know, those skills are intertwined.         12:14:23
16      Q.   Do you consider yourself an expert in SAS?
17      A.   I do not.  I used to be, but not now.
18      Q.   And you don't consider yourself an expert in
19   policy interpretation, do you, Mr. Witt?
20      A.   I do not.                                           12:14:44
21      Q.   Okay.  And you're not offering an opinion in this
22   case on policy interpretation?
23      A.   I am not.
24      Q.   Okay.  And you don't consider yourself an expert
25   in life insurance regulation, right?                        12:14:52
```

Page 72

```
 1   BY MS. STEIN:
 2      Q.  Why do you not know how to answer the question?
 3             MR. LYTLE:  Object to the form.
 4             THE WITNESS:  I developed a straightforward
 5   methodology that identified the lost account value at a        12:43:05
 6   particular point in time.  It was on point.  It was
 7   directly answering the question at hand.
 8   BY MS. STEIN:
 9      Q.  So your methodology was created solely for the
10   purpose of this litigation?                                    12:43:26
11             MR. LYTLE:  Object to the form.
12             THE WITNESS:  Yeah.  I mean it's -- I guess
13   logic is the most important ingredient that I used.  And
14   that manifested itself in the methodology that was used
15   for this case.                                                 12:43:55
16   BY MS. STEIN:
17      Q.  Has your methodology been tested?
18             MR. LYTLE:  Object to the form.
19             THE WITNESS:  Oh, well, it was tested
20   rigorously by opposition in the Vogt case in Missouri,         12:44:16
21   and I've tested it substantially.
22   BY MS. STEIN:
23      Q.  Has your methodology been subject to peer review
24   outside of litigation?
25      A.  No.                                                     12:44:36
```

Veritext Legal Solutions
866 299-5127

1   Q.  Did you run it to past any of your actuarial
2   colleagues to see what they thought?
3   A.  No.
4   Q.  What controlling standards did you use in
5   applying your methodology?                                12:44:54
6           MR. LYTLE:  Object to the form.
7           THE WITNESS:  I -- my work speaks for
8   itself.  I -- I don't have any standards to point to.
9   It's my work product is there, everything's been turned
10  over.  The other side can verify everything I've done.    12:45:11
11  BY MS. STEIN:
12  Q.  Did you rely on any literature in developing your
13  methodology?
14          MR. LYTLE:  Object to the form.
15          THE WITNESS:  It is -- it is a very                12:45:31
16  simple -- it's simultaneously simple and incredibly
17  complex.  But the complexity comes about from the data,
18  not from the methodology itself.  The methodology
19  identifies excess, cost of insurance rates or rates
20  where there is an excess cost of insurance above and      12:46:00
21  beyond the underlying pricing mortality.
22          Substitutes those rates back into the -- the
23  exact formula that is specified in the contractual
24  language.  I recalculate what the account value would've
25  been using transactions that actually occurred using      12:46:17

Page 89

```
 1              MS. STEIN:  Thank you.
 2              THE WITNESS:  Yeah.
 3              MR. LYTLE:  If it -- if it helps you,
 4   Deborah, we are happy to take a quick break now.  And if
 5   that's something that you want to -- because you're on       01:04:37
 6   that line of questioning, we can take a quick break now
 7   and try to identify that for you, if that's helpful.
 8              MS. STEIN:  I will want to see it.  But I'm
 9   going to press on for now.  So I'm fine doing it on a
10   break.                                                        01:04:51
11   BY MS. STEIN:
12      Q.  So Mr. Witt, were you -- were you the one to
13   decide that these were the -- the numbers, the mortality
14   experience numbers were the numbers to use for building
15   your model?                                                   01:05:13
16              MR. LYTLE:  Object to the form.
17              THE WITNESS:  I'd say it was the -- the
18   counsel that developed the theory of what their damages
19   were.  But my use of this specific mortality table was
20   entirely based on State Farm's documents and testimony.       01:05:37
21   BY MS. STEIN:
22      Q.  And in making that determination did you exercise
23   your actuarial science judgment?
24      A.  I didn't have to.
25      Q.  Why not?                                               01:05:50
```

Page 102

1    A.  I felt like my hands were tied.  The -- on

2  document after document and testimony after testimony,

3  State Farm said that this was the pricing mortality.

4    Q.  What do you mean by pricing mortality?

5    A.  The mortality table that was used in the pricing    01:06:13

6  and re-pricing exercise.

7    Q.  Did you have to do any math to reach the

8  conclusion that these were the right numbers to use?

9         MR. LYTLE:  Object to the form.

10         THE WITNESS:  Again, I didn't have to.  It    01:06:41

11  was -- it was self-evident.  These numbers, these rates

12  were contained in asset share testing.  Multiple State

13  Farm witnesses identified this table with the

14  adjustments that are noted in the New Jersey actuarial

15  memorandum as the appropriate table to represent pricing    01:07:01

16  mortality.

17  BY MS. STEIN:

18    Q.  In your experience working as an actuary, did you

19  ever have an occasion to have to unload expenses from

20  COI rates?    01:07:31

21         MR. LYTLE:  Object to the form.

22         THE WITNESS:  I have engaged in exercises

23  that effectively do that through reverse engineering.

24  And I try to -- I try to identify how a company is

25  recapturing expenses and -- and how it affects the    01:07:59

```
 1              MS. STEIN:  Thank you.

 2              THE WITNESS:  Yeah.

 3              MR. LYTLE:  If it -- if it helps you,

 4   Deborah, we are happy to take a quick break now.  And if

 5   that's something that you want to -- because you're on        01:04:37

 6   that line of questioning, we can take a quick break now

 7   and try to identify that for you, if that's helpful.

 8              MS. STEIN:  I will want to see it.  But I'm

 9   going to press on for now.  So I'm fine doing it on a

10   break.                                                         01:04:51

11   BY MS. STEIN:

12      Q.  So Mr. Witt, were you -- were you the one to

13   decide that these were the -- the numbers, the mortality

14   experience numbers were the numbers to use for building

15   your model?                                                    01:05:13

16              MR. LYTLE:  Object to the form.

17              THE WITNESS:  I'd say it was the -- the

18   counsel that developed the theory of what their damages

19   were.  But my use of this specific mortality table was

20   entirely based on State Farm's documents and testimony.        01:05:37

21   BY MS. STEIN:

22      Q.  And in making that determination did you exercise

23   your actuarial science judgment?

24      A.  I didn't have to.

25      Q.  Why not?                                                01:05:50
```

```
 1        A.   I felt like my hands were tied.  The -- on

 2   document after document and testimony after testimony,

 3   State Farm said that this was the pricing mortality.

 4        Q.   What do you mean by pricing mortality?

 5        A.   The mortality table that was used in the pricing    01:06:13

 6   and re-pricing exercise.

 7        Q.   Did you have to do any math to reach the

 8   conclusion that these were the right numbers to use?

 9             MR. LYTLE:  Object to the form.

10             THE WITNESS:  Again, I didn't have to.  It          01:06:41

11   was -- it was self-evident.  These numbers, these rates

12   were contained in asset share testing.  Multiple State

13   Farm witnesses identified this table with the

14   adjustments that are noted in the New Jersey actuarial

15   memorandum as the appropriate table to represent pricing     01:07:01

16   mortality.

17   BY MS. STEIN:

18        Q.   In your experience working as an actuary, did you

19   ever have an occasion to have to unload expenses from

20   COI rates?                                                   01:07:31

21             MR. LYTLE:  Object to the form.

22             THE WITNESS:  I have engaged in exercises

23   that effectively do that through reverse engineering.

24   And I try to -- I try to identify how a company is

25   recapturing expenses and -- and how it affects the           01:07:59
```

```
 1   competitiveness of a policy.

 2   BY MS. STEIN:

 3      Q.  And did -- in doing that did you -- do you follow

 4   the same steps that you follow here?

 5              MR. LYTLE:  Object to the form.                01:08:16

 6              THE WITNESS:  Similar, except I normally

 7   don't have the benefit of knowing what a company's

 8   pricing mortality is.  And so I would use more like an

 9   industry standard to compare it to.

10   BY MS. STEIN:                                             01:08:36

11      Q.  Now when you say that you -- you followed State

12   Farm's -- the way they price mortality, is there

13   anything that you didn't follow that State Farm did with

14   respect to mortality?

15              MR. LYTLE:  Object to the form.                01:08:51

16              THE WITNESS:  With respect to the use of

17   this table, I believe that I've faithfully reproduced

18   what was used in the original pricing.  And in the

19   re-pricing, consistent with multiple documents that were

20   produced by State Farm, testimony of multiple witnesses,  01:09:23

21   and perhaps more importantly, no evidence to the

22   contrary that -- that I can recall right now that would

23   suggest that I should've used anything else.

24   BY MS. STEIN:

25      Q.  Is there anything else that State Farm did in     01:09:40
```

Page 104